**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

        CASE NO. 08-CR-571-JG-1

v.

        HON. JOHN GLEESON

ISRAEL WEINGARTEN,
        Defendant.

| | |
|---|---|
| Andrea Goldbarg | Demosthenes Lorandos, Ph.D., J.D. |
| Rachael J. Nash | Ashish S. Joshi |
| United States Attorneys Office | Lorandos & Associates |
| 271 Cadman Plaza East | Attorneys for the Defendant |
| Brooklyn, NY 11201-1820 | 214 North Fourth Avenue |
| (718) 254-7578 | Ann Arbor, MI 48104 |
| | (734) 327-5030 |

# DEFENDANT'S SENTENCING MEMORANDUM

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................iii

DEFENDANT'S ARGUMENT.........................................................1

PART ONE - CONTEXT..................................................................1

    THIS HONORABLE COURT WAS KEPT IN THE DARK.............................1

    DEFENDANT'S OBLIVIOUSNESS WAS HIS REAL CRIME........................3

    WHO IS ISRAEL WEINGARTEN?......................................................3

        What do the Rabbis say?..........................................................3

        What do his Director and his students say?...................................4

        How do friends and neighbors describe Rabbi Weingarten?.................4

        FULL CUSTODY - - What did his family friends and neighbors say?......5

        What about this *Single Father* headed family?............................6

    WHO IS FEIGE (Anshin) WEINGARTEN ?..........................................7

        Feige in the Community............................................................7

        Feige knows Freme Leah's allegations are false.............................8

        Feige has *serious* mental health issues......................................9

        Feige is a criminal with *serious* psycho-sexual pathology................9

            Sexual assault against Yoil.................................................9

            Sexual assault against Chayeh Sureh......................................9

            Sexual assault against Yakev Nuchem.....................................10

            Sexual assault against Chaneh Goldeh.....................................10

            Sexual assault against Shmiel Meir.........................................10

    WHO IS FREME LEAH WEINGARTEN ?..........................................10

i

Freme Leah was promiscuous, with serious sexual boundary issues........10

Freme Leah sexually, with older neighbor...................11

Freme Leah sexually, with her maternal Aunt..............11

Freme Leah sexually, with her brother Yoinesun.........11

Freme Leah, with her infant brother Shmiel Meir.........11

Freme Leah is a criminal with *serious* psycho-sexual pathology..............12

Sexual assault against Chayeh Sureh..............................12

Sexual assault against Chaneh Goldeh..........................12

Freme Leah is a pathological liar...............................................12

What do *eye witnesses* say?..........................................12

What do *teachers - - principals - - peers - - friends - -* say?..........13

"sex-around-the-clock" claim?  What do *eye witnesses* say?........14

PART TWO  -  SCORING THE GUIDELINES..............................................15

The Offense Level.......................................................................15

Grouping / Combining of the Offenses................................18

Defendant's Criminal History.............................................19

Guideline's Range of Imprisonment...................................20

Sentencing in a Post-*Booker* World...................................20

"sufficient, but not greater than necessary"..............20

Mitigating Factors Present in This Case............................23

DEFENSE SENTENCING RECOMMENDATIONS...................................26

## TABLES OF AUTHORITIES

### *Cases*

*Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 2365 (2000)............................. 16

*Gall v. U.S.*, 552 U.S. ___, 128 S.Ct. 586, 599 (2007).................................................... 26

*Kimbrough v. United States*, 552 U.S. ___, 128 S.Ct. 558, 564 (2007) ......................... 20

*Kimbrough v. United States*, 552 U.S. ___, 128 S.Ct. 558, 574 (2007) ......................... 22

*Kimbrough v. United States*, 552 U.S. ___, 128 S.Ct. 558, 586 (2007) ......................... 23

*Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035 (1996)............................................ 25

*Reno v. Koray*, 515 U.S. 50, 115 S.Ct. 2021 (1995)....................................................... 24

*See United States v. Cordoba Murgas*, 233 F.3d 704, 709 (2d Cir.2000) ...................... 16

*States v. Nellum*, 2005 WL 300073 (E.D.Ind. 2005) ...................................................... 23

*States v. Nellum*, 2005 WL 300073, 4 (E.D.Ind. 2005) ................................................... 25

*States v. Volpe*, 78 F.Supp.2d 76, 89 (E.D.N.Y. 1999).................................................... 25

*U.S. v. Delmarle*, 99 F.3d 80, 85 (2d Cir. 1996)............................................................. 20

*U.S. v. Jones*, 460 F.3d 191, 195 (2d. Cir. 2006)............................................................ 26

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006) ...................................... 25

*United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005)......................................... 20

*United States v. Carmona-Rodriguez*, 2005 WL 840464, 4 (S.D.N.Y. 2005)........... 23, 25

*United States v. Concepcion*, 983 F.2d 369, 389 (2d Cir.1992), *cert. denied sub nom*

    *Frias v. United States*, 510 U.S. 856, 114 S.Ct. 163 (1993)........................................ 16

*United States v. Devalle*, 967 F.Supp. 781 (E.D.N.Y. 1997)........................................... 25

*United States v. Gigante*, 94 F.3d 53, 56 (2d Cir.1996), *cert. denied sub nom Aloi v.*

    *United States*, 522 U.S. 868, 118 S.Ct. 179 (1997) ...................................................... 16

*United States v. Guiro*, 887 F.Supp. 66 (E.D.N.Y. 1995)..................................................25

*United States v. Hanrington*, 741 F.Supp. 968, 975 (D.D.C. 1990) ................................25

*United States v. Johansson*, 249 F.3d 848, 853-54 (9th Cir. 2001) ................................23

*United States v. Lucania*, 379 F.Supp.2d 288, 297 (E.D.N.Y. 2005) .............................23

*United States v. Neiman*, 828 F.Supp. 254 (S.D. N.Y. 1993) ..........................................25

*United States v. Ochoa-Suarez*, 2005 WL 287400 (S.D.N.Y. 2005)...............................23

*United States v. Ranum*, 353 F.Supp.2d 984 (E.D. Wis. 2005) .......................................22

*United States v. Rausch*, 570 F.Supp.2d 1295, 1308 (D.Colo. 2008).............................25

*United States v. Sisti*, 91 F.3d 305, 312 (2d Cir.1996) ....................................................22

*United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir.1996)............................................22

*United States v. Thomas*, 355 F.3d 1191, 1202 (9th Cir. 2004).......................................23

*United States v. Wong*, 40 F.3d 1347, 1382 (2nd Cir. 1994) ...........................................25

### **_Statutes_**

18 U.S.C. § 2241 ..........................................................................................................16, 17

18 U.S.C. § 2241(a) ...........................................................................................................18

18 U.S.C. § 2423(a) .....................................................................................................16, 17

18 U.S.C. § 3553(a)(2)........................................................................................................21

18 U.S.C. § 3553(b)(2)(A)(ii)(1) .......................................................................................24

18 U.S.C. § 3582(a) ............................................................................................................21

18 U.S.C. § 3585(b) ............................................................................................................26

U.S.C. § 2423(b) ...........................................................................................................17, 18

U.S.S.G. § 3D1.4 ................................................................................................................19

## *Other Authorities*

The Sentencing of Elderly Criminals, 29 Am. Crim. L. Rev. 1025-44 (1992)................. 26

Barbaree, H. E.; Langton, C.M.; Blanchard, R. and Cantor, J.M. (2009) "Aging Versus

Stable Enduring Traits as Explanatory Constructs in Sex Offender Recidivism:

Partitioning Actuarial Prediction Into Conceptually Meaningful Components" 36

*Criminal Justice and Behavior* 443; May, 2009.......................................................... 25

Campbell, T.W. (2nd Ed) (2007) *Assessing Sex Offenders – Problems and Pitfalls*

Second Edition, Spring Field, Illinois, Charles C. Thomas Publishers ........................ 25

Correctional Health Care Addresses The Needs Of Elderly And The Chronically Ill And

Terminally Ill Inmates, U.S. Department of Justice, National Institute of Corrections,

2004 edition, pp. 9-10 ................................................................................................... 26

Harris, A. J. R., Phenix, A., Hanson, R. K., & Thornton, D. (2003). *Static-99 coding*

*rules: Revised 2003*. Ottawa: Department of the Solicitor General of Canada ........... 25

## DEFENDANT'S ARGUMENT

## PART ONE - CONTEXT

Respectfully, by newly retained counsel, Defendant argues that in Sentencing under our Federal system - context is everything.  In what context did the alleged events occur?  What was the context of the time?  What was the context of the community?  What was the context of the parties to the litigation?  What is the context now?  What is the context and contour of the community's needs now?

## THIS HONORABLE COURT WAS KEPT IN THE DARK

Respectfully, Defendant argues that this honorable Court was kept in the dark by the pre-trial process of the two retained attorneys[1] and the inept bumblings of the Defendant representing himself.  The incompetent ramblings of prior retained counsel and the Defendant's inept bumblings denied this honorable Court access to Rabbinical Court after Rabbinical Court which investigated and took testimony from Freme Leah[2] and Feige.  *But for* the lame pre-trial process of prior retained counsel the *Sat Mar* community - could have easily given this honorable Court not one, not two but three

---

[1]   No doubt Mr. Rhodes and Mr. Stutman have malpractice insurance.  And yet they give the Government Affidavits designed to hurt this Defendant.  What aplomb; what grace; what selfless dedication to the rights of the downtrodden.

[2]   In these papers, the primary complaining witness is referred to as Freme Leah - the name she testified she no longer uses as she testified she has left the community and religious life - but this is the name used by the witnesses and Affiants (spelled variously by the Yiddish speakers) who knew her directly.  For the purposes of making a record, witnesses and Affiants were constrained by truthfulness and accuracy to use the name they knew this complaining witness by.  This witness is also referred to in these papers as "Jane Doe" - - another name she does not use - because that is the name assigned to her in a variety of additional papers.

1

complete reports from three separate Rabbinical Courts, in three separate countries; who thoroughly investigated Freme Leah and Feige's allegations and found them to be without merit.

The *non*-investigation of prior retained counsel denied this honorable Court access to New York *Children's Protective Services* workers and the New York *Foster Care Services* workers Brian Deluhy - Jennifer Heller - Deborah Beler who carried on active investigatory, supervisory and therapeutic relationships with this family *for years*. Through their investigatory, supervisory and therapeutic efforts the ridiculous claims of Freme Leah and Feige were found to be fraudulent and the minor Weingarten children were placed by the Family Court in the custody of Defendant Israel Weingarten.

The circuitous and hidden pre trial process of prior retained counsel denied this honorable Court access to *eye witnesses* who received apologies from Freme Leah *that she had lied and lied and lied about Defendant Weingarten and sexual contact*.  Six separate apologies for repeated lies about sex with Father, made to six separate Weingarten children and six separate requests for forgiveness.  None of this information was given to this honorable Court.

With respect to Freme Leah's outrageous August 19th, 1997 through September 12th, 1997 "non-stop, hardly remember getting dressed . . "  sex-around-the-clock claim - - thoroughly unprepared prior retained counsel denied this honorable Court direct access to *a dozen eye witnesses* - Yidel Rotter; Yakev Bar Friedman; Berish Kraus; Shulem Kraus; Yosef Chaim Cohen; Sureh Cohen; Esther Englander; Gita Krausz; Rachael

Krausz; Miriam Friedman; Ester Krausz and Alexander Krausz *actually saw* Freme Leah during those 25 days in Antwerp, Belgium.[3]


## DEFENDANT'S OBLIVIOUSNESS WAS HIS REAL CRIME

The real crime the Defendant committed was being oblivious to the devastating abuse perpetrated by Feige (Anshin) Weingarten.   The real crime the Defendant committed was being oblivious to Feige (Anshin) Weingarten taking Yoinesun and Freme Leah as her sex partners.  The real crime the Defendant committed was being oblivious to Feige (Anshin) Weingarten viciously sexually and physically assaulting *all* of the Weingarten children. . . for years.

But what is the context?


## WHO IS  ISRAEL WEINGARTEN ?

### What do the Rabbis say?

Rabbi Israel Weingarten is a very Honor full & intelligent Rabbi.

Rabbi Shea Glanz

Rabbi Weingarten...extremely sincere, sensitive and very sympathetic. . .

Rabbi Uziel Frankel

Rabbi Israel Weingarten . . . exemplary fineness, sincerity and concern for others. . .

Rabbi David Wolpin

. . .a very pious and upright individual.  The allegations. . .preposterous, and outrageously fabricated falsehoods. . .

Rabbi David Weisberger

. . . piety with the depth of character and dedication to Torah.

Rabbi Moshe Rubin

---

[3] *please see:* EXHIBIT A Witness and Affiant Statements -  these will be referred to as well as digested, through out.

. . .an honest reliable and trustworthy person. . . always a forgiving - sympathetic and understanding father.

Rabbi Efrayim Friedman

**Defendant Weingarten was an esteemed Talmudic and rabbinical scholar and the Dean of the MACHEZEKEI HADDAS** *schul* **on Ostenstraten, Antwerp, Belgium** <u>**What do his Director and his students say?**</u>

He was a founder of a school, this school had teachers and staff, each receiving a weekly salary. . .except for one person, Rabbi Weingarten. . . I had the luck to learn in this school where he brought up each child with utmost devotion.

Student Naftali Englander

I have known...for over 20 years.  Rabbi Israel Weingarten...directed his own Talmudical High School for boys here in Belgium, to the utmost satisfaction of all the parents and students alike.

Bais Rachel Girls Academy - Director Robert Friedmann

. . . integrity, righteousness and truth. . . a very highly esteemed and respected pedagogue. . . his ability to instill in our hearts a sense of morality, ethical values and properness.

Student Joshua Gottesman

Rabbi Yisrael Moishe Weingarten... A "Tzadik", a title that is being used "only" for people who are famous to be true people without sin!  Many students tried the most they can to grow, and reach a high level in Talmud, and then to be welcomed to Rabbi Weingarten's college in Belgium.

Student Jehuda J. Rolnitzky

I can attest that Rabbi Weingarten and his family are the embodiment of what an observant Jew should strive to become. . . utmost politeness and gentleness. . .

Student Andrew Schiller
[Eagle Scout, BS in Electrical Engineering, Cum Laude in 2008]

Having become familiar with him....I have felt fortunate in the extreme.

Student Michael Levine

<u>**How do friends and neighbors describe Rabbi Weingarten?**</u>

I personally know this Rabbi for more than 20 years. . . An honest, trustworthy, spiritual Rabbi . . .a straight forward and correct Person. .

David Rutttner

Rabbi Yisrael Moshe Weingarten. . . Is known throughout Monsey as a person with a sterling reputation and of upright character traits.

David E. Chavoly

4

. . .very respectable, Honored and beloved Rabbi Israel Weingarten. . .

Mrs. Mintza (Landau) Katz

I am a 38-year-old native of Los Angeles and a graduate of University of California.  . . . Rabbi Weingarten is of an epitome of gentleness.   His steady paternal guidance of his youngest son reminds me of those idealized fathers of 1950s television.

Ben Greenberg

. . . a religious honest man, an upright citizen who raises his children with decent morals and values to be admired.

A. & C. Weinbaum

. . . a central, supportive and beloved figure.

Miriam Braun

. . . an excellent teacher. . .

Alexander Krauz

. . . a brilliant and educated man. . .

Helene Horowitz

. . . superlative standards of integrity, honesty. . . [with] . . rigorous disciplinary exercise of word and manner. . .

David Drossman

. . . an exceptional nice person. . . . school for young boys and whoever studied there really turned out well, well mannered and refined people.

Israel Gold

. . . Rabbi as an extremely good and decent person. . . a man that can be trusted implicitly.

Naftoli S. Bodenheimer

. . . very pleasant. . . righteous, he inspires one who needs to be inspired, he helps one who needs help. . . an innocent and righteous person. . .

Ivan Vysotski

**Defendant Weingarten emigrated to Monsey, New York  - and after his six younger children & Rabbi Weingarten fought off the ridiculous claims of ex-wife Feige _and daughter Freme Leah_ - - And the Family Court granted Weingarten FULL CUSTODY - - What did his family friends and neighbors say?**

 A fine honorable person. . .   Rebbe Weingarten was always a father and a mother to his children. . . honest, fine and modest person. . .

Yitta Landau

5

A very, very special man. . . .devoted to G-d and devoted to his family . .

<div align="right">Sarah Greenfeld</div>

. . . beloved and devoted father.  I . . .know Rabbi Weingarten as someone who strives for the best for his children. . .

<div align="right">E. Turnheim</div>

. . . a very devoted father to all of his children.

<div align="right">Robert Friedmann</div>

. . . a great friend as well as a great Father.

<div align="right">Manfred & Malka Knopfler</div>

. . . Father that always gave them the utmost support.

<div align="right">Ester Baum</div>

**What of the Weingarten family _after_ Defendant and his six younger children fought off the ridiculous claims of ex-wife Feige _and daughter Freme Leah - -_ After the Family Court granted Weingarten FULL CUSTODY - - What did his family friends and neighbors say - about this _Single Father_ headed family?**

. . . his home, it is a lively, cheerful, and happy home.   His children are the envy of the neighborhood. . .

<div align="right">Naftoli S. Bodenheimer</div>

 . . exemplary fineness, sincerity and concern for others . . .

<div align="right">Rabbi David Wolpin</div>

On several occasions have I had opportunity to observe Rabbi Weingarten's relationship with his children.  It is one of great respect and devotion.  He also goes out of his way to protect them against harmful influences. . .

<div align="right">Adam Brudzevski<br>[Mensa - Applied Philosophy at the University of Lund, Sweden]</div>

. . . sincere character. . . serious. . . mature. . .

<div align="right">Mrs. B. Seidenfeld</div>

. . . constant and loyal sources of warmth, generosity, love and kindness. .

<div align="right">David Drossman</div>

. . . Warmth & Friendliness . . .

<div align="right">Manfred & Malka Knopfler</div>

<div align="center">6</div>

. . . How beautiful the songs they used to sing together with their father, the heart would melt from this.

<div align="right">Mrs. Mintza (Landau) Katz</div>

Rabbi Weingarten's children are the most talented and extra ordinary mannered children I ever met . . .

<div align="right">Chana Cohen</div>

I am a teacher. . . Chayeh is a mature, well grounded adult.  It is a pleasure to be in her presence. . .

<div align="right">Rachel B. Cik</div>

I was a teacher. . . these two girls were wonderful students and with their excellent behavior were really a pleasure to deal with.

<div align="right">Mrs. F. Leitner</div>

As a teacher. . . Sheindal, who was now in her father's custody, blossomed into a happy, confident young lady.   I have visited the Weingarten household on countless occasions. It is a real home full of laughter and happiness.  Nothing suggesting anything amiss. . .

<div align="right">Henchie Eizikovits</div>

. . . son Yoil, who I see as a role model for what an, as of yet unmarried Jewish man, my age, should be like.

<div align="right">Adam Brudzevski<br>[Mensa - Applied Philosophy at the University of Lund, Sweden]</div>

It is impossible to describe the pain & torture this poor family is going through & suffering from the mother & rotted sister, because of the false terrible lie they are spreading around. . .

<div align="right">Rabbi Jacob Landau<br>[volunteer Rabbi in Several jails.]</div>

## WHO IS FEIGE (Anshin) WEINGARTEN ?

### Feige in the Community:

In my experiences with so many messy divorce/custody situations within the community, these horrendous allegations do not come to me in any way as a shock.  Shamefully, many scorned wives and dysfunctional children will seek to hang an innocent husband/father with a noose made from fictitious molestation allegations.  In nearly every case similar to the above that I have experienced, there was a rabbi or were rabbis and/or other community activist behind the wife (*nearly always from the same related pool*) assisting he in the false allegations.

<div align="right">Rabbi Uziel Frankel</div>

<div align="center">7</div>

In the middle of the day we took the class outside to play.  Suddenly I see a white mini-van stops next to the children and Mrs. Weingarten ran out fast from the car, and ran to Shindel pulling her with all her strength trying to pull her into the car.  Shindel screamed hysterically for help- and with all her strength tried to get away from the grabbing painful hands.   Right after this incident Mrs. Weingarten with her harmful helpers, spread around ugly posters in the streets to dirty our family.  They wrote a false story on me that I hit the Mother.   A few days later she filed false allegations in court against her husband...  From that time, started  very hard and painful months - where the children were taken away from their father.  Until finally the court and CPS realized and proved the false allegations and returned the children to the Father.

<div align="right">Mintza (Landau) Katz</div>

She called...her 2 nephews who are big & strong guys and they pulled the Rabbi out of his home & beat him up with a metal stick in front of the children while they were screaming & crying & scared to death, and the mother was laughing.

<div align="right">Rabbi Jacob Landau</div>

When the children are talking about their mother they give a shudder.    ...so they should awake with a scare.    ...she knocked with it on the head!!!   When a child wasn't feeling well, she forced to go to school.     ...her fever went up, and the teacher sent her home.  When she came home the mother locked the door and didn't let her in.  She sat outside on a hot day, under the sun without the ability to drink or to lay down, until the time she comes home every day. . . . In the meantime, my older sister told the Weingarten children that their mother is here.  They all got frustrated and pale for a few seconds, and then escaped from a back door.

<div align="right">Yitta Landau</div>

**Feige knows Freme Leah's allegations are false:**

Feige also told me that she knows that Israel is not guilty of abusing Friemelei and that the allegations are false. . . that Friemalea had ruined the relation between them. .

<div align="right">Moishe Kraus</div>

Feige told me that she did not do enough to protect Israel against false allegations made by Friemelei.  Feige further told me that she know that Friemelei was corrupt and dirty . . and that all of Friemelei's accusations were false. . .

<div align="right">Yiddel Rotter</div>

[Feige] told the kids in my father's presence that he is having some sexual relationships with some women, and afterwards she admitted to me that it was all lies and she just did it to hurt my father. . . .

<div align="right">Yoil Weingarten</div>

[Feige]...admitted to me that it was all lies and she just did it to hurt my father. . . [Feige] told me: "I'll make up stories that you are having sex with Tatti and spread it all over! . . . And don't worry, everyone will believe me!"

<div align="right">Chayeh Sureh Weingarten</div>

**But Feige has *serious* mental health issues:**

Rabbi Leibish Rottenberg & Bais Rachel Girls Academy - Director Robert Friedmann consulted on getting Feige Weingarten to a psychiatrist and following the evaluation - - ...the psychiatrist confirmed that she needs psychiatric treatment.

<div align="right">Robert Friedmann</div>

**And Feige is a criminal with *serious* psycho-sexual pathology:** [4]

**Sexual assault against Yoil:**
In 1999 my mother Feige(Anshin) Weingarten touched my private parts and later on came to my bed and sexually assault me. . .
She would put her finger into her rectum and then push the same finger into my face and mouth and spit into my mouth. . .
Yenti together, one across the other partilly naked, I was screaming  on them so my mother Feige (Anshin) Weingarten and my sister Freime Leah Weingarten threatened me....

<div align="right">Yoil Weingarten</div>

**Sexual assault against Chayeh Sureh:**
Feige(Anshin) Weingarten beat me. . .
. . .came to my room daily and sexually abused me.     She would hold her hand over my mouth so no one could hear me scream. . .

---

[4] Curiously, this is an individual the Government is trying to protect.  Upon information and belief, documents claim that the FBI *threatened* Rockland County social services personnel, when the Family Court stripped Feige Weingarten of custody and returned the children to defendant Israel Weingarten **- - - Furthermore - - -** Upon information and belief, on April 21st of this year Assistant United States Attorney Andrea Goldbarg and FBI Special Agent Jessica Miller inserted themselves *unannounced and unbidden*, into the Rockland County custody proceeding concerning the Weingarten minors.  When questioned it was determined that AUSA Goldbarg and FBI Spc. Agt. Miller proposed to testify that adult Weingarten children with custody of the Weingarten minors were "crazy" and "brainwashed".  **- - - Furthermore - - -** Witnesses attest that after the Family Court rebuffed Goldbarg & Miller's request to inject themselves into the Rockland County Family Court proceedings - - AUSA Goldbarg and Spc. Agt. Miller spent approximately an hour with Rockland County District Attorney Thomas Zugibe and/or DA Investigator Mary Murphy.  NOTE: A criminal investigation into charging Feige and Freme Leah is underway.  The District Attorney's office had been interviewing the adult Weingarten children.   When 23-year-old Chayeh Sureh Weingarten telephoned her attorney to report the AUSA and FBI agent with DA Zugibe, Agent Jessica Miller assaulted Chayeh and screamed at the girl "I'm going to arrest you!!"
***If*** counsel for Defendant Israel Weingarten had acted as Spc. Agt. Miller *or* AUSA Goldbarg, ***then*** the Government would be screaming for an Obstruction of Justice warrant.

[She] would also put her finger into her rectum...into my face or mouth and threaten to kill me if I told my "Tatti". . .

[She] chased me with a knife yelling...the same finger into my face and mouth and spit into my mouth.

<div align="right">Chayeh Sureh Weingarten</div>

**Sexual assault against Yakev Nuchem:**

In 1997 until 2000 my mother assaulted my sexually several times.  I saw my mother sexually assaulting the other children as well. . . .

In 1997 my mother would put her finger into her rectum and then push the same finger into my face and nose and spit in my face.

<div align="right">Yakev Nuchem Weingarten</div>

**Sexual assault against Chaneh Goldeh:**

My mother, Feige(Anshin) Weingaten beat me. . .

In 2001 my mother, Feige (Anshin) Weingarten began to come to my room daily and sexually abuse me.  Sometimes she would hold her hand over my mouth so no one could hear me scream. . .

[She would] . . put her finger into her rectum and push this same finger into my face or mouth and threaten to kill me if I told . . .

She also would put her finger into her rectum and then push the same finger into my face and mouth and spit into my mouth. . . .

[She would] . . threaten to kill us or to kill herself.

<div align="right">Chaneh Goldeh Weingarten</div>

**Sexual assault against Shmiel Meir:**

In 1995 after my younger brother Shmiel Meir Weingarten was born . . .my mother. . . playing with Shmiel Meir's private parts and showing it to other kids.

<div align="right">Yakev Nuchem Weingarten</div>

I saw my mother. . .kissing and licking Shmiel Meir's penis. . .

<div align="right">Chaneh Goldeh Weingarten</div>

I saw my mother. . .kissing and licking Shmiel Meir's penis often. . .

<div align="right">Chayeh Sureh Weingarten</div>

## <u>WHO IS FREME LEAH WEINGARTEN</u> ?

### <u>Freme Leah was promiscuous, with serious sexual boundary issues:</u>

### Freme Leah interacted sexually, with her <u>mother:</u>

In 1994 or 1995 I saw my mother . . . sister Freme Leah Weingarten partially naked playing together in the bathroom.

<div align="center">10</div>

<div style="text-align: right;">Yoil Weingarten</div>

In 1994 I saw my mother . . . and my sister Freme Leah Weingarten partially naked and involved in sex play and on top of one another.

<div style="text-align: right;">Chayeh Sureh Weingarten</div>

**Freme Leah at age 15, interacted sexually, with her married older <u>neighbor</u>:**
While I was playing by Meierowitz, I saw Friemeh Leah going into and then come out of the bathroom together with Mr. Meierowitz.

<div style="text-align: right;">Chaneh Goldeh Weingarten</div>

In 1995 in Antwerp, Belgium my sister Freme Leah took all of the younger children to the home of Mr. Meierowitz "to play" many times.  But when we went there my sister Freme Leah and Mr. Meierowitz would stay in his bedroom for hours and hours every time his wife was not at home.

<div style="text-align: right;">Chayeh Sureh Weingarten</div>

**Freme Leah interacted sexually, with her <u>maternal Aunt</u>:**
In 1995 I saw my aunt . . . "Yenti" and my sister Freme Leah Weingarten in bed for hours, naked and working on one another.

<div style="text-align: right;">Chayeh Sureh Weingarten</div>

I saw my aunt "Yenti" and my sister Freme Leah Weingarten in bed for hours, on one another.

<div style="text-align: right;">Chaneh Goldeh Weingarten</div>

"Yenti" together, one across the other partially naked, I was screaming  on them so my mother Feige Anshin-Weingarten and my sister Freime Leah Weingarten threatened me....

<div style="text-align: right;">Yoil Weingarten</div>

**Freme Leah interacted sexually, with her <u>brother Yoinesun</u>:**
In  late September, 1997 I saw Freme Leah using my older brother Yoinesun for sex.  I actually walked into the room and saw Yoinesun's naked erection and Freme Leah laughing. . .

<div style="text-align: right;">Chayeh Sureh Weingarten</div>

**Freme Leah interacted sexually, with her <u>infant brother Shmiel Meir</u>:**
In 1995 after my younger brother Shmiel Meir Weingarten was born. . . Freme Leah playing with Shmiel Meir's private parts and showing it to other kids.

<div style="text-align: right;">Yakev Nuchem Weingarten</div>

I saw my sister Freme playing around with my baby brother Shmiel Meir's private parts.

<div style="text-align: right;">Yoil Weingarten</div>

<div style="text-align: center;">11</div>

**<u>Freme Leah is a criminal with _serious_ psycho-sexual pathology:</u>**

**Sexual assault against Chayeh Sureh:**
Freme Leah and my brother Yoinesun sexually assaulted me on several occasions
<div align="right">Chayeh Sureh Weingarten</div>

Freme Leah told me...  Leah threatened me and said I would be killed.
<div align="right">Chayeh Sureh Weingarten</div>

**Sexual assault against Chaneh Goldeh:**
When I was a child, my sister Freme Leah and my brother Yoinesun sexually assaulted me on several occasions beginning when I was six or seven years old.
<div align="right">Chaneh Goldeh Weingarten</div>

**<u>Freme Leah is a pathological liar:</u>**
**_Forget_ three separate Rabbinical Courts, in three separate countries; who thoroughly investigated Freme Leah's allegations and found them to be without merit.  What do _eye witnesses_ say?**

Freime Leah told me directly that her stories about sex and my father were lies that she made up.
<div align="right">Chaneh Goldeh Weingarten</div>

January of 1997 and August of 1997, I saw and heard how my sister, Friemeh Leah, in the presence of my other siblings, asked my father to forgive her for the lies and allegations that she made up on him.
<div align="right">Chaneh Goldeh Weingarten</div>

I saw my older sister, Frieme Leah, actually tell my older brother Yoil and my younger, Yakev Nuchem and my older sister Chayeh Sureh Weingarten that she lied about my "Tatti"...
<div align="right">Chaneh Goldeh Weingarten</div>

I saw my older sister, Frieme Leah, actually tell my other siblings that she lied and lied about my "Tatti"(my father)...
<div align="right">Yakev Nuchem Weingarten</div>

Freme Leah told me with tears in her eyes that her stories about my father were lies that she made up.
<div align="right">Yakev Nuchem Weingarten</div>

I heard Freme Leah tell my father, Israel Weingarten that her stories about sex were lies that she made up.
<div align="right">Chayeh Sureh Weingarten</div>

<div align="center">12</div>

Freme Leah told me directly that her stories about sex and my father were lies that she made up.

<div align="right">Chayeh Sureh Weingarten</div>

My Older sister Frieme Leah Weingarten spoke directly to me and begged me to forgive her for what she did to me and for the lies about my "Tatti" that she many times.

<div align="right">Yoil Weingarten</div>

Freme Leah told me directly that her stories about sex and my father were lies that she made up.

<div align="right">Yoil Weingarten</div>

My sister Friem Leah Weingarten told me that my grandmother Mrs. Anshin and my mother Feige Anshin-Weingarten used her as a tool to make up lies about sex about my father.

<div align="right">Yoil Weingarten</div>

_**Forget**_ **three separate Rabbinical Courts, in three separate countries; who thoroughly investigated Freme Leah's allegations and found them to be without merit.  What do - -** _**teachers**_ **- -** _**principals**_ **- -** _**peers**_ **- -** _**friends**_ **- - say?**

Friemelei...a pupil in our Bais Rachel girl's school where I serve as the director.  She was known as a constant liar, most of the words that passed her mouth were not true, and whenever she felt that she is not being believed, she begins to cry with crocodile tears, to stir the emotions of her listeners.

<div align="right">Director - Robert Friedmann</div>

I wish to voice my protest concerning a private letter which was used in court to incriminate Rabbi Israel Weingarten. . . . twice I wrote that I did not believe the story...

<div align="right">Rabbi G.A. Royde</div>

I was a teacher at Israel Weingarten's school (yeshiva) since 1988.  Friemelei came alone just to spend some time with my family.   Friemelei had also stayed over night in our house during that period.  I know of Friemelei's reputation in the community as a liar.

<div align="right">Teacher Yosef Chaim Cohen</div>

Friemelei did not seem like and abused child at all.  I know Friemelei's reputation in the school and the community.  Friemelei was a constant liar.

<div align="right">Her Seventh Grade Teacher Sarah Stauber</div>

During my interactions with Friemelei, I saw no signs of her being abused by her father.  What I saw was a healthy and loving relationship between the father and the daughter.  Friemelei's reputation in the community is that of a liar, an actress and an untrustworthy person.

<div align="right">Fellow Student Sarah Cohen</div>

<div align="center">13</div>

I did not observe any signs of Friemelei being abused.  I have observed Friemelei in the company of her father.  I am aware of Frimemlei's reutation in the community. . . is that of being a liar, a professional actress, an attention seeker and an untrustworthy person.

<div align="right">Fellow Student Hinde Englander</div>

Frieme Leah's reputation in the community is that of being a liar, fantisizer and a untrustworthy person.

<div align="right">Fellow Student Gita Krauz</div>

I visited Israel's family often and knew everyone - including Friemelei - quite well.  I witnessed Friemelei fabricate and lie about other children.  I also oblserved Friemelei being good at baking up false stories.  I am aware that Friemelei's reputation in the community was that of a liar.

<div align="right">Family Friend of decades Yiddel Rotter</div>

Friemelei's reputation in the community was that of a constant liar and being untrustworthy.

<div align="right">Family Friend Debora Freed</div>

I also know of Friemelei's reputation in the community.  Friemelei's reputation in the community is that of being a liar.

<div align="right">Family Friend Elky Krausz</div>

**What of Freme Leah's ridiculous "non-stop, hardly remember getting dressed. " "sex-around-the-clock" claim?  What do *eye witnesses* say?**

I saw and spoke with Friemelei Weingarten in my school between the dates of August 19, 1997 and September 12, 1997.  I found Friemelei to be a happy and confident girl.

<div align="right">Esther Englander</div>

I saw and spoke with Israel and Frieme Leah Weingarten when they were at my parents' house in Belgium during August 19, 1997 and September 12, 1997. . . I observed Frieme Leah to be perfectly fine and happy.

<div align="right">Gita Krausz</div>

I also saw him regularly with his daughter, Friemelei walking on the Antwerp streets.

<div align="right">Bais Rachel School Director Robert Friedmann</div>

. . .in Antwerp, Belgium between August 19, 1997 and September 12, 1997.   During this time, Israel & Friemelei visited my family at our house and we had several meals together.  Fremelei looked perfectly fine and happy.

<div align="right">Rachel Krausz</div>

I observed a loving and healthy relationship between Friemelei and her father, Israel . . Friemelei appeared to be happy to be with Israel.

<div align="right">Alexander Krausz</div>

<div align="center">14</div>

I found Frimelei to be happy, confident and content.  I did not find Friemelei to be scared to her father.

<div align="right">Miriam Friedman</div>

I observed Friemelei to be perfectly fine and happy. . . I observed a loving and healthy relationship between Friemelei and her father.

<div align="right">Ester Krausz</div>

I would go visit them unannounced and knock on the door.  Friemelei would open the door right away.  Everything looked normal.  I also observed Friemelei shopping by herself...  I also observed Friemelei walking the streets of Antwerp during this time period.

<div align="right">Yiddel Rotter</div>

**This is the context** the inept bumblings of prior retained counsel and an over reaching United States Attorney denied this honorable Court.

## PART TWO  -  SCORING THE GUIDELINES

### The Offense Level

The Sentencing Guidelines in effect at the time of the sentencing, if used, would produce a guideline range that is higher than it would be if the Court had used the manual in effect on the day the offense was allegedly committed. Therefore, as required by the Constitution's *Ex Post Facto* Clause, the offense levels are computed using guidelines in effect *at the time the offense was allegedly committed*. The offense was allegedly committed in April, July, August and September of 1997. Therefore, the guideline used to compute the offense level are the November 1, 1995 Guidelines as amended by the Interim Publication effective November 1, 1996.

**Count One**: Transportation of a Minor with Intent to Engage in Criminal Sexual Activity – Bet Shemesh, Israel to Brooklyn, New York: July 30, 1997 and August 19, 1997 – 18 U.S.C. § 2423(a)

(1) Offense Guideline: The Statutory Index lists the offense guideline for the federal offense under 18 U.S.C. § 2423(a) to be **2A3.2**.[5]
(2) Base Offense Level: **15**
(3) Specific Offense Characteristic: Since the defendant was "Jane Doe's" father, the offense level is increased by **2** levels. 2A3.2(b)(1).
(4) Adjustments – Victim Related: None.
(5) Adjustments – Role in the Offense: None.
(6) Adjustments – Obstruction of Justice: None.
(7) Adjusted Offense Level: **17**.


**Count Two**: Transportation of a Minor with Intent to Engage in Criminal Sexual Activity – Brooklyn, New York to Antwerp, Belgium: August 19, 1997 and September 12, 1997 – 18 U.S.C. § 2423(a)

---

[5] The Statutory Index lists the offense guideline to be 2G1.2. The Cross reference found in subsection (c)(3) of 2G1.2 indicates that the controlling guideline is 2A3.2. However, the Cross reference found in subsection (c)(2) of 2G1.2 indicates that an enhancement to guideline 2A3.1 may be required if the offense involved criminal sexual abuse. This enhancement is not required in this case. There is ample evidence that no sexual abuse of "Jane Doe" occurred. *See* PSR ¶ 139-142. Further, the Defendant was not charged with, nor found guilty of, a crime of criminal sexual abuse. In fact, a violation of 18 U.S.C. § 2241 – the code section of criminal sexual abuse - is not even *mentioned* in Count 1 or Count 2 of the Indictment. To allow some statements of alleged sexual abuse made by "Jane Doe" – which were clearly contradicted by other witnesses during the "spectacle" [Tr. 3/5/09, pg. 805 the Court's word]– to convert the present case into a sex abuse case would tantamount to letting these untried and unsubstantiated accusations act as "a tail which wags the dog of the substantive offense." *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 2365 (2000). Since guideline 2A3.1 is not applicable to Count 1 and Count 2, no other enhancements pursuant to 2A3.1 are applicable either.
In the alternative, should this Court be inclined to view the uncharged conduct of alleged sexual abuse of "Jane Doe" as "relevant conduct" and find that the controlling guideline is 2A3.1, it should depart downward while sentencing the Defendant. Where findings as to uncharged relevant conduct made by the sentencing court, based on a preponderance of the evidence, substantially increases the defendant's sentence, a downward departure may be necessary in the interest of justice. *See United States v. Cordoba Murgas*, 233 F.3d 704, 709 (2d Cir.2000); *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir.1996), *cert. denied sub nom Aloi v. United States*, 522 U.S. 868, 118 S.Ct. 179 (1997); *United States v. Concepcion*, 983 F.2d 369, 389 (2d Cir.1992), *cert. denied sub nom Frias v. United States*, 510 U.S. 856, 114 S.Ct. 163 (1993).

(1) <u>Offense Guideline</u>: The Statutory Index lists the offense guideline for the federal offense under 18 U.S.C. § 2423(a) to be **2A3.2**.

(2) <u>Base Offense Level</u>: **<u>15</u>**

(3) <u>Specific Offense Characteristic</u>: Since the defendant was "Jane Doe's" father, the offense level is increased by **2** levels. 2A3.2(b)(1).

(4) <u>Adjustments – Victim Related</u>: None.

(5) <u>Adjustments – Role in the Offense</u>: None.

(6) <u>Adjustments – Obstruction of Justice</u>: None.

(7) <u>Adjusted Offense Level</u>: **<u>17</u>**.

**<u>Count Three</u>**: Travel with Intent to Engage in Sexual Acts with a Juvenile – Antwerp, Belgium to Bet Shemesh, Israel: April 14, 1997 and July 30, 1997 – 18 U.S.C. § 2423(b)

(1) <u>Offense Guideline</u>: The Statutory Index lists the offense guideline for the federal offense under 18 U.S.C. § 2423(b) to be **2A3.1**[6]

(2) <u>Base Offense Level</u>: **<u>27</u>**

(3) <u>Specific Offense Characteristics</u>: (A) Since "Jane Doe" had not attained the age of 16 years, the offense level is increased by **2** levels. 2A3.1(b)(2)(B); also, (B) Since the defendant was "Jane Doe's" father, the offense level is further increased by **2** levels. 2A3.1(b)(3)(A).[7]

(4) <u>Adjustments – Victim Related</u>: None.

(5) <u>Adjustments – Role in the Offense</u>: None.

(6) <u>Adjustments – Obstruction of Justice</u>: None.

(7) <u>Adjusted Offense Level</u>: **<u>31</u>**.

**<u>Count Four</u>**: Travel with Intent to Engage in Sexual Acts with a Juvenile – Bet Shemesh, Israel to Brooklyn, New York: July 30, 1997 and August 19, 1997 – 18 U.S.C. § 2423(b)

(1) <u>Offense Guideline</u>: The Statutory Index lists the offense guideline for the federal offense under 18 U.S.C. § 2423(b) to be **2A3.1**.

(2) <u>Base Offense Level</u>: The 1995 Guideline provides a base offense level of **<u>27.</u>**

---

[6] The Statutory Index lists the offense guideline for the federal offense under 18 U.S.C. § 2423(b) to be 2A3.1, 2A3.2, or 2A3.3. However, a review of the Indictment and the age of "Jane Doe" at the time of the alleged offense indicate that 2A3.1 appears to be the most analogous guideline for Counts Three, Four and Five.

[7] Specific Offense Characteristic pursuant to 2A3.1(b)(1) is not applicable in Counts Three, Four and Five. As indicated in Footnote 1, Defendant was not charged with, or convicted of, a violation of 18 U.S.C. § 2241, regardless of its mention in Counts Three, Four and Five. Further, this enhancement is also *not applicable* based on the definition, territorial jurisdiction of 18 U.S.C. § 2241(a) or (b), and the facts of the instant case.

(3) <u>Specific Offense Characteristic</u>: Since the defendant was "Jane Doe's" father, the offense level is further increased by **2** levels. 2A3.1(b)(3)(A).
(4) <u>Adjustments – Victim Related</u>: None.
(5) <u>Adjustments – Role in the Offense</u>: None.
(6) <u>Adjustments – Obstruction of Justice</u>: None.
(7) <u>Adjusted Offense Level</u>: **<u>29</u>**.

**<u>Count Five</u>**: Travel with Intent to Engage in Sexual Acts with a Juvenile – Brooklyn, New York to Antwerp, Belgium: August 19, 1997 and September 12, 1997 – 18 U.S.C. §2423(b)

(1) <u>Offense Guideline</u>: The Statutory Index lists the offense guideline for the federal offense under 18 U.S.C. § 2423(b) to be **2A3.1**.
(2) <u>Base Offense Level</u>: The 1995 Guideline provides a base offense level of **<u>27.</u>**
(3) <u>Specific Offense Characteristic</u>: Since the defendant was "Jane Doe's" father, the offense level is further increased by **2** levels. 2A3.1(b)(3)(A).
(4) <u>Adjustments – Victim Related</u>: None.
(5) <u>Adjustments – Role in the Offense</u>: None.
(6) <u>Adjustments – Obstruction of Justice</u>: None.
(7) <u>Adjusted Offense Level</u>: **<u>29</u>**.

**<u>Grouping / Combining of the Offenses</u>**

The offenses that the Defendant was charged and convicted of cannot be grouped.

*See* U.S.S.G. § 3D1.2.

Pursuant to U.S.S.G. § 3D1.4, the combined offense level is determined by taking the offense level applicable to the Count with the highest offense level and increasing that offense level by the units indicated in the table provided in U.S.S.G. § 3D1.4. In determining the number of units for these purposes, the guidelines instruct us to:

(a) Count as one unit the Count / Group with the highest offense level. Count one additional unit for each Count / Group that is equally serious or from 1 to 4 levels less serious.

(b) Count as one-half unit any Count / Group that is 5 to 8 levels less serious than the Count / Group with the highest offense level.

(c) Disregard any Count / Group that is 9 or more levels less serious than the Count / Group with the highest offense level.

The most serious offense in this case is **Count Three** due to its Adjusted Offense Level of **31.** As such it would be assigned one (1) unit pursuant to U.S.S.G. § 3D1.4. Counts Four and Five would be assigned one (1) unit each as they are 1 to 4 levels less serious (with Offense Level 29). Counts One and Two would be discarded as they are 9 or more levels less serious than Count Three (with Offense Level 17). This would result in the addition of total of three (3) units – one for Count Three and one each for Counts Four and Five – to the offense level of Count Three. This results in increasing the total offense level for Count Three to **34**.

**Therefore, we have**:

Combined Adjusted Offense Level: **34**

Adjustment for Acceptance of Responsibility: None[8]

**Total Offense Level**: **34**

**Defendant's Criminal History**

Defendant has no criminal convictions apart from the current conviction. Defendant has no prior sentences; as such the criminal history category is **I**.

The Guidelines require the sentencing court to calculate a defendant's criminal history principally with reference to his prior sentences. *U.S. v. Delmarle*, 99 F.3d 80, 85

---

[8] While there is no downward departure for Acceptance of Responsibility as the Defendant claimed (and continues to maintain) that he is innocent and endured the "spectacle" [Tr. 3/5/09, pg. 805 the Court's word] a Due Process nightmare.  The Defendant's exercise of his right to a jury trial cannot be considered an "aggravating" factor and a ground for an upward departure. *See* § 5K1.2 Refusal to Assist – Policy Statement.

(2d Cir. 1996). The sentencing court may however consider departing from the criminal history category computed strictly pursuant to the Guidelines "[i]f ***reliable*** information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct." *Id*. (*emphasis added*). No such reliable information exists in this case that would require the Court to depart upwards from the criminal history category.

**<u>Guideline's Range of Imprisonment</u>**

Based upon a total offense level of 34 and a criminal history category of I, the guideline imprisonment range is **<u>151-188 months</u>**.

**<u>Sentencing in a Post-*Booker* World</u>**

In the post *Booker*[9] world, the sentencing guidelines are "effectively advisory." *Kimbrough v. United States*, 552 U.S. ___, 128 S.Ct. 558, 564 (2007). The guidelines are simply one factor among several that sentencing courts must consider in fashioning a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). *Id*. Courts are no longer required to impose sentences within the guidelines range – even where there is no basis to "depart." Under 18 U.S.C. § 3553(a), the *key requirement* is that the sentence in each case be "**sufficient, but not greater than necessary**:"

> (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

---

[9] *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005).

(B)  To afford adequate deterrence to criminal conduct;

(C)  To protect the public from further crimes of the defendant; and

(D)  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

When courts search for the best way to provide defendants with needed rehabilitation, as required by § 3553(a)(2)(D), the judges are required to recognize "that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

When determining whether the sentencing is minimally sufficient to comply with the § 35539(a)(2) purposes of sentencing – "sufficient, but not greater than necessary" – the Court must consider several factors listed in other subsections of § 3553(a). These include:

(1) the nature and circumstances of the offense;

(2) the history and characteristics of the defendant;

(3) the purposes of sentencing;

(4) the kinds of sentences available;

(5) the (advisory) guidelines and policy statements issued by the sentencing commission;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and finally

(7) the need to impose a sentence that is sufficient, but not greater than necessary.

Neither the statute nor the *Booker* decision suggests that any one of the above factors is to be given greater weight than any other factor. So, the sentencing range determined by the guidelines does not carry greater weight than say, the history of the defendant or the circumstances of the offense. Indeed, the guidelines are only *one* of the many factors the courts must consider in sentencing. *Booker, supra* at 764-765. Further, *Booker* also allows courts to consider factors that the guidelines previously **precluded** – such as the defendant's age, education, mental and emotional condition, physical condition, family ties and responsibilities, and socio-economic status. *See United States v. Ranum*, 353 F.Supp.2d 984 (E.D. Wis. 2005).

This Court has "familiarity with the individual case and the individual defendant … and is in a … position to find facts and judge their import under § 3353(a)." *Kimbrough v. United States*, 552 U.S. ___, 128 S.Ct. 558, 574 (2007). So long as the sentencing court does not rely on misinformation, its "discretion is largely unlimited either as to the kind of information [the court] may consider, or the source from which it may come." *United States v. Sisti*, 91 F.3d 305, 312 (2d Cir.1996). Also, it does not matter whether or not this information or evidence was admissible at trial. *United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir.1996).

The courts generally make factual determinations for the purposes of sentencing using the "preponderance of the evidence" standard. However, any upward departures should be held to a higher standard such as "clear and convincing" evidence or even "beyond a reasonable doubt." *See United States v. Ochoa-Suarez*, 2005 WL 287400

(S.D.N.Y. 2005); *United States v. Johansson*, 249 F.3d 848, 853-54 (9th Cir. 2001);

*United States v. Thomas*, 355 F.3d 1191, 1202 (9th Cir. 2004).

**Mitigating Factors Present in This Case**

      Mitigating factors[10] justifying a sentence below the advisory guideline range in

this case include, but are not limited to:

(1) The Defendant's age. The Defendant is 59 years old. Recidivism "is markedly

    lower for older defendants." *United States v. Lucania*, 379 F.Supp.2d 288, 297

    (E.D.N.Y. 2005); *United States v. Carmona-Rodriguez*, 2005 WL 840464, 4

    (S.D.N.Y. 2005). In *States v. Nellum*, 2005 WL 300073 (E.D.Ind. 2005), the

    Court imposed a sentence below the guideline range on a 57-year-old defendant

    because of his age and because the Court found that the likelihood of recidivism

    for a man his age was very low citing a May 2004 government study.[11] Further,

---

[10] It is important to note that though a single mitigating factor may not warrant a downward departure, a **combination of factors might**. U.S.S.G. § 5K2.0 Commentary; *Kimbrough v. United States*, 552 U.S. ___, 128 S.Ct. 558, 586 (2007). Further, the Defendant acknowledges that the standard for downward departure in child crimes and sexual offenses differs from the standard for other departures under the policies of the Commission in so far as it includes the requirement set in 18 U.S.C. § 3553(b)(2)(A)(ii)(1), that any mitigating circumstance that forms the basis for such a downward departure be affirmatively and specifically identified in Chapter 5 of Part K of the Guidelines. However, this case is ***not*** about "child crimes" or "sexual offenses." The Defendant was not charged with, nor found guilty of any "child crimes" or "sexual offenses." Further, there is ample evidence [albeit evidence that two ineffective attorneys never bothered to obtain - *please see:* EXHIBIT A Witness and Affiant Statements],  that no sexual abuse of "Jane Doe" occurred. *See* PSR ¶ 139-142.

[11] There are three essential scientifically validated reasons for determining this Defendants risk of recidivism as exceedingly low:  ONE - He is alleged to have been an "incest" offender.  Incest offenders have by far the lowest rate of recidivism. Campbell, T.W. (2nd Ed) (2007) *Assessing Sex Offenders – Problems and Pitfalls* Second Edition, Spring Field, Illinois, Charles C. Thomas Publishers.  TWO - Twelve years of being offense free has been scientifically verified to demonstrate and exceedingly low level of recidivism risk Harris, A. J. R., Phenix, A., Hanson, R. K., & Thornton, D. (2003). *Static-*

research shows that elderly inmates are more vulnerable to abuse and deprecation, have difficulty in establishing social relationships with younger inmates and sometimes need special physical accommodations in a relatively inflexible physical environment. Moreover, first-time offenders are "easy prey for more experienced predatory inmates."[12] Finally, it should be noted that a prison sentence for an elderly defendant is unequal to the same sentence for a younger defendant, because the sentence is a larger part (if not the entire part) of the elderly defendant's remaining life expectancy.[13]

(2) Title 18 U.S.C. § 3585(b) provides that a defendant generally must "be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences." Credit is awarded for any presentence restraints on liberty. *See Reno v. Koray*, 515 U.S. 50, 115 S.Ct. 2021 (1995). Here, the Defendant has been incarcerated since the time of his arrest and the Court must take this fact into account at the time of formulating a sentence.

---

*99 coding rules: Revised 2003*. Ottawa: Department of the Solicitor General of Canada. THREE - The definitive work on offender age and recidivism risk has just been published: Barbaree, H. E.; Langton, C.M.; Blanchard, R. and Cantor, J.M. (2009) "Aging Versus Stable Enduring Traits as Explanatory Constructs in Sex Offender Recidivism: Partitioning Actuarial Prediction Into Conceptually Meaningful Components" 36 *Criminal Justice and Behavior* 443; May, 2009. Barbaree and colleagues draw on fifty years of research to reliably document that from age 25 onwards there is a gradual but continuous downward slope in the percent of risk for recidivism such that at age 55+ the diminution in recidivism risk is significant and dramatic.

[12] *See Correctional Health Care Addresses The Needs Of Elderly And The Chronically Ill And Terminally Ill Inmates*, U.S. Department of Justice, National Institute of Corrections, 2004 edition, pp. 9-10. It should be noted that throughout the report, the elderly are defined as age 50 or older.
[13] Note, The Sentencing of Elderly Criminals, 29 Am. Crim. L. Rev. 1025-44 (1992).

(3) Ruin of Reputation. With his reputation ruined by his conviction, the Defendant – a world renowned scholar on Jewish religion – is unlikely to ever involve himself in future misconduct. Therefore, this factor of specific deterrence has been accounted for. *See United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006).

(4) Given his ultra-orthodox background and his religious bearing, the Defendant is unusually susceptible to abuse in prison and may have to spend most of his time in segregation. *See United States v. Volpe*, 78 F.Supp.2d 76, 89 (E.D.N.Y. 1999).

(5) Defendant is a 59-year old man and in delicate physical health. Defendant suffers from "elevated uric acid levels in his body" and from "urinary retention, which requires self-catherization every two and a half to three hours." *See* PSR ¶ 152. Medical care that will be needed during imprisonment is a factor that may require downward departure. *United States v. Carmona-Rodriguez*, 2005 WL 840464, 4 (S.D.N.Y. 2005); *States v. Nellum*, 2005 WL 300073, 4 (E.D.Ind. 2005). Defendant's medical problems also increase his "vulnerability to victimization in prison" and is "an unnecessary and unacceptably high risk." *See United States v. Rausch*, 570 F.Supp.2d 1295, 1308 (D.Colo. 2008); *also see Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035 (1996).

(6) Defendant's prospects for rehabilitation are also valid grounds for this Court to grant a downward departure. *See United States v. Devalle*, 967 F.Supp. 781 (E.D.N.Y. 1997); *United States v. Wong*, 40 F.3d 1347, 1382 (2nd Cir. 1994); *United States v. Guiro*, 887 F.Supp. 66 (E.D.N.Y. 1995); *United States v. Neiman*, 828 F.Supp. 254 (S.D. N.Y. 1993); *and United States v. Hanrington*, 741 F.Supp. 968, 975 (D.D.C. 1990).

**Defense Sentencing Recommendations**

Long imprisonment is not *sine qua non* to achieve the goals of sentencing. "A sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. U.S.*, 552 U.S. ___, 128 S.Ct. 586, 599 (2007). A sentence of brief imprisonment coupled with probation or supervised release with conditions is an onerous punishment and can be sufficient in this case. *Id.*

The totality of circumstances in this case begs for this Court's compassion and mercy at sentencing:

> "Although the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness."
> *U.S. v. Jones*, 460 F.3d 191, 195 (2d. Cir. 2006)

In fourteen pages, present counsel provides this honorable Court with information previous retained counsel never bothered to obtain.[14]   This important and essential information makes clear that this honorable Court was kept in the dark.  This important and essential information makes clear that this Defendants' obliviousness was his real crime.  Nevertheless, if this Court is disinclined to grant this Defendant a new trial, the

---

[14]   Where prior retained counsel had many months, present counsel has had less than thirty days to obtain essential information.  In this time, present counsel has provided this honorable Court with information concerning: the outrageous over reaching of the United States Attorney *supra at NOTE FOUR*; Statements from at least a dozen *res gestae* witnesses; Affidavits from *eye witnesses* and more.  None of this information on the essential context of these allegations was previously given to this honorable Court.

fact remains that during the "spectacle"[15], the Defendant was convicted of travel for immoral purposes over a one hundred forty four day period - - twelve years ago.

The Defense recommends a sentence including:

One year in Federal Prison with credit for time served;

Five Years of Federal Probation to include:

Two years of tether and exclusive residence in New York;

Two years of individual treatment;

Two years of family treatment.

Dated:  April 28th, 2009

Respectfully submitted,

s/ Demosthenes Lorandos                                          s/ Ashish S. Joshi
Demosthenes Lorandos                                               Ashish S. Joshi
Lorandos & Associates                                            Lorandos & Associates
Counsel *Pro Hac Vice*                                           Counsel *Pro Hac Vice*
Attorneys for the Plaintiffs                                  Attorneys for the Plaintiffs
214 North Fourth Avenue                                       214 North Fourth Avenue
Ann Arbor, Michigan 48104                                   Ann Arbor, Michigan 48104
(734) 327-5030                                                        (734) 327-5030

---

[15] Tr. 3/5/09, pg. 805 the Court's word.