UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

                                               **MEMORANDUM**

       - against -                        **AND ORDER**

                                               08 CR 571 (JG)

ISRAEL WEINGARTEN,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


A P P E A R A N C E S:

        LORANDOS & ASSOCIATES
                214 North Fourth Avenue
                Ann Arbor, Michigan 48104
        By:    Demosthenes Lorandos
                Ashish S. Joshi
                Attorneys for the Defendant

        BENTON J. CAMPBELL
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, New York 11201
        By:    Andrea Goldbarg
                Rachael J. Nash
                Assistant U.S. Attorneys

JOHN GLEESON, United States District Judge:

         Israel Weingarten moves for an order setting aside the jury's verdicts of guilty

and for a new trial. Having reviewed the written submissions, I see no need for an evidentiary

hearing or oral argument. For the reasons set forth below, the motion is denied in all respects

except one. Specifically, the claim that counsel rendered ineffective assistance to the defendant

prior to trial is not addressed here, and it may be asserted again in a collateral challenge pursuant

to 28 U.S.C. § 2255.

Sentence will be imposed this afternoon at 2:00 p.m.

BACKGROUND

A.      *The Offense Conduct*

At the times relevant here, the defendant and his family were members of the Satmar sect of Hassidic Judaism.  The sect is characterized by ultra-orthodox rules and traditions, which were imposed even more strictly in the defendant's home.  Tr. 172-77.[1]

The defendant and his former wife, Feige Weingarten, have eight children.  Their oldest daughter, who is referred to here as Jane Doe, is the victim of the defendant's crimes.

The defendant was born in 1950 in Brooklyn, where he was raised.  He resided there with his family until his marriage in 1979.  The marriage occurred in Jerusalem, and the defendant and his wife stayed in Israel afterward.  Their first child, Yoinesun, was born shortly thereafter, and Jane Doe was born in June of 1981.  In 1983, they moved to Antwerp, Belgium. Jane Doe was two years old at the time.  Presentence Report ¶¶ 116, 118-120.

When Jane Doe was approximately nine years old, the defendant began abusing her sexually.  Prior to that time, he abused her physically, beating her bloody with a knotted leather strap when she strayed from his conception of appropriate female modesty (such as when she took swimming lessons in school in a bathing suit, rather than in her long dress and woolen tights).  Tr. 183-85.  The sexual abuse began with the defendant instructing Jane Doe to massage his stomach; he then forced the little girl's hand onto his erect penis and pushed her hand up and down.  Tr. 202-04.

---

[1]      Citations in the form "Tr. __" are to the pages of the trial transcript.  Citations to the transcripts of pretrial proceedings are in the form "Tr. [date of proceeding] at __."  Citations to the defendant's memorandum of law in support of the instant motion (*see* docket entry 70-2) are in the form "Def.'s Mem. at __."

With that, the defendant commenced more than six years of horrific sexual abuse of his daughter. He would pull down her tights and touch her vagina and anus with his fingers. Tr. 220. When Jane Doe first reported the abuse to her mother, in whom she felt comfortable confiding, the defendant responded by beating Jane Doe with his fists, kicking her between the legs and cracking her over the head with a long hard vegetable. Tr. 222-23.

The sexual abuse occurred all over the Antwerp apartment. Tr. 226. At night, the defendant would creep into Jane Doe's bed, undress her and himself, and begin touching her. The defendant would grunt, ejaculate, wipe himself and begin again. Tr. 226-27.

When Jane Doe asked the defendant why he was abusing her, he blamed her. She was too pretty, her "eyes pull[ed]" and "seduce[d]" him. Tr. 224. Jane Doe was about 11 years old at the time. The defendant also blamed his wife for the abuse, telling Jane Doe that her mother was not "giving him any." *Id.* This made Jane Doe angry at her mother. Tr. 225.

When Jane Doe reached puberty, the abuse got rougher. The defendant penetrated her vagina with his fingers. He would put his knee between her legs, push up and down, and ejaculate. Tr. 232-33.

At age 13 or 14, Jane Doe began to resist the abuse and threatened to tell other people. The defendant told her she would never be believed, as he was a respected member of the community and she was a liar. Also, she would have no proof, he said, because he had been careful not to have intercourse with her. Tr. 236-37. On one occasion during this period, the defendant's wife walked into the bedroom when the defendant had Jane Doe in their bed. Either that day or the next, when the defendant was away at a wedding in London, Jane Doe recounted for her mother the previous several years of abuse. The mother assured Jane Doe that she would

confront the defendant by writing him a letter.  Tr. 239-46.

Upon his return, the confrontation occurred and the defendant responded by administering the worst physical beating Jane Doe had ever received from him.  Her physical bruises were so pronounced the defendant would not allow her return to school for at least a week.  Tr. 247-51.  When she did, her principal spoke to her about what was occurring.  Eventually, Rabbi David Weiss, a leader of the Belgian Satmar community, brought Jane Doe before a rabbinical court and arranged to have her sent to England to stay with his daughter and attend school.  Tr. 253-59.

The charges in this case are based on events that occurred in 1997, when Jane Doe was 15 and 16.  She had returned to Belgium after being told to leave the Satmar school in England; Rabbi Gabriel Royde, the principal of the school, told her the talk of sexual abuse of Jane Doe was damaging to the other students in the school.  Tr. 270.

When Jane Doe returned to Belgium, the defendant told her that the family had to move to Israel because she had given him a bad name in Belgium.  On April 14, 1997, Jane Doe went from Belgium to Bet Shemmesh, Israel with her family.  While there, she was not permitted to go anywhere alone.  She had to sleep in the living room, instead of with her sisters in the girls' bedroom.  The defendant sexually abused Jane Doe almost nightly, coming to her bed or calling her to his bed.  He touched her everywhere and penetrated her vagina and anus with his fingers.  He forced her to touch him and move her hand up and down his penis.  Tr. 271-74.

On May 13, 1997, Jane Doe traveled back to Belgium from Israel with her parents and her younger siblings to continue packing for the move to Israel.  The defendant told her he was taking her because she was trouble and he did not want her out of his sight.  In Belgium,

4

Jane Doe helped her mother pack the family's possessions. Her father sexually abused her almost every night in the room both he and her mother slept in. Tr. 276-78. Jane Doe then returned with her family to Israel. When they returned to Israel, the sexual abuse continued. Tr. 281-82.

On July 30, 1997, Jane Doe traveled with her father alone from Israel to Brooklyn because the defendant's father was dying. Jane Doe did not want to go because she was afraid of her father. He told her she had to go with him because he could not let her out of his sight. The defendant sexually abused her in his brother's house the night they arrived in Brooklyn. Tr. 283-85.

On August 19, 1997, after her grandfather died, Jane Doe left New York and traveled to Belgium with her father for what Jane Doe described at trial as a "sexathon." Tr. 290. Alone with Jane Doe for about a month in the Antwerp apartment, which was filled with packed boxes awaiting shipment to Israel, the defendant abused Jane Doe "night and day, every day." Tr. 290. He kept her naked in the bedroom. He would imitate sex and ejaculate on top of her, right outside her vagina. Breaking new ground in his abuse, he sought to have her perform oral sex on him. When she refused, he forced his penis into her mouth anyway. He forced her to perform oral sex in this way more than ten times during that trip. Tr. 291-92, 454-55.

The defendant would not permit Jane Doe to leave Belgium until she recorded a conversation with her neighbor. The conversation had to sound as though she was seducing him. Tr. 294-386. A year before, when her parents had traveled to the United States, Jane Doe had become attracted to the neighbor, a married man who had been sympathetic and comforting when she told him of her father's abuse. She had kissed him, and he caressed her outside her

clothes.  She had wanted it to go farther because "it was the first time a guy was touching me it [and] wasn't my father," but the neighbor refused.  Tr. 296.  Jane Doe recorded the conversation with the neighbor because she felt it was the only way she could leave Belgium.  The defendant told her he was going to play it for the rabbis, to prove his claim that it was the neighbor who had molested her, not him.  After she gave the tape to her father, he permitted her to return to Israel.  Tr. 297-99.

In Israel, Jane Doe and her mother contacted Rabbi Weiss again, who helped Jane Doe return to England.  After being there for some months, Jane Doe learned that her father was looking for her.  She panicked and fled to Rabbi Royde's house, where she locked herself in a bedroom just before her father arrived.  She heard her father yelling and called the police.  Her father started banging on the door so hard it started to break.  Jane Doe thought, "This is the end. This is where it's all going to end.  He's going to choke me, do something to me.  It's going to be over."  Tr. 303.  The door flung open and her enraged father entered.  However, the police arrived right behind him and rescued her.  Jane Doe told the police she did not want to go with her father because he had molested her for many years.  With the assistance of an attorney, she sought and received an order of protection against her father from the British courts.  Tr. 303-13.

B.    *The Charges*

Count One of the five-count indictment charged the defendant with transporting Jane Doe from Israel to Brooklyn with the intent that she engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a).  Count Two alleged the same offense, and focused on the trip from Brooklyn to Antwerp.  Counts Three through Five charged the defendant with traveling in foreign commerce (Antwerp to Israel, Israel to Brooklyn, and Brooklyn to Antwerp,

respectively) for the purpose of engaging in illicit sexual conduct with Jane Doe, in violation of 18 U.S.C. § 2423(b).

C.    *The Trial, the Defense, and the Verdicts*

On March 2, 2009, the morning of jury selection, the defendant announced that he wanted to represent himself.  My efforts to dissuade him, though extensive and repeated, failed.  Finding no basis to deny him his qualified right of self-representation, and that the defendant had made a knowing and voluntary decision to exercise that right, I permitted him to represent himself at trial.  *See* Tr. 6-19, 28, 99-100, 106-08.

The government's case included the testimony of Jane Doe, her older brother Yoinesun Weingarten[2] and their mother Feige Weingarten.  Among the other witnesses was Robert Longman, the police constable who rescued Jane Doe when the defendant tried to confront her at Rabbi Royde's house in Manchester, England in 1997.

The defense evolved over the course of the case and indeed during the trial itself.  An *in limine* motion that related to the scope of the permissible cross-examination of Jane Doe disclosed the following theory of defense:  Jane Doe's relationship with the next door neighbor in Belgium had been sexual in nature; the international travel with and by the father was not for the purpose of abusing her but to rescue her from the neighbor; and the shame of the affair with the neighbor in the Satmar community was so grave that Jane Doe fabricated sex abuse

---

[2]    During the period the defendant was abusing Jane Doe, he told Yoinesun repeatedly that Jane Doe was "overheated and she was always jumping on me"; *i.e.*, that "she seduced him."  Tr. 543.  On one occasion, before allowing Yoinesun to return from Belgium to his religious school in England, the defendant required him to record a conversation with Jane Doe that the defendant would use to persuade his wife that the defendant was not the only one in the house who had sexual involvement with Jane Doe.  Tr. 543.  Manipulating Yoinesun's feelings of guilt over "playing doctor" with his sister when they were much younger, the defendant scripted a conversation that would make it look like Jane Doe demanded sexual attention from her brother.  Tr. 542-43.

allegations against her father to divert attention from it.  *See* Letter dated January 28, 2009 from Mr. Rhodes to the Court, at 2 ("[Jane Doe], accordingly, was not introduced to sex by her father, but rather by the married neighbor, behavior so scandalous in her insular community that anything and everything would and could be said to keep it from becoming public, even to the extent of making false allegations about her father.").

This was still the defense when the trial began.  In his opening statement, the defendant identified "the abuser" of Jane Doe as the next door neighbor in Belgium.  Tr. 157; *see also* Tr. 161-62, 163, 165.  However, that theory was essentially abandoned after Jane Doe testified.  Perhaps this was because there was no evidence that Jane Doe's relationship with the neighbor was anything other than brief and nonsexual.  In any event, as the trial progressed, the defendant turned his turrets toward his former wife -- Jane Does's mother -- and sought to prove that she had physically and sexually abused Jane Doe and indeed the entire family.  To support that theory, the defendant called two of his other daughters to testify.  In troublingly similar ways, they each described their mother as alternately savagely beating Jane Doe (Tr. 914, 938) and engaging in playful -- and *consensual* -- sexual activity with her (Tr. 916, 939).  One of these daughters, Chaya Weingarten, added an especially odd touch.  She testified that Jane Doe ordered her to "make up stories on my father that he's abusing me sexually," Tr. 898, and threatened to resort to her "mafia connections" if Chaya refused.  Jane Doe was 15 or 16 at the time and Chaya was 11, and they had been living in Antwerp since before Chaya was born.

The jury found the defendant guilty of all five counts.

## DISCUSSION

A.      *The Rule 33 Standard*

Federal Rule of Criminal Procedure 33(a) reads, in pertinent part: "upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Generally, a motion for a new trial 'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998)). I have "'broad discretion ... to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). Though I am entitled to "weigh the evidence and in so doing evaluate for [my]self the credibility of the witnesses," *Sanchez*, 969 F.2d at 1413 (quotation marks omitted), I "must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury," *Ferguson*, 246 F.3d at 133 (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)).

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. "There must be a real concern that an innocent person may have been convicted." Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority "sparingly" and in "the most extraordinary circumstances."

*Id*. at 133-34 (citations omitted) (quoting *Sanchez*, 969 F.2d at 1414); *see also id*. at 139 (Walker, C.J., concurring in part and dissenting in part) ("Like many legal metaphors, the 'thirteenth juror' analogy lacks precision. It fails to convey the considerable circumspection that this court has required of district courts' decisions on Rule 33 motions based on the weight of the

evidence.").

B.      *The Defendant's Claims*

Weingarten asserts five grounds in support of his motion.  First, he contends that he was deprived of his right to counsel at his trial.  Second, he claims that once he proceeded to represent himself, his right to do so was violated by the unsolicited participation in his defense by his standby counsel, Mr. Alan Stutman and Mr. Barry Rhodes.  Third, Weingarten claims that my denial of one of his requests for a continuance was an abuse of discretion.  Fourth, he claims his right to a fair trial was violated by bias on my part.  Finally, Weingarten claims that I erred by failing to conduct an inquiry into a claimed conflict of interest on the part of Mr. Stutman and Mr. Rhodes.

Before addressing these claims individually, a few words about the defendant himself are appropriate.  First, Weingarten is a very strong-willed person, a characteristic he demonstrated throughout the proceedings.  For example, we had a brief court appearance scheduled for 10:00 a.m. on October 14, 2008.  However, because a religious holiday was to commence that evening, the defendant refused to be brought to court.  Tr. Oct. 14, 2008 at 2. Similarly, although a scheduled 1:00 p.m. appearance on Friday, December 12, 2008, left ample time to return the defendant to the Metropolitan Detention Center ("MDC") before sundown, he again refused to be brought to court.  Though he told the jail personnel he was sick, his attorney simultaneously conveyed to the court the "dissatisfaction" of the defendant's supporters with Friday afternoon appearances.  Tr. Dec. 12, 2008 at 2.  At trial, the defendant told me after he decided to represent himself that he needed "a table somewhere," not in a cell, where he could work with materials brought in from the outside to prepare his defense.  Tr. 30.  He told me

10

when he would be needing to wash his hands, when he would have to pray (and when he could not), and what he would and would not eat.  *See* Tr. 75-76.  He asked to have witnesses sequestered, Tr. 144; instructed the jurors during his opening statement to keep their voices up, Tr. 145; asked for a room outside the cell block to prepare his cross-examination of Jane Doe, Tr. 208; and asked to be kept late in the courthouse and returned early the following morning to prepare for the second day of the cross-examination.  Tr. 404-05.  I mention these things not by way of criticism -- indeed, I did my best to accommodate many of the defendant's requests, which I thought were made in good faith[3] -- but rather to describe the defendant's personality.  This was Weingarten's first experience as a defendant in a criminal case, but he was by no means intimidated by the process.

Second, long before he sought *pro se* status, Weingarten was vocal and assertive in his own defense.  Until literally the day of trial, he was represented by Mr. Stutman and Mr. Rhodes, but he rarely left the representation entirely to them.  He supplemented his lawyers' arguments, sometimes after asking permission,[4] sometimes despite being advised by them not to speak.[5]  He fashioned arguments on his own and advanced them in court.[6]  He would interrupt

---

[3]	*See, e.g.*, Tr. 99 (directing deputy marshals to provide to defendant food provided by supporters); Tr. 101 (directing deputy marshals to permit defendant's supports to sit wherever they wanted in spectator session); Tr. 404 (directing that defendant be kept in the courthouse for an hour after court ended for the day and brought back early the next day, and that a room be provided to him and standby counsel, so that the defendant could prepare for cross-examination); Tr. 997-98; (reflecting request made by Court to Warden of MDC to wake defendant early on Purim to permit pre-sunrise meal); Tr. 1090-91 (honoring request made in chambers by defendant's sons that defendant be provided with scroll on Purim to facilitate prayer).

[4]	*E.g.*, Tr. Dec. 15, 2008 at 41-42 (adding, in essence, a renewed bail application to counsel's request for an adjournment of the trial date).

[5]	*E.g.*, Tr. Feb. 6, 2009 at 13 ("The Defendant:  Give me permission to talk.  Mr. Rhodes:  No") and 14 (in response to the Court's inquiry of Mr. Stutman on same subject, defendant responds).

[6]	Tr. Dec 15, 2008 at 32-34 (suggesting that we postpone until mid-trial the question whether Rule 15 depositions should be taken in Europe).

the prosecutor's arguments as she made them.[7]

Third, there can be no overstating the importance to this case of an offstage force the defendant described as his "people." These mostly unidentified persons, presumably fellow members of the defendant's Satmar community, had an important impact on this case for one simple reason: the defendant chose to place his trust in them, not in his lawyers. Thus, instead of choosing his own counsel, the defendant let his "people" retain Mr. Stutman and Mr. Rhodes for him. *See* Defendant's February 23, 2009 letter to the Court ("Def.'s Feb. 23 Letter"). I have no doubt they organized the bizarre letter-writing campaign early in the case attacking the victim.[8] The defendant claims that when he became dissatisfied with Mr. Stutman and Mr. Rhodes, he complained to his people, Def.'s Feb. 23 Letter, at 1, and that they in turn asked the lawyers to seek to be relieved, *id.* at 3. One of the apparently key people, a nonlawyer named Menachem M. Blum, tried to appear on the defendant's behalf in late February. *See* docket entry dated February 25, 2009. At trial, the defendant told me he had entrusted his people, not his attorneys, with task of obtaining the often-mentioned but ever-elusive tape recordings that would prove the defendant's innocence. Tr. 392.[9] Though there are innumerable other examples of the "people's" influence, they culminated with a unique and unfortunate situation during the defense case: I was told there were defense witnesses outside the courtroom door, but neither defense counsel nor the defendant himself could say who they were. Tr. 960. Counsel had to be

---

[7]     *E.g.*, Tr. Feb. 6, 2009 at 28 (interrupting prosecutor to refute her contention that the victim had not returned to the Satmar community; drawing admonition from Court).

[8]     *See* Tr. Nov. 19, 2008 (supplying copies of letters to all counsel and admonishing defendant's supporters to speak to the Court only through counsel and with notice to the government); Tr. Feb. 6, 2008 (Court describing how letters' attacks on victim raised the specter of intimidation).

[9]     And indeed, during trial they in fact supplied a tape to the government, which discovered upon examination it had been tampered with. Tr. 389.

dispatched to the hallway to find out who the defendant's people, in their wisdom, had selected to testify on the defendant's behalf. Upon his return, counsel's report illustrated in microcosm the value of these people on whom the defendant elected to rely: "Your honor, I spoke to the individual that was trying to coordinate the appearance of witnesses. In all candor, he has no idea if anyone -- he hopes somebody will be here tomorrow from overseas. In all candor, he has no idea if anybody will be here." Tr. 961.

With that backdrop, I turn to the defendant's specific claims in support of his motion for a new trial.

1.    *The Decision by Weingarten to Represent Himself*

Given the fact that a judge may refuse to allow a represented defendant to switch to *pro se* status after the start of jury selection, *see United States v. Stevens*, 83 F.3d 60, 66-67 (2d Cir. 1996), it is fair to say the defendant announced his decision to represent himself at the last possible moment. Indeed, as I attempted to talk him out of it, the 120 prospective jurors were literally waiting outside the courtroom door.

a.    *The Request*

The defendant contends that his request to represent himself was "by no means" clear and unequivocal. Def.'s Mem. at 4. Of course it was. Mr. Stutman reported the defendant's desire "to examine each one of the government's witnesses." Tr. 7. The defendant, who knows how to express disagreement, did not disagree. In the ensuing colloquy, I explained to the defendant that if he indeed chose to represent himself, he would do everything -- not just cross-examine the witnesses -- and I tried hard to talk him out of that decision. Tr. 7-19. There was nothing equivocal about his disregard of my advice and decision to proceed *pro se*. We then

13

began jury selection, but before I mentioned to the prospective jurors that the defendant would be representing himself, I tried again at a sidebar to dissuade the defendant.  Tr. 28.

After the jury was selected, we broke for lunch.  Before the break, I asked the defendant to consider again my comments about self-representation, and referred to his dependence on Mr. Stutman and Mr. Rhodes during jury selection to strengthen my case. Specifically, I asked the defendant to empower me to tell the jury before opening statements that he had allowed me to talk him into being represented by counsel.  *See* Tr. 99-100.  I renewed my efforts to persuade after lunch, but the defendant told me as follows:  "I didn't change my mind, and I'm going to proceed to be my own fighter for myself ...."  Tr. 107.

In sum, the defendant's expressed desire to represent himself was clear and unequivocal and impervious.

b.      *The Voluntariness of the Decision and the Defendant's Intent to Represent Himself*

The defendant also suggests that he sought to represent himself only because of "a complete breakdown in the attorney-client relationship" and because his lawyers were unprepared.  Def.'s Mem. at 3.  According to the defendant, the record demonstrates that he "*never intended*" to waive his right to counsel.  *Id.* at 2 (emphasis in original).

These assertions are not correct.  Though it is true the defendant believed that his attorneys were not as prepared for trial as he was, there was no "breakdown," complete or otherwise, in the attorney-client relationship.  The defendant communicated effectively with his counsel, insisted on being able to do so even after he began representing himself, and regularly

14

consulted with them throughout the trial.[10]  The record shows, and I find, that the defendant

intended to represent himself and chose to do so because he believed, mistakenly, that (1) he

could do a better job at trial than his lawyers could do; and (2) by directly addressing his victims,

he could reassert control over them and thereby undermine their testimony.  Having presided

over the trial, I now believe the defendant would likely have made the same decision no matter

who represented him.

i.    *Counsel's Preparedness*

It bears emphasis that Mr. Stutman and Mr. Rhodes were prepared for the trial of

this case.  Even before the bail hearing on November 19, 2008, Mr. Stutman was familiar with

the large volume of materials related to the Weingartens' child custody proceedings in Rockland

County during the period from 1999 through approximately 2003, which involved, *inter alia*,

Jane Doe's allegations of sexual abuse.  *See* Tr. Nov. 19, 2008 at 10.  Though Mr. Rhodes was

new to the case as of that date, he had already reviewed a great deal of that material.  *Id.* at 8.

The ensuing motion practice confirmed the attorneys' familiarity with the case.

The defendant moved to dismiss the indictment on various grounds, for inspection of the grand

jury minutes with regard to the prosecutor's legal instructions on a critical element of the

offenses, to preclude several items of proposed testimony and for a bill of particulars.  The

government moved for, *inter alia*, an order pursuant to Fed. R. Crim. P. 15 directing the taking

of depositions in Europe and for an order pursuant to Fed. R. Evid. 412 precluding certain areas

of cross-examination of Jane Doe.  Since several of the proposed deponents would give "outcry"

testimony, the Rule 15 motion was infused with admissibility issues; since the defendant was

---

[10]        *See* Section B.2. & footnote 16, *infra*.

detained as a flight risk, the motion also raised thorny procedural due process concerns. The Rule 412 motion required a nuanced articulation of the anticipated defense, and of how due process required that the defendant be permitted to elicit certain testimony about Jane Doe's relationship with the neighbor in Belgium. In their written submissions and at the various oral arguments, Mr. Stutman and Mr. Rhodes demonstrated their ample knowledge of the facts of the case and of the applicable legal principles.[11]

In December, Mr. Stutman informed the Court that his review of the Rockland County proceedings had led him to complaints made to (and investigations undertaken by) one or more child protection agencies, and that the complaints had been made not only by Feige Weingarten and two of her children, but by community members as well. Counsel asked for more time to absorb all of that material so as not to "shortchange" the defendant at trial. Tr. Dec. 15, 2008 at 41. The time requested was given, and the trial was adjourned to March 2, 2009. The additional time was put to good use, for even as they were learning in late February from the defendant's people that he wished to replace them, counsel expressed their willingness and ability to proceed to trial. Letter dated February 23, 2009 from Mr. Rhodes to the Court, at 1-2. True, they lamented the defendant's reliance on his people in connection with retaining an expert and with respect to obtaining, transcribing and producing alleged tape recordings of Jane Doe and her mother, but counsel represented their ability and willingness to proceed to trial. *Id.*

My first question upon learning of the defendant's desire to represent himself was directed not to the defendant but to counsel. I asked them both if they were prepared to defend the case. Each answered, unequivocally, that he could. Tr. 8. I accepted those representations,

---

[11]     *See*, *e.g.*, Letter dated December 8, 2008 from Mr. Rhodes to the Court (opposing Rule 15 motion); Def.'s memorandum of law in support of his motion to dismiss the indictment, filed November 26, 2008.

not merely because Mr. Stutman and Mr. Rhodes have a professional obligation to the Court, and their representations deserve respect, but also because they were confirmed by all my interactions with them during the pendency of the case. Accordingly, whatever the defendant *believed* with regard to counsel's preparedness for trial, counsel were in fact prepared to try this case. Moreover, though the defendant himself made it clear that there had not been a breakdown in communications between him and his lawyers (as discussed more fully below), I am confident that Mr. Stutman and Mr. Rhodes would not have said they were prepared to defend the case if any such breakdown had occurred.

      ii.    *The Defendant's Belief in His Own Lawyering Skills*

The defendant himself made it clear that he chose to go *pro se* for a reason that had nothing to do with any communication breakdown: he thought he would be better at lawyering than his lawyers would be.

Modesty is not among the defendant's character traits. When Mr. Stutman observed during jury selection that he was a teacher, not a rabbi, the defendant interjected that, as a graduate of a rabbinical college, he is "even higher" than a rabbi. Tr. 51. To the jury, he analogized his position as a teacher at a yeshiva to that of a dean of a college. Tr. 161.

In discussing with me his decision to represent himself, the defendant explained that the lawyers failed his pre-trial tests of their abilities. He "gave them one or two examples" of what "she" (presumably Jane Doe) had said in the grand jury and challenged them to rebut the statements. They failed. Tr. 13. Though he was able to show them how to do it, "because I still know my case better than everyone," he did not have enough time to give such instructions for "the whole case in one day." *Id.* The problem with the lawyers, the defendant further explained,

was that rebutting the victim's story "would have, let's say, ten or fifteen steps," and they would take "the second step before the first step." Tr. 14.

The role Weingarten sought for his counsel flatly contradicts his claim that there was a breakdown in the relationship. "I'm taking that choice," the defendant responded when I asked if he wanted to represent himself despite my strong advice against it, "but I have to be able to speak to [Mr. Stutman and Mr. Rhodes]." Tr. 16. And indeed, throughout the proceedings, the defendant acted like he was the lawyer and Mr. Stutman and Rhodes had been assigned to him as paralegals.[12]

In response to the post-trial motions, Mr. Rhodes has stated that the defendant told him that he "believes that he knows best, that he knows all, that everyone else is ignorant, and ... that he felt wonderful after he decided to go *pro se* and had gained complete control of the case." Rhodes Aff. ¶ 2. That was precisely the impression the defendant left on me as well. Indeed, during the critical moments when the defendant made the final decision to represent himself, it was his mantra. *See* Tr. 13 ("I still know my case better than everyone); Tr. 18 ("I still feel I'm the best to do it"); *id*. ("when I gave [Mr. Stutman and Mr. Rhodes] examples and I showed them how to do it, they didn't have anything with what to answer.").

Thus, the problem with the defendant's self-representation was not that he had no choice, but that he made a bad choice after a crystal clear warning against it. As is frequently the case with *pro se* defendants, Weingarten's conception of what the trial would be about, and what

---

[12]        *See* Tr. 209 (defendant wants lawyer to stay late to "find things" for use in defendant's cross-examination); *id.* (defendant needs time to give his lawyers "notes, this and there, and to go check that, talk to this guy in England, this guy there"); Tr. 953 (defendant states he will consult with counsel regarding whether defendant should testify). *See also* Section B.2. & footnote 16, *infra* (describing the consultations between the defendant and counsel during the trial).

would be relevant facts, was mistaken. During jury selection, he wanted me to weed Zionists out of the venire because the trial would address "issues about Arabs and Palestine." Tr. 53. His lengthy opening statement included a lecture on Judaism (Tr. 131-37), which he persisted in giving even after I suggested at sidebar it could hurt him (Tr. 133).

At the beginning of his cross-examination of his daughter, the defendant thought it advisable to inquire as follows:

> Q:     You have mentioned that your father has a hairy stomach
>        which made you disgusted because of his hairy stomach.
>        Do you still say that's true, that your father had a hairy
>        stomach?
>
> A:     Yes, you have a hairy stomach.
>
> Q:     Yes. Would you describe every hairy stomach is different,
>        even if it's hairy. We'll talk about if it's hairy, but every
>        hairy stomach, it could be full, it could be in special areas.

Tr. 336. In cross-examining both Jane Doe and his son Yoinesun, the defendant thought it advisable to dwell on whether they had complied with Jewish law. He grilled Jane Doe on whether she followed the rules "unclean" women must follow when attending a relative's deathbed and funeral, whether she respected the strict separation of the sexes at her grandfather's funeral, and whether she knew the rules regarding women washing their hands in the street after a funeral. Tr. 414-19; 425-30. The line of questioning culminated in a rant about Jane Doe's conduct in the Satmar community before her "secular [life], [her] atheism." Tr. 427. The cross-examination of Yoinesun included questioning about his observance of the Sabbath and other Jewish laws. Tr. 560. In both instances, the impression in the courtroom was clear: the defendant believed that a failure to abide by the religious strictures of the Satmar community reflected dishonesty.

19

Similarly, the defendant saw importance in other matters that had no bearing or only marginal bearing on the important issues at trial. For example, his cross-examination of Jane Doe focused on, *inter alia*, whether a particular international flight included a stop-over in Italy (Tr. 440-41); the property in her grandfather's estate (Tr. 446-47); whether she packed the family's possessions in Belgium with sufficient care to meet international insurance regulations (Tr. 490-95); and the defendant's ability to communicate in Flemish and the Belgium movers' ability to communicate in English (Tr. 483-88). I had to continually remind the defendant to focus on the claims of abuse. *See*, *e.g.*, Tr. 486.

Once the defendant demonstrated his preferred approach to defending his case, it became clear why Mr. Stutman and Mr. Rhodes failed the audition he gave them, and that no decent lawyer would have passed it.

### iii. *The Defendant's Attempt to Reassert Control Over His Victims*

There remains, however, one respect in which the defendant's decision to represent himself made sense. And more than any other factor, the observations set forth below fuel my belief that there may well have been no circumstances in which the defendant would *not* have chosen to represent himself.

I tried hard, as earnestly as I could, to talk the defendant out of representing himself. At the time, I thought the best, most persuasive argument I could make was to focus on how unseemly it would be for him to personally cross-examine his own daughter after she testified that he had sexually abused her for years. Such a spectacle struck me as so obviously contrary to the best interests of the defense that I thought it might persuade the defendant to relent.

The moment the defendant began his cross-examination of Jane Doe, I realized how naive I had been. Testimony I credit proved that he once totally controlled Jane Doe, Yoinesun and his ex-wife Feige. He abused them, mentally, physically, and, in Jane Doe's case, sexually as well. At trial, it was clear the defendant wanted to own them once again, to get inside their heads again in a way he could not accomplish if he sat at the defense table while a lawyer cross-examined them. I now believe the main argument I was using to dissuade him from representing himself was the most likely reason he was going to represent himself no matter what I said.

I have seen fear in courtrooms before, but I have never seen anything like what I saw in this case. And it was not only visible -- anyone present could *feel* Jane Doe's fear of her father. It filled the courtroom. One of the many indelible images from this trial was Jane Doe's testimony describing the face the defendant made when he was angry at her. A trial transcript often cannot do justice to the testimony it preserves, and in my experience that has never been more true than it is with the trial transcript here at pages 222, 247 and 303, where Jane Doe testified about the face of her father before he beat her. When she gave the testimony reflected on page 247, she actually mimicked him, jaw forward and imaginary pais held back away from the angry face, and observers could see the defendant's face in hers. Another indelible image was Jane Doe's reaction at the very start of the cross-examination, when the defendant said her name. *See* Tr. 323. She burst into tears. She turned and asked me quietly -- and I see now this was not captured by the court reporter -- if I could make it so he would never say her name again.

The defendant's son and ex-wife began their cross-examinations the same way

Jane Doe started hers. Their fear was palpable.[13]  And the same thing happened, in different

degrees, to all three of them as their testimony progressed:  they all gathered strength.  I am

certain part of the reason was the passage of time -- it had been years since the defendant abused

them and dictated every facet of their lives.  And part of the reason had to be the feeling of

security the courtroom itself gave them despite the defendant's presence.  In any event, the

defendant's obvious effort to climb back into their heads failed, and courtroom observers could

actually watch them coming to that realization.  In Feige Weingarten, it produced one of the

more unusual courtroom scenes I have witnessed.  The transcript at 740-41 fails to fully convey

what happened, *i.e.*, why I had to tell Feige Weingarten to get a grip on herself.  She delivered a

wisecrack to her ex-husband in an answer on page 740, and I admonished her.  Then she began

laughing, and her laughing gathered steam and became uncontrollable.  When she could not stop,

a break was necessary.  It was not disrespect on Feige Weingarten's part; rather, in my view, it

was all relief and release.

That the defendant's strategy was to reassert his dominance over his family

members was placed in even clearer relief by the change in him the moment someone outside his

family testified.  When Robert Longman, the police constable from England, took the stand on

the fourth day of the trial, the defendant's demeanor changed dramatically.  He had been calm

and collected, and in a perverse way seemed to be enjoying himself,[14] during his opening

---

[13]    The scene not far into Yoinesun's cross-examination, where he stood, facing the rear wall of the courtroom, and cried uncontrollably, is not captured in the record.  Feige's refusal to answer questions (and the resulting admonition), reflected on page 727 of the trial transcript, was plainly the result of fear.

[14]    The defendant visibly enjoyed reducing his daughter to tears.  When I pointed that out to him at sidebar, he laughed some more.  Tr. 443.  I also had to admonish the defendant for making gestures at the victim while she testified on direct.  Tr. 288.

statement[15] and when Jane Doe and her older brother testified. The moment Longman took the stand, however, the defendant became visibly agitated. He attributed it first to Longman's British accent, which concededly required us all to adjust at first. Tr. 658. But when Longman was directed to speak more loudly and slowly, he did just that. The defendant's agitation continued, and the record captures some of this at pages 658-68. The defendant complained that the interpreter was not translating the testimony into Yiddish for him but then, when the interpreter started translating, the defendant repeatedly told him to stop. Tr. 667-68. The defendant interrupted Longman's direct examination. Tr. 658-60. In my view, the reason for the change was that damaging testimony was coming from someone the defendant did not believe he could control; without that advantage (or at least that perceived advantage), the defendant was a different person in the courtroom.

Having presided over the trial, I now reject even more emphatically than I did at the time the defendant's complaints about his lawyers and his claim that he felt compelled to represent himself only because he had no confidence in them. I now believe that there were likely no circumstances in which the defendant would have given up his right to personally interrogate Jane Doe, his eldest son and his ex-wife. I also believe he knew no lawyer would have done what he insisted on doing: putting daughters he still controls on the witness stand to give robotic, preposterous testimony in his defense.

---

[15] The defendant, a former teacher at a yeshiva, gave a long, rambling opening statement that he plainly enjoyed. *See* Tr. 133 (Court remarking on how comfortable the defendant was before the jury). To the extent current counsel's crass reference to the defendant's "Pidgin English" (Def.'s Mem. at 15) is intended to suggest that the defendant was impeded by language difficulties, I reject the suggestion. Though the defendant speaks heavily accented English, he has a thorough command of the language. Admittedly, he claimed otherwise (*see* Tr. 20, 142, 145), but outside the presence of the jury I rejected the claim as bogus (*see, e.g.*, Tr. 16, 20, 408). I arranged for a Yiddish translator anyway (*see* Tr. 20, 408), and the defendant proved me right by rejecting any assistance from the translator. *E.g.*, Tr. 666-68. The translator remained anyway, and was not used by the defendant.

c.    *The Sufficiency of the Court's Inquiry*

The defendant claims that my inquiry of him prior to allowing him to represent himself was insufficient. I find this argument to be without merit.

Before allowing a defendant to represent himself, the judge should obtain a knowing and intelligent waiver of the right to counsel. Though there is no set script that must be followed, *see United States v. Fore*, 169 F.3d 104, 108 (2d Cir. 1999), the judge must generally explain "the dangers and disadvantages of self-representation." *Faretta v. California*, 422 U.S. 806, 835 (1975). There should also be sufficient discussion between the judge and the defendant to persuade the judge that the waiver is a rational one, and that the defendant has the mental capacity to understand the consequences of relinquishing the right to counsel. *See United States v. Schmidt*, 105 F.3d 82, 88 (2d Cir. 1997).

I have no doubt that my discussion with the defendant satisfied these standards. My persistent and repeated efforts to dissuade him, both prior to jury selection and on each end of the lunch hour after the jury was picked, were intended to serve two purposes. First, I hoped to succeed, *i.e.*, that the defendant would agree to be represented by his counsel. The second purpose was to ensure that if I failed, there would be no doubt about the defendant's understanding of the consequences of his choice and that the choice was not only a voluntary one but indeed a determined one. The record of our colloquy speaks for itself. *See* Tr. 7-19, 28, 99-100, 107. It is sufficient to note here that I found the defendant's decision, though unwise, was informed, rational and voluntary. I reiterate that finding here, and accordingly reject the defendant's claim that a new trial is warranted on this ground.

2.    *The Claimed Interference With the Right to Self-Representation*

24

The defendant claims that after he was improvidently granted the right to represent himself, that right was infringed by Mr. Stutman and Mr. Rhodes. This argument is frivolous.

The defendant's argument relies on the principles set forth in *McKaskle v. Wiggins*, 465 U.S. 168 (1984). In that case, the Supreme Court held first that a "*pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury." *Id.* at 178. If standby counsel perform a role over the defendant's objection that effectively allows counsel "to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded." *Id.* (emphasis in original). Second, the Court held that "participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id.* Citing *McKaskle*, the defendant contends that it "was a folly for the Court to appoint Mr. Stutman and Mr. Rhodes as standby counsel," and that their "unsolicited participation at trial eviscerated Defendant's right to present his own defense." Def.'s Mem. at 8-9.

As for the first contention, *McKaskle* makes clear that there is no absolute bar to the appointment of standby counsel even where a defendant objects. *See* 465 U.S. at 176-77. More to the point, however, is the fact that the defendant did not object to my appointment of Mr. Stutman and Mr. Rhodes as standby counsel. To the contrary, he insisted on it. As discussed above, when he chose self-representation over representation by Mr. Stutman and Mr. Rhodes, the defendant said he had "to be able to speak to them" during the trial. Tr. 16. And

speak to them he did, throughout the trial.[16]  In short, the input of standby counsel in this case was not only unsolicited, it was demanded by the defendant himself.

The defendant claims that he was "set up" by Mr. Rhodes, that is, that Mr. Rhodes deliberately induced him to ask two objectionable questions.  Def.'s Mem. at 9.  I find the accusation irresponsible.  The first of the two questions was indeed a mistake, for which Mr. Rhodes accepted full responsibility at sidebar.  *See* Tr. 375-76.  The second, which related to whether the defendant had ever abused the witness (his daughter Chaya), reflected nothing more than Mr. Rhodes's unflagging effort to assist the defendant.  *See* Tr. 900-01.  That I sustained an objection to the question hardly indicates, as defendant now suggests, that Mr. Rhodes sought to undermine the defense.  The defendant's memorandum on this issue asks, "Who was running the defense?  The Defendant or the standby counsel?"  Def.'s Mem. at 9.  Though these questions are no doubt rhetorical, they deserve to be answered.  Israel Weingarten, not his standby counsel, ran the defense at trial.  No reasonable observer of the trial or reader of the trial transcript would contend otherwise.

The argument that the defendant's "decision to not take the stand in his defense was made by *standby counsel*," Def.'s Mem. at 10 (citing Tr. 960, emphasis in original), overlooks the colloquy a few minutes earlier.  I spoke directly to the defendant about his decision whether to testify.  Tr. 952.  He told me at the time that he would confer with standby counsel before making his decision.  Tr. 953 ("I'll have a meeting with my lawyers and ask them.  At least they serve me on that.").  A few minutes later, the defendant did just that, and counsel reported, in the defendant's presence, that the defendant's decision was to not testify.

---

[16]        *See*, *e.g.*, Tr. 409, 414, 417, 433, 435, 475, 481, 525, 568, 597, 645, 711, 712, 752, 756, 783, 793, 873, 953, 960 (all reflecting consultations between Weingarten and either Mr. Stutman and Mr. Rhodes or both).

Tr. 960. The defendant's implicit suggestion that this was not in fact his own decision is nonsense.

       3.       *The Motion for a Continuance*

      The defendant claims that the Court abused its discretion by denying him a continuance. The motion focuses on the request made (and denied) on February 25, 2009.

      By way of background, the original trial date in this case was January 20, 2009. That date was set on October 28, 2008. However, on December 15, 2008, defendant's counsel informed me that more time was needed to prepare for trial. When I asked how much additional time was needed, I was told by Mr. Stutman "I would realistically ask the court for the first week of March, if that's possible." Tr. Dec. 15, 2008 at 42. Based on that representation, I adjourned the trial to March 2, 2009.

      On February 6, 2009, defense counsel orally sought another adjournment at a court appearance called to address various unrelated matters. Counsel requested an adjournment into May -- substantially beyond the Passover holiday period, which would begin on April 10 -- so that "community leaders" and "anticipated defense witnesses" could clean their homes for both Purim (occurring on March 9) and the Passover holidays. Tr. Feb. 6, 2009 at 39-45. Because the trial in the case was expected to take less than two weeks (and in fact consumed less than seven trial days), the March 2 date had been fixed at the defendant's request, and the Court had a crowded trial calendar, the adjournment request was denied.

      On February 25, 2009, five calendar days before trial, Weingarten made the application at issue here. The motion came before me in an odd way. On February 23, I received a letter from Mr. Rhodes informing me that he had received an e-mail from one of the

defendant's "supporter[s]" advising him that the defendant had mailed a letter to the Court seeking the dismissal of Mr. Stutman and Mr. Rhodes as his lawyers. *See* docket entry 42. I had received no such letter, but with jury selection just a week away, I calendared the case for February 25 to address the issue.

On that date the defendant handed me a copy of a letter dated February 23, 2009 to me from him, which I made part of the record. *See* docket entry 47. It complained that Mr. Stutman and Mr. Rhodes had, *inter alia*, "not spent with me more than 30 hours," had shown him "dishonesty, lack of communication and above all, lack of integrity." Def.'s Feb. 23, Letter at 1. He asked me to "give my people a possibility to hire more appropriate lawyers." *Id.* at 4. Though a continuance was not explicitly requested, such a request was obviously implicit in the defendant's request to replace his legal team.

To "show" the lawyers' alleged dishonesty, lack of communication and lack of integrity, the defendant's letter attached a November 27, 2008 letter from Mr. Rhodes to the defendant. It addressed a number of issues, including an enclosed affidavit for signing by the defendant; what would be needed to support a renewed bail application; and a forthcoming government motion. I reviewed the defendant's letter and its attachments, *see* Tr. Feb. 25, 2009 at 4, and believed at the time that his complaint about Mr. Rhodes's letter focused on its first paragraph, which reads as follows:

> Dear Mr. Weingarten:
>
>> My apologies are extended if you view our last session as a bit harsh; it is essential that you be prepared very quickly for your testimony at trial. That means staying on point and keeping it brief, which is what Mr. Stutman and I were forcing you to do. Your innocence and your intelligence drive you in different directions than we as lawyers know

you must go as a witness.

Letter dated November 27, 2008 from Mr. Rhodes to defendant (attached to docket entry 47).

After reviewing the defendant's letter I stated as follows:

THE COURT: Okay. I will make this a part of the record. This is dated February 23, from Mr. Weingarten to me.

Let me make a few observations to you in light of what you have written to me in this letter. First, it may strike you as unusual and anomalous for a lawyer to file an affidavit before it gets signed, but it actually happens quite a bit, and they follow up with a signed copy. That's kind of not significant from my perspective.

I understand you are upset with regard to my denial of your request for an adjournment of the trial date so that people could get ready for Purim and Passover; but that's a judgment I made, and I'm not persuaded that it's inconsistent with the religious needs of the people you would like to call as witnesses or for whatever purpose have present for the trial, to go to trial on Monday. Nothing that's said in here disabuses me of that notion. I was listening and, with respect, I disagree with that application.

You attach a letter from Mr. Rhodes that evidences what you say is and what he describes as a harsh session that he had with you. I'm not sure why you would want to share that with me, but if it's to try to persuade me that if your lawyer has had rough sessions with you that means that's a reason to discharge him or relieve him at this late date, that's just not persuasive to me. Don't interrupt me. Your lawyer is not serving you well if everything is peaches and cream and everything is cordial.

You are in the fight for your life right now, not literally but maybe figuratively. Maybe as a practical matter you are in the fight of your life, and a lawyer's job is to not just to hold your hand and walk you through it, but -- who knows what this was about. It's obviously about preparing you for your testimony.

You know, you could have a lawyer who is going to do nothing but coddle you all along the way, and maybe that's good legal representation, but in most instances, it's lousy legal representation.

Lastly, I'm going to tell you my impression. I will let you address it. You know, I don't really care about your people. I don't know who your people are. You say your people hired these lawyers.

These are your lawyers who came into this case to represent you. They have been fighting for you. We are now three business days before the start of the trial, and you are telling me you never wanted them from the outset.

I have no intention -- that just doesn't strike me as a meritorious application, to adjourn the case so that you and your people, whoever they are, can find a new lawyer. You should have done this before now.

Now you can speak.

Tr. Feb. 25, 2009 at 4-6.

The defendant thereupon delivered an array of oral complaints about his attorneys. I excluded the government while the defendant addressed (1) the fact that counsel had to amend the affidavit of the defendant that had been submitted in support of the defendant's motions; (2) the previously-mentioned problem with the Purim holiday; (3) the attorneys' preparation of him for testifying; (4) the fact that his wife was abusing him; (5) his differences with his lawyers about how to challenge Jane Doe's credibility; (6) their tactical failure in connection with the bail motion; and (7) their failure to discern a problem with the chronology of events provided by Jane Doe to the prosecutors and to Rockland County officials. Tr. Feb. 25, 2009 at 8-19.

At the conclusion of that sealed sidebar, I denied the motion. I rejected the defendant's claim that his lawyers -- who were not seeking to withdraw, *see* Letter dated February 23, 2009 from Mr. Rhodes to the Court, at 1 -- could not represent the defendant. I also did not credit his assertion that he had believed for months that they were unable to

represent him.  I told the defendant that if he wished to *add* to his legal team he could, but his application for an adjournment of the trial was denied.  Tr. Feb. 25, 2009 at 21-22.

I concluded then, and reiterate here, that there were no meritorious grounds for the defendant's eleventh-hour request.  Defense counsel were prepared to try the case, which, despite the state court custody proceedings, was not a particularly complicated case.  To the extent they might have been better prepared, it was only because the defendant himself allocated some of the responsibility to his "people."  The claim that Purim and house-cleaning needs for Passover (which would not occur until almost a month after the trial ended) would deprive the defendant of defense witnesses was hollow.  That there were any exculpatory tapes at all, let alone the hundreds of such tapes recklessly suggested by the current motion, is extremely doubtful.

Trial courts exercise broad discretion when they entertain applications for adjournments.  *See Morris v. Slappy*, 461 U.S. 1, 11 (1983).  At the time I denied the February 25, 2009, application, I believed I was exercising that discretion prudently, with due regard for the defendant's legitimate interests.  Nothing that has occurred since, or that has been argued in the instant motion, has altered that belief.  Accordingly, the motion for a new trial on this ground is denied.

4.      *The Claim of Bias*

The defendant claims that my "apparent" bias against the defendant at trial requires a new trial.  Def.'s Mem. at 15.  I disagree.

As the defendant's motion acknowledges with emphasis, *id.* at 16, the Court extended itself to help the defendant present his case.  During the testimony of Jane Doe, for

example, I interceded on more than 70 occasions in an effort to help the defendant defend

himself.[17]  I did the same thing throughout the trial.  The defendant's penchant for asking

hopelessly compound questions and for interrupting everyone demanded extreme patience, and

[17]      Tr. 110 (explaining the difference between advocate and witness, and encouraging defendant to ask for a sidebar if he needed help); Tr. 133 (advising defendant that religious lecture in opening statement could hurt him); Tr. 142 (invitation to sidebar if defendant had questions); Tr. 167 (allowing defendant much more time to make opening statement than a lawyer would have received); Tr. 209-10 (delaying defendant's return to detention center and directing his early return to court the next morning); Tr. 211 (advising defendant to read Jane Doe's "3500 material" to prepare for her cross-examination); Tr. 311 (advising defendant that he could ask leading questions on cross-examination); Tr. 324-25 (advising defendant regarding foundation for prior inconsistent statements); Tr. 328-30 (assisting defendant's presentation of Jane Doe's grand jury testimony); Tr. 335 (explaining again how to lay foundation for prior inconsistent statements); Tr. 337 (helping to pose question); Tr. 338 (helping to break down compound question); Tr. 338 (instructing defendant to pose bite-sized questions); Tr. 338 (helping to break down compound question); Tr. 340 (explaining difference between testifying and inquiring); Tr. 343 (same); Tr. 344 (same); Tr. 350 (encouraging defendant to pose simple questions); Tr. 350 (same); Tr. 350-51 (helping to break up compound question); Tr. 353-54 (assuring defendant he will be treated with respect but admonishing against gestures protesting adverse rulings); Tr. 357-58 (helping to pose shorter question); Tr. 362 (advising defendant to avoid mischaracterizing Jane Doe's testimony, which was preventing him from establishing chronology of events); Tr. 362 (asking question for defendant); Tr. 367 (same); Tr. 363-64 (helping defendant refer to Rockland County deposition testimony); Tr. 364 (lending defendant my copy of deposition transcript); Tr. 365 (posing clarifying question); Tr. 365 (helping to pose question); Tr. 366 (helping defendant pose question without mischaracterizing prior testimony); Tr. 367 (helping defendant form simple question); Tr. 368 (interrupting narrative to help defendant ask questions); Tr. 370 (helping to pose questions); Tr. 370 (same); Tr. 372 (same); Tr. 376 (advising defendant that he could ask Jane Doe if her relationship with Belgian neighbor was sexual); Tr. 378 (posing question for defendant); Tr. 379-80 (figuring out what defendant wanted to ask and helping him ask it); Tr. 383 (breaking down compound question); Tr. 384 (same); Tr. 386 (posing questions for defendant); Tr. 387 (advice on difference between examination and summation); Tr. 388-94 (trying to identify question; advice on cross-examination based on alleged tape recording); Tr. 395 (more advice on need for bite-sized questions); Tr. 396 (help with posing questions); Tr. 402 (advice regarding how to ask questions as foundation for recorded statements); Tr. 413 (clarifying question); Tr. 414 (posing questions for defendant); Tr. 416 (same); Tr. 421 (clarifying question); Tr. 422-23 (same); Tr. 437 (posing questions for defendant); Tr. 438 (helping to pose questions); Tr. 443 (advice regarding compound questions); Tr. 445 (posing questions for defendant); Tr. 449 (encouraging defendant to focus on allegations); Tr. 452 (posing question); Tr. 453-54 (helping to pose question); Tr. 454 (breaking up compound question); Tr. 458 (advising defendant how to ask leading questions); Tr. 458-59 (helping defendant convert his own assertions into leading questions); Tr. 461 (breaking down compound question); Tr. 461 (same); Tr. 463 (clarifying testimony); Tr. 464 (same); Tr. 466 (breaking up compound question); Tr. 467 (clarifying question); Tr. 469 (clarifying question); Tr. 471-72 (helping defendant pose question); Tr. 478 (posing question); Tr. 481 (helping defendant frame question); Tr. 484 (helping to frame questions); Tr. 493-94 (advising defendant to move to more relevant subjects); Tr. 499 (helping to narrow question); Tr. 500 (helping to frame question); Tr. 501 (helping to identify question); Tr. 501-02 (assisting with compound question); Tr. 503 (helping to identify question); Tr. 505 (advising defendant to ask simple questions); Tr. 507 (helping to identify question); Tr. 509-10 (inquiring at sidebar whether defendant truly wanted to elicit potentially damaging testimony); Tr. 511 (helping to divide compound question).

he received it.[18]

Recognizing that, the defendant says the "question remains as to what impression the Judge's actions and demeanor may have left on the jury." Def.'s Mem. at 16. His answer to that "question" is based not on the trial record, but on a New York tabloid's report of an exchange between me and the defendant when the jury was out of the room. *Id.* Since I took pains to ensure that the jury was not exposed to any media reports, *see e.g.*, Tr. 206, 776, 1101, I need not address the argument further. The motion for a new trial on this ground is denied.

5.     *The Failure to Make a* Curcio *Inquiry*

The defendant's claim that his due process rights were violated because I failed to conduct a "*Curcio* inquiry," Def.'s Mem. at 17, fails because his counsel were not afflicted with a potential conflict of interest. The claimed "serious conflict" allegedly arose out of (1) the attorneys' "beating up" the defendant; and (2) the alleged filing of a false affidavit. *Id*. at 18. But the "beating up" remark was simply a figure of speech commonly used (as it was here) to refer to a lawyer's preparation of a client for cross-examination. *See* Tr. Feb. 25, 2009 at 19. As for the alleged false affidavit, nearly three months earlier Mr. Rhodes had made minor changes to a previously-filed (and unsigned) affidavit of the defendant. He accurately reported at the time that "[t]his, the final Affidavit, is essentially the same as the first one. It is just longer." Letter dated December 27, 2008 from Mr. Rhodes to the Court, at 2 (attaching the final, executed

---

[18]     In addition, I devoted considerable effort and time to assisting the defendant with his defense at the conclusion of testimony on March 5, 2009. Tr. 778-811, 797 ("Your life is on the line. I want to give you every opportunity to defend yourself."). My goal was to help him understand whether evidence he planned on introducing and testimony of witnesses he claimed would be flying across the Atlantic would be admissible and/or cumulative. For example, I advised him that evidence he sought to introduce about his anatomy at the time of the abuse through a party that never actually observed it would be inadmissible as hearsay, but that he would be permitted to prove it another way. Tr. 794-98.

affidavit).  Neither of these events gave rise to a potential conflict of interest.  Accordingly, the motion for a new trial on this ground has no merit.

## CONCLUSION

For the reasons set forth above, the motion is denied in all respects except one. Specifically, the claim that counsel rendered ineffective assistance to the defendant prior to trial is not addressed here, and it may be asserted again in a collateral challenge pursuant to 28 U.S.C. § 2255.

So ordered.


John Gleeson

Dated: Brooklyn, New York
        May 8, 2009