UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X

DOCKET NO. 08-CR-571 (S1) (JG)

UNITED STATES OF AMERICA


      -against-

                             **SENTENCING MEMORANDUM**

ISRAEL WEINGARTEN,

           Defendant.
_____X


## PRELIMINARY STATEMENT

Israel Weingarten comes before this Court for resentencing following remand by the United States Court of Appeals for the Second Circuit on January 18, 2011, reversing one count of conviction, Count Three. *United States v. Weingarten*, 632 F.3d 60 (2d Cir. 2011). Accordingly, "the constellation of offenses of conviction has been changed and the factual mosaic related to those offenses" has been altered. *United States v. Quintieri,* 306 F.3d 1217, 1227-1228 (2d Cir. 2002). Thus, this court is required to "confront the offenses of conviction and facts anew" and sentence Mr. Weingarten *de novo. United States v. Rigas*, 538 F.3d 108, 115 (2d Cir. 2009).

This memorandum focuses on the sentencing requirements of 18 U.S.C. § 3553(a) and argues that based on Mr. Weingarten's age, health, his susceptibility to

abuse in prison, the unlikelihood that he would re-offend, and other relevant material

information to the sentencing determination that a reasonable variance is warranted

from his applicable Guidelines range of 168-210 months, but in no event, a sentence

greater than the low end of the applicable Guidelines, is "sufficient but not greater

than necessary" to fulfill the purposes of a criminal sentence.[1]

**PROCEDURAL HISTORY**

Mr. Weingarten was indicted on August 18, 2008, in connection with three

instances of travel to the United States for his travel with his then minor daughter,

Leah, (all occurring more than 10 years prior to the indictment) for the purpose of

engaging her in sexual abuse. All accusations concern incestuous conduct.  Counts

One and Four relate to Mr. Weingarten's his transportation of  Leah and his travel

with her from Israel to Brooklyn in or about July-August 1997 for the purpose of

sexual abuse. Counts Two and Five relate to  Mr. Weingarten's transportation of Leah

and his travel with her from Brooklyn to Antwerp, Belgium, in or about August-

September 1997, for the purpose of sexual abuse.  Counts One and Two are charged

as violations of 18 U.S.C. § 2423(a) (1997)  and specifically charge  Mr. Weingarten

with the transportation of Leah with the intent that she would engage in sexual activity

---

[1] This memorandum adopts in whole and by reference the arguments of prior counsel and
Mr. Weingarten, *pro se*, as set forth in  previous sentencing proceedings, including sentencing
memorandum, objections to the initial and first amendment to the Presentence Report.

for which he could be held criminally liable under New York law.  Counts Four and Five, charged as a violation of 18 U.S.C. § 2423(b) (1997), and specifically charged Mr. Weingarten with his own travel in connection with his transportation of Leah, respectively with Count One and Count Two.  Count Three, reversed by the Court of Appeals, charged Mr. Weingarten with traveling in foreign commerce from Antwerp to Israel in or about April - July 1997 for the purposes of engaging in sexual activity with the same daughter in violation of 18 U.S.C. 2423(b) (1997).

Mr. Weingarten was arrested on October 6, 2008, and has been incarcerated continuously since that date.  One week before jury selection, Mr. Weingarten dismissed the lawyers who had been hired for him by supportive members of his closely-knit Satmar Sect of the Orthodox Jewish Community. Despite the advice of this Court and many others, Mr. Weingarten elected to represent himself.  Not surprisingly, he was inept at trial and only a few days of testimony, he was convicted on March 11, 2009, of all counts.

The Probation Department's First Addendum to the Presentence Report ("PSR"), dated April 29, 2009, calculated a Guidelines sentence of 262-327 months (a range of 21 years and10 months to 27 years and three months) using the 1997 edition of the Guidelines because of an *ex post facto* issue that would have arisen had

the Guidelines in effect on the date of sentencing been used.[2]  On May 8, 2009, this Court sentenced Mr. Weingarten to serve 30 years in prison.  On each of Counts One, Two and Three, this Court sentenced Mr. Weingarten to the statutory maximum of 10 years which sentences were to run consecutively to one another.  On Counts Four and Five, this Court also sentenced Mr. Weingarten to the statutory maximum of 10 years, but ordered that these sentences were to be served concurrently with each other and concurrently with the sentences imposed on Counts One, Two and Three.  The Court also sentenced Mr. Weingarten to three years of supervised release with specified conditions on each count with the terms to run concurrently, and imposed the required special assessment.  *See* Sentencing Transcript, May 27, 2009 ("Sent. Tr.") at 78-79.

On June 9, 2011, the Probation Department, again using the 1997 edition of the Sentencing Guidelines, recalculated the Guidelines sentence following the remand and determined it to be 210 to 262 months (a range of 17.5 years to 21 years and 10 months).  On August 25, 2011, Mr. Weingarten notified the Probation Department of his objections to the Second Addendum, notably its failure to recite for the Court Mr. Weingarten's current health status and the hardships of his confinement. *See* attached letter to Probation, filed herewith in Exhibit A. Mr. Weingarten supplemented his objections by letter on August 29, 2011 to assert that Probation's grouping

---

[2] All of the references herein to the statute under which the prosecution proceeded and the applicable Sentencing Guidelines are to the versions in effect in 1997 unless otherwise stated.

4

calculations are erroneous and that the correct adjusted guideline range should be Level 35, which is 168 to 210 months (a range of 14 years to 17.5 years). Exhibit A.

**BACKGROUND**

Mr. Weingarten is 61 years old, slight of stature and a member of one of the most ultra-Orthodox Jewish sects, Satmar. He is a second generation Holocaust survivor. His father's first wife and three children, who Mr. Weingarten has always related to emotionally as siblings, perished in the Holocaust.

Mr. Weingarten's parents were married in Europe in 1948 and immigrated to the United States. Mr. Weingarten was born in Brooklyn in 1950 and raised in a pious Chassidic environment. At an early age Mr. Weingarten displayed an extraordinary aptitude for Torah study and both his parents were very proud. As a youngster, he pursued his studies in schools outside his neighborhood, and while still a teenager he was sent to Israel to study. His father suffered from war-related depression and thus was emotionally distant, but Mr. Weingarten was very close to his mother who suffered medical problems with the birth of her youngest child that incapacitated her for life. His mother died in 1995; his father died in 1997.

Mr. Weingarten pursued the life of a scholar and educator, shunning the material opportunities that working in another profession might have offered. He received a small stipend for his teaching and academic administrative responsibilities

that while his mother was alive was supplemented by funds from his parents who supported his decision to follow this calling.

Mr. Weingarten met his wife while he was living in Israel, though in contrast to the usual pattern in which parents make such choices, he relied on friends, peers and elders to advise him in this regard. The selection of Feige as a wife was based on the fact that she came from a good family and was reportedly well-organized, efficient, practical, and could manage day-to-day affairs.

Mr. Weingarten and Feige were married in 1979 and divorced in 2002. During the course of their 23 year marriage the union produced eight children. There is no dispute that the marriage was contentious and dysfunctional virtually from the beginning and deteriorated seriously after the birth of each child.

A.    **Family Relationships**

One of the most unfortunate consequences of Mr. Weingarten's decision to represent himself is that the trial record is woefully deficient with respect to material, relevant testimony from witnesses who would have placed before the court another view of the family and Mr. Weingarten's relationship with his children.[3] We present

---

[3] Mr. Weingarten requested an adjournment to secure new counsel and to all overseas witnesses to travel to Brooklyn to testify on his behalf. The Court denied his request, citing court calendar issues and noting that Mr. Weingarten's argument that witnesses could not be available because of the upcoming Passover holiday was not credible because the seven-day trial was scheduled to conclude approximately two weeks before Passover would even begin. *See United States v. Weingarten*, 2009 WL 1269722 at *14, *16 (E.D.N.Y. May 8, 2009). Mr. Weingarten and his counsel failed to apprise the Court that in contrast to adherents of Reform, Conservative and

here  some of that information,  not in an effort to undermine or disrespect the jury's verdict, but simply to complete the record for the purposes of sentencing and to supplement the PSR with information that enables the Court to gain a sense of a different Israel Weingarten- one who bears no resemblance to the person described to the jury.

In 2001, Mrs. Weingarten applied to a rabbinic court (the Biet Din) in Monsey, New York, for a divorce and custody of their then six minor children.  In 2002, the three judges of the Biet Din ordered Mr. Weingarten to give his wife a divorce (in the Orthodox tradition, a religious divorce can only occur when the husband grants a "get" to the wife), but refused to give her custody.  In a departure from usual tradition which favors maternal child custody, the Biet Din awarded full custody to Mr. Weingarten.

Approximately at the same time that she was denied custody and thereafter for two years, as detailed to some extent in the PSR at ¶¶ 126-133, Mrs. Weingarten, with the help of family and friends, in an effort to circumvent the Biet Din ruling,

---

even modern Orthodox Judaism, in the ultra-Orthodox Satmar community, cleaning and emptying out a residence in preparation for Passover starts the first day afer Purim and it takes the entire 28 day period before the Passover holiday begins.  It is an arduous process that requires scrubbing literally every nook and cranny in the house and thereafter keeping it clean until the holiday begins. *See* Affidavit of Rabbi Chaim David Weiss ("Weiss Affidavit") at ¶ 10(d) filed herewith as Exhibit B.  (Rabbi Weiss has been traveling and is presently in transit between Israel and Belgium.  He has authorized counsel to submit his Affidavit, but it remains to be executed.  It will be filed with the Court as a supplement to this Memorandum.)

unrelentlessly filed *seriatim* complaints against Mr. Weingarten that he had abused and neglected the children with the Departments of Child Protective Services ("CPS") in both Orange and Rockland Counties, and specifically that he had sexually abused Leah, Chana and Chayeh. Her complaints prompted cross-complaints by Mr. Weingarten. CPS had the authority to remove the children from the home and place them in foster care, and for two years social workers investigated the allegations and repeatedly dismissed all the complaints (hers against him as well as his against her) as unsubstantiated. The CPS records are voluminous.[4] They detail how social workers charged with investigating the allegations and making recommendations in the best interests of the children made unannounced home visits to Mr. Weingarten's house where the children were living. They sought information from the children's teachers and doctors, and interviewed not only the children and parents, but other relatives. Time after time they found no evidence of abuse. Quite the contrary, they found a loving home where the children were well cared for and safe. Nonetheless, every time that a case was closed, the documents demonstrate that within days,

---

[4] Counsel have obtained many of the CPS records and some of the discovery in the family court proceedings. They demonstrate a pattern of spurious complaints, intense investigation and review by supervisory personnel, and subsequent dismissals upon a finding of unsubstantiated complaints against Israel and counter-complaints against his wife. The plethora of complaints and allegations include numerous statements by Mrs. Weingarten that her daughters were never abused, then retractions of such statements followed by statements reaffirming that no abuse occurred. However, consistent in the more than 500 pages received is the Weingarten children's assertions that they were never abused by their father and that they wanted to remain in his custody. Upon request, counsel will make these records available to the Court for its review.

another complaint was made and CPS would have to investigate anew.

The first complaint reported to CPS was in December 2001. CPS investigated and found the allegations were unsubstantiated. *See* PSR at ¶ 126. The first complaint of child sexual abuse to be investigated by civil authorities in New York was in March 2002 when the Ramapo Police Department received an anonymous report that Mr. Weingarten was sexually abusing his daughter Chayeh. *Id.* at ¶ 112. The police investigated, and the charges were dismissed. *Id.* at ¶113. Within a week, a complaint was made to CPS alleging that Mr. Weingarten had sexually abused Chana. CPS investigated and found the charges were unsubstantiated. *Id.* at ¶ 126. Over the course of the period from December 2001 through September 2003 there were no fewer than six separate CPS investigations, four of which involved allegations that Mr. Weingarten had sexually abused the children. *Id.* The social service system charged with determining the best interests of the children an protecting them from harm repeatedly dismissed the complaints as unsubstantiated. *Id.* at ¶ 130.

In spring 2003, Mrs. Weingarten filed a petition in Orange County family court for sole custody of the children. Simultaneously, CPS complaints were made in both Orange County (where Mrs. Weingarten resided) and Rockland County (where Mr. Weingarten resided with the children). The social workers from Orange County

interviewed Leah whose complaint about sexual abuse was almost identical to the charges brought in this Court.  The complaints were subsequently consolidated and transferred to Rockland County.  Based on Leah's statements, in an abundance of caution to protect the children from any risk of harm and to give CPS time to investigate anew, the children were removed from Mr. Weingarten's custody and placed in foster care first with a niece and nephew and later in "unaffiliated homes," *i.e.,* homes  of non-relatives.  *Id.* at ¶¶ 132-133.  The children were hysterical at having been torn from the father and comforted only by the fact that they would be all kept together.  CPS records reflect that "while the children visited with [Mr. Weingarten] on a weekly basis, they refused to see their mother and acted negative towards her."  PSR at ¶ 133. Over the course of more than a year, CPS investigated, depositions were taken, and contested proceedings were held in the Family Court at the conclusion of which a civil court in Rockland County awarded custody of all the minor children to Mr. Weingarten (PSR at ¶ 133), and the children returned to live with their father where they continued to live uninterrupted until his arrest on October 6, 2008.

The Court at sentencing had grave reservations about the expressions of love and support by Chayeh S. Malba and Chana Golda Berkowitz (both nee Weingarten) who testified in the defense case as well as the other children who submitted affidavits

to the Court for its consideration at the original sentencing.  *See* Sent. Tr. at 75-77.

Relying on the trial testimony of Leah and her older brother, the Court believed Mr.

Weingarten had so dominated, manipulated and brainwashed these children, that they

were incapable of providing truthful testimony.  *See* Sent. Tr. at 75-77.  As stated

above, CPS after intensive interviewing and review of voluminous  records from

numerous disinterested parties, credited the statements of each of the children and

determined that in was in the children's best interests to be placed in the custody of

their father, not their mother, a determination that was adopted by a judge sitting in

Rockland County family court.  *See* PSR at ¶ 133.

   At the request of counsel, the three next oldest children after Yoni and Leah,

Chayeh, Yakev, and Chana have written letters to the Court in an effort to share with

the Court the father that they knew growing up and that despite his incarceration,

remains a presence in their adult lives.  They share their feelings about his upcoming

sentence.  Each, tries to impart to the Court, through examples, her and his own[5]

---

[5] In the original sentencing proceeding, the Court reacted with skepticism to affidavits submitted by the Weingarten children, suggesting that there was a formulaic quality to them and that they were laced with references inappropriate to children of their years at the time.  Counsel have met with the spouses of both Chayeh and Chana and each has expressed the view that their wives' were not brainwashed by the father.  They have normal, healthy marital relationships and have evidenced none of the trauma that would be expected.  Moreover, each has represented that the letters written to the Court are genuinely from the heart and that the feelings of support for Mr. Weingarten and loss at the prospect of a lengthy incarceration are real and sincere.  Counsel has also had several telephone conversations with each of these young ladies and each presented themselves as articulate, self-assured, and each expressed a genuine desire to assist counsel. These letters were drafted by these girls with counsel suggesting merely the type of information about their father that might be of interest to the Court.

feelings of love and support from Mr. Weingarten and pleads that the Court grant him mercy.  Collectively they paint a picture of someone very different than the person about whom Leah and Yoni spoke during the 2009 sentencing proceedings.

Chayeh now 25 years old, recently married and fortunate after a difficult pregnancy to have a daughter of her own, mourns the loss of her father's presence for these life cycle events.  With a full heart she recounts what it was like living with her father, the kind of person that he was and the loving support he has consistently provided to her.  She writes,

> I always felt so lucky and thrilled under my father's care.  If I was a need for something and I told my father, I got it.  If I needed some help with homework, I got it.  If I needed some attention, I also got it..... and everything was done with such concern and interest with his whole heart and soul, that I felt so luck to grow up in my father's house.  [Ellipses in original]
>
> ***
>
> It is difficult for me to define the magnitude of my father's

---

As for what the Court viewed as implausible in Chayeh's trial testimony and affidavit – the statement that  when Leah was perhaps 15 and Chayeh was 11, Leah had threatened to use her "Mafia connections" if Chayeh did not say that she had been abused by her father (Sent. Tr. at 76) – counsel respectfully suggest that the Court reads more into this statement than was intended.   It appeared incredulous to the Court that a young child would make such an association.  The Court, based on its perception of Mr. Weingarten's domination and manipulation of Chayeh, concluded that the affidavit must have been false.  *Id.*  Respectfully, we point out that the Court misapprehended Chayeh's reference.  "The mafia" as used by children in the community of Chayeh's youth in Israel did not refer specifically to an organized crime family, or the La Cosa Nostra with which we in the United States associate the term.  It was rather a generic collective noun that references some unknown boggy-man, an imaginary someone or something that might put another child in fear.

12

generosity and interest in helping others.  Starting from my earliest memories, I cannot remember a time that he was not giving.  He was always engrossed in the needs of his children, his neighbors and his community.

\*\*\*

Rarely have I seen him doing for himself.  His concern and love was always for us.  When I was 16 I became very ill. I had all sorts of symptoms which finally after 5 months of tests, meeting different doctors, diagnosed as Lyme Disease.  My father devoted his whole energy to find a cure for me, while keeping up with his household responsibilities, keeping tabs on my siblings so that they shouldn't feel neglected and  maintaining a part time job.

\*\*\*

I was fortunate to wed over a year ago and became pregnant right away.  My pregnancy was strewn with complications including gall bladder stones and later colisititis, an infection in my gall bladder in my seventh month that required surgery but was impossible to do at that time.  Despite the approach of the presentencing [sic], my father's mind was on me – how was I doing?  How was I feeling? ... He researched colisititis and asked to speak to my doctors.  I obliged.  His persistent was impressive and through his research and questioning, he was able to advocate on my behalf, get me the proper medication, and put my mind at ease at this critical moments of my life.

\*\*\*

I can tell you countless stories of his exceptional nature - each one supercedes the one before it.  Conviction and sentencing of this very special man – my dear father – robs his family of treasured moments. ... How could I express the feelings of my broken heart on a piece of paper??? Please have compassion on my wonderful father and our

13

family.

*See* letter of Chayeh S. Malba, July 2011, Exhibit C.[6]

Yakev Weingarten, now 21, describes how he has always had "a very close relationship with his father" whose concern is "genuine" and "focuses on all aspects of [his] life."  Without his father he is afraid.  He writes,

> As his resentencing is coming up, I feel as if my life is unraveling, and I'm unsure if  anything will ever be the same again.  To have this happen to me at this time of my life is scary.  At 21, my life just beginning.  My fiancé and I are planning our future, our home and our life.  Having my father go through such an ordeal is heartbreaking.   He was always my staunchest supporter and the person I leand on throughout my life.
>
> ***
>
> [H]e gave and gave and gave again, yet we were taught never to expect anything.

Letter of Yakev Weingarten, July 2011 (Exhibit C).

Yakev tells an interesting story about the relationship between Mr. Weingarten and Shmiel, one of his younger siblings, that illustrates as Yakev says, his father's "compassion."  We submit, it also demonstrates Mr. Weingarten's respect for his children and his desire to foster self-confidence and pride, healthy attributes of a normal childhood:

---

[6] Letters from close family members are collected in Exhibit C.  All other letters are collected in Exhibit D in alphabetical order.

> One time I noticed in a drawer a bag with a book in it. I wondered who the book was for. A few days later, Shmiel came home beaming holding a book with the same cover. He said his teacher gave it to him. I wondered if we still had the other book. I carefully walked to the cabinet to search for the book, but only found the bag. My father had just come into the room and noticed my expression and my brother's excitement. He winked at me and was smiling at my brother. I realized in that instant that my father has taking time from his busy schedule to buy the book, give it to Shmiel's teacher to present for him for his good behavior in school. It seemed like my father was always coming up with unique ways to make everyone feel good.

*Id.* Yakev concludes,

> He always went out of his way for us. Today he sits behind bars facing a serious accusation [sic]; however his mind is not on this. When I come to visit, he asks what I am doing, and reading, if I have what I need, how the others are doing. I'm always a bit uncomfortable with his intense interest on us, when his life is in such a turmoil, but to him we are the most important part of his life.
>
> ***
>
> I hope through this letter you can appreciate the loving father that I have been privileged to have. Please have mercy on him ....

*Id.*

Chana, the fifth child of Israel and Feige Weingarten and the third daughter, writes candidly of her childhood to the Court in an "effort to put into words what my father has done for me, as a girl among her friends, as a teacher in school, a wife to

15

my husband, and a mother to my beautiful child."  *See* Exhibit C, letter of Chana

Golda Berkowitz, Aug. 9, 2011.

> I cannot forget, how I used to wait that night should fall, so that my precious father will come home the same time that I need to go to bed, and therefore he'll come say  the Krias Shema (evening prayers) with me, and tell me interesting stories, until I would fall asleep with sweet dreams ....  [Ellipses in original]

> If I would do something naughty, such as fighting with my siblings, or shaming them  I wouldn't be scared to get smacked, but I knew that my father would call me, and gently ask me why I didn't behave myself the way I should be.  If there would be a valid reason, my father would call the other child (who I was fighting with) and ask them why he did whatever he did.  Then he would punish to go stand in the corner for a few minutes, and then ask forgiveness, and promise not to misbehave again in the future.  After a few minutes we would be best friends again.

> \*\*\*

> My father noticing my love for drawing sat with me many hours, explaining me the many tools I could use, and what effects they achieve, the rules how to set out a picture, such as shadow, perspective, making thins look transparent, or like glass and so on.  My father taught me so well that whenever we made a production in school, or  any kind of program, I would always be the one they picked to do sceneries, etc.

> \*\*\*

> When I was finally in 12[th] grade, I had the option to study teacher's training, in order to become a teacher.  It entailed learning a lot of extra material and giving model lessons in

schools.  Even though I was popular in school, the thought of talking in front of a class of students made me very nervous.  When my father heard my feelings, he reassured me that he would help me, and asked me please that I should take the course.

I became very frightened when I received the date and class to give a model lesson, in the 7th grade, even after a full year of training.  My father helped me set out a lesson, with all details, such as how to stand while talking, how to talk, to make eye contact with the pupils, to be calm and sure of what I was saying, etc.

When I was finished giving the lesson to the happy 7th graders, I wasn't sure I wanted to leave the classroom anymore!

To my father's immense happiness, I landed a teaching job at the end of that year.  It will now be the 5th year that the happy principal, parents and students enjoy me as their teacher.  I believe that if my dear father wouldn't be imprisoned now I would already be a high school teacher with the help that I would no doubt have gotten from him.

*** 

When I think of my father's situation, a person with broad mind who has so much good, and wisdom and intellect in him, sits locked up in a prison cell for what will soon be **three** years, I feel shivers going through all of my bones!  There are not enough kindhearted, good people in the world that are prepared to help only others and not think of himself at all!!! [Emphasis in original]

*** 

I beg the Honourable Judge, should have mercy and compassion on my father, who has already suffered so

17

much throughout his life.

***

I am beseeching you ...

*Id.*

Chayeh, Yakev and Chana Weingarten present compelling evidence that they each have a healthy, loving relationship with their father despite the obvious stress and tremendous loss caused by the estrangement of their mother and the two oldest children, Leah and Yoni. Their expressions of support are consistent with the years of investigation by CPS.

B.   **Conduct of the Trial**

Mr. Weingarten was his own worst enemy at trial. In all the proceedings involving Leah, Yoni and his former wife, that Mr. Weingarten had endured up until the criminal trial, in civil courts and at Biet Dins, he had always been represented by counsel.   His decision to represent himself, on the eve of trial, was premised on his belief that his lawyers were not prepared because they had not interviewed witnesses he believed material to his defense. He also knew that critical documents had not been subpoenaed, much less translated from Yiddish and reviewed.   He thought he would be better served representing himself because he, at least, had a command of what he thought the evidence should be.   He did not appreciate, however, the gap between his

vision of the facts and his ability to present admissible evidence to the jury.  Thus, before this Court at trial, for the first time, he was alone and he was scared, although his anxiety and fear may have come across to the Court as anger or arrogance. Indeed because of his fear he could not absorb or follow much of the Court's instructive suggestions as to how to conduct an examination.  He was  unschooled in the rules of procedure and inept – an embarrassment to himself in the eyes of the Court, the jury, the government, his supporters, and his family.  Leaving aside what the jurors and prosecutors thought, the view was unanimous that he should never have represented himself.  He proved beyond doubt the saying that a man who represents himself has a fool for a client.

The Court at the first sentencing castigates Mr. Weingarten for cross-examining his own children – not only how he conducted the examinations, but the fact that he did so at all.  *See* Sent. Tr. at 70.  Yet, a careful review of the cross-examination reveals that in fact, Mr. Weingarten stayed away from confronting either child regarding the actual sexual abuse conduct.[7]   Rather, notwithstanding attempted

---

[7] Mr. Weingarten made one attempt on cross-examination (Trial Transcript ("Tr.") at 328-330) to impeach Leah's trial testimony about having more than once been forced to massage her father's stomach (Tr. at 203) with her grand jury testimony  in which she said that she had never before touched a man's naked skin when her father forced her to masturbate him (Trial Exhibit LW-3500-14 at 26), but the effort backfired.  Mr. Weingarten did not intend to ask a question that would elicit a response that would embarrass his daughter, and thereafter he limited his examination and impeachment efforts to collateral areas in an effort not to exacerbate the anger, embarrassment and anxiousness that he knew must be attendant to his cross-examination.

assistance from the Court, he bumbled his way through ineffective impeachment of Leah about what appeared to the Court to be inconsequential details of collateral activities.[8]

For example, he conducted a lengthy examination about how Leah comported herself at the bedside of her dying grandfather, at his funeral, and in the days that followed.  *See* Tr. 413-449.  To all, the examination seemed pointless.  Leah had testified in the government's case that in July 1997, when Mr. Weingarten traveled to New York to see his father before he died, she accompanied him.  *Id.* at Tr.  at 283-286.  She testified about staying in the home of her uncle and aunt and traveling to the hospital where she held her grandfather's hand.  *Id.* at Tr. 285-286.

On cross-examination, Mr. Weingarten asked Leah about the trip to the hospital, where she stood in the room, holding her grandfather's hand in the hospital room, where she stood at the funeral.  *See generally* Tr. at 413-449.  Mr. Weingarten had a point in this examination but it was obscured by his courtroom incompetence. In the Chassidic community of which Mr. Weingarten senior, Israel, his siblings, and Leah (at the time) were a part, women and men are strictly segregated.  *Id.* at Tr. 178.

---

[8] Not only as a father did he not want to cause his daughter more embarrassment and shame, but such an interrogation would be prohibited by the Jewish law by which he governs his conduct. As an Orthodox Jew, and particularly Satmar, for example, he is prohibited from dwelling on lascivious thoughts much less discussing matters of pertaining to sexuality with a woman or a girl child.

They do not gather in the same room and even family members do not in public touch one another. *See generally* Tr. at 172-178. Mr. Weingarten's attempted to impeachment Leah as to her as to hand holding testimony and her presence in the room with others was to elicit testimony about Jewish customs and law for two purposes. First, it was to demonstrate that Leah's version of the events was impossible in light of Jewish law. Second, because he equated a failure to abide by Jewish law as equal to dishonesty, he wanted to demonstrate that if the events were as she testified to, then she violated Jewish law, and was therefore, dishonest.

Mr. Weingarten tried to do the same with Leah's testimony about attending her grandfather's funeral. *Id.* at 415-417. According to Jewish law in order to be considered a "participant" in a funeral the participant must be within four steps of the coffin. He attempted to impeach Leah's statement that she was a participant in her grandfather's funeral by demonstrating that Satmar would not have permitted her to be within four steps of the coffin. *Id.* at Tr. 415-516. *See* Weiss Affidavit at ¶ 10 (b), Exhibit B. Again, either way his goal was to undermine her credibility. If she was within four steps of the coffin she had defied Jewish law and was dishonest. Alternatively, if she testified that she was a participant at the funeral when in fact she was not, that too was dishonest.

His purpose in his cross-examination was to establish that if she would lie about

these aspects of what happened on this trip to New York then it was more probable that she was lying when she testified about the charged criminal conduct. To a trial lawyer, impeachment is an ordinary tool, commonplace at trial.  To one whose only experience with cross-examination takes place within the halls of Talmudic study, the technique proved elusive and in the end undercut Mr. Weingarten's very argument to the jury.  With each failure he became more frustrated and his facial grimacing, as described by the Court, were manifestations of that frustration.

C.   **The Israel Weingarten Known to His Family, Friends, Students, Colleagues And Satmar Leaders In The Community In Which He Works, Lives, Serves, and Prays**

In anticipation of the first sentencing, defense counsel quoted at length from the more than 103 pages of letters and sworn statements submitted to this Court by Mr. Weingarten's teachers, family and friends, students, colleagues and leaders from the Satmar community in which he works, lives, serves, and prays.  Submitted with this submission are additional letter from his family as discussed above as well as from his other supporters. They ask the Court to consider in sentencing, the other Mr. Weingarten, the one they know and love and whom they have found in their daily life to be someone to admire.

Jacob Cohen is Mr. Weingarten's son-in-law- husband of Sheindl, the youngest daughter.  He writes of making the drive to Virginia to visit Mr. Weingarten when he

was incarcerated at FCI Petersburg and about the concern that Mr. Weingarten showed for Sheindl as she prepared for the birth of their first chid, notwithstanding his own hardships.  Most importantly, however, in his letter he recounts his view of his wife's impressions of her childhood.

> In the short time that I have come to know him I found him to be a very intelligent, friendly and kindhearted person, and there is a lot more that I hear from my wife, she speaks with nostalgia about the days when the whole family was sitting together with their father at the *Shabbos* meal around the table singing together, the warmth that he gave for each child, how he was always a father *and* a mother for all the children, listening to their stories from school and assisting them with their homework, how they used to go together for hikes in Ardenen, Belgium and on the mountains in Israel, all that adds up to a very devoted and dedicated father.

Letter of Jacob Cohen, Jul. 7, 2011, Exhibit C.

Sheindl Cohen, now 19 years old but only a child of seven or eight at the time of the offenses of conviction, herself writes about the pain that she feels as a result of being separated from him.

> [M]y father means for me everything from since when I was little, I feel like I am in prison with him.  When I go to visit him a shudder goes through my body when I see his pain, his swollen eyes from crying doesn't let me rest....  Although he hides his pain I am his child and I feel the sufferings that he is undergoing....  Honourable judge, please have mercy on my father and console his broken family ... his growing family needs him....  I never heard him call anyone bad names even though who so bitterly

23

> tortured him, he taught me how to be a good person to my
> family , my students and everyone else, please have mercy
> on my baby who needs his grandfather outside.

Letter of Sheindl Cohen, Aug. 7, 2011, Exhibit C.

Jacob and Chana Klein are the niece and nephew with whom CPS initially placed the Weingarten children for foster care while it investigated the charges against both of the parents. During that period of time they saw Mr. Weingarten regularly and knew him to be a "kind, warm father and a righteous person who followed all the laws." Especially significant is that they observed that during this period, after the children returned from visitations with their father, "they were always happy, calm and satisfied." Letter of Jacob and Chana Klein, Aug. 9, 2011, Exhibit C.

Some of the people who have taken the time to write to the Court about their experiences with Mr. Weingarten and their views of his character and conduct have known him for more than 30 years. Moses and Vivienne Stern "have always known him to be an honest and upright person in all his ways. There was never any question of doubt on his morality. He is a man with a heart of gold." Letter of Moses and Vivienne Stern, Jul. 19, 2011, Exhibit D. Jacob Lederer knows Mr. Weingarten to be "a very generous person, always ready to help others. His sensitivity to other persons feeling is outstanding. He would go out of his way to help another person. Letter of Jacob Lederer, Jul. 15, 2011; *see also* Letter of Rabbi Yeshaya Holzer, Aug. 9, 2011

24

(Exhibit D). Maurice Hershaft of London was born in Belgium and his relationship to Mr. Weingarten dates back 25 years. He has "known [Mr. Weingarten] to be a person who constantly helped others, with support, advice and counselling in all matters. One of the main positive qualities, how he succeeded in his counselling ,was due to his endless patience and the time that he devoted to endlessly helping people with his counselling, giving up days and nights on end. Letter of Maurice Hershaft, Jul. 19, 2011; *see also* Letter of Mark Mayer Beller, Jul. 10, 2011, Exhibit D.

Moshe Kraus and his daughter have written separately to the Court. Moshe knows Mr. Weingarten from the late 1990s when he used to stay in the Kraus' home when he was in Manchester. Then Moshe and his wife were guests in the Weingarten home, first in Israel and later in New York. He writes:

> Seeing the special moral and spiritual atmosphere surrounding [Mr. Weingarten], and the positive impression made on those who sought his advice, and seeing the way he would educate his children and especially the extraordinary happy and calm atmosphere I felt whilst being in his house – I thought it would be beneficial for my teenage daughter to spend her summer holidays at the Weingartens in the summer of 2006. (She had become friendly with his daughter writing letters.) I was proven correct as she came back home after the holidays really inspired to higher moral and spiritual behavior. As time went on he became to us in our family the role model to emulate. We would say to each other concerning right or wrong - "What would Yisrael Moshe say about that?"

25

Letter of Moshe Kraus, Jul. 4, 2011, Exhibit D.   His daughter, Suri, now 18, describes

Mr. Weingarten as "a quiet, gentle person."  She talks about how

> He speaks quietly and has a very pleasant way about him. He spends his day praying and learning torah, he would larn and spend time with his children with whom he is very close.  At his shabbos table there was the most beautiful atmosphere.  He sang Shabbos songs with his children and gave them torah lessons, emphasizing good character trains. He brought a special calm to his home .... Throughout my entire stay I did not once hear him raise his voice or speak angrily.... I feel very luck to know this family.  Rabbi Weingarten and his children have been a real inspiration to me.  I am getting married soon and I hope to replicate in my own home that special atmosphere that I felt with them."

*See* Letter of Suri Kraus,undated (Exhibit D).  See also Letters of Rabbi Jacob

Moskowitz, Jul. 18, 2011 ("Rabbi Jacob Moskowitz ("his children admired and

adored him for his warmth and courage"); Rabbi E. Schlesinger, Jul. 13, 2011 ("I

admire his strength, peace of mind, and esteemed behavior in times of crisis")

(collected in Exhibit D).

Many of Mr. Weingarten's former students have written and the consistent

thread throughout what they write is how Mr. Weingarten helped them and their

schoolmates when they were encountering especially difficult times, and how he was

always compassionate and yet respectful, a guiding force to each of them and

someone who will always be remembered as a valued teacher and role model.

Abraham Haut knows first-hand about Mr. Weingarten's kindness.  As a young

man of only 15, and "as I was coming from a broken home and Rabbi Weingarten was my backbone in all aspects from finding me a foster home here in London in a suitable Talmudic college and give me financial support through my youth and since, have a very strong relationship in which I see him as a father figure and he has also given me a lot of advice and guidance."  Mr. Haut sums it up by saying, "I can state very clearly and with full confidence that what I am and have achieved in life is being sent through god through Rabbi Weingarten."  Letter of Abraham Haut (sent by email), Jul. 11, 2011.  *See also* Letters of Alexander Krausz, Jul. 13, 2011("he brought out the best in each and every child"); A. Shulem Englander, Jul. ("he was literally a father to each individual boy and cared for every student in every respect");

But the student whose experiences with Mr. Weingarten are perhaps the most relevant to the Court's sentencing determination, is Chaya Fuchs Levinson who writes from Jerusalem.  As a teenager she fell in with the wrong crowd and was in "danger of losing [her] family and whole way of life."  She describes how Mr. Weingarten met with her and her father, and eventually convinced the father that she should be sent to the Manchester Seminary for schooling.  She writes how she felt at the time and to this day that Mr. Weingarten "was the only person who truly understood me."  Letter of Chaya Fuchs Levinson, Jul. 7, 2011, Exhibit D.  *See also* Letters of Chaim Joseph Stauber, undated; Chaim Friedman (sent by email Jul. 18, 2011); Phillippe Herzog,

Jul. 19, 2011, Exhibit D.

Rabbi I. Weiss, the Chief Rabbi of Jerusalem, writes of having known Mr. Weingarten since he lived in Antwerp at a time when they were colleagues. In his view, "Israel Weingarten is a pure man with high religious standards and high moral standards." Letter of Rabbi I. Weiss, Jul. 3, 2011.

Rabbi Abraham Ginsberg on behalf of the leadership of the Committee for the Preservation of Jewish Cemeteries in Europe writes of how Mr. Weingarten was a founding member and until his incarceration remained actively involved in researching and identifying "many of the mass graves all over Europe in order to mark them and maintain them according to Jewish Law and Tradition." Mr. Weingarten, he writes, "served as a role model to the other members in his conviction, devout commitment and selfless devotion" to the organization. He appeals to you to take into consideration Mr. Weingarten's "long standing service to the Jewish Community" in your sentencing decision and grant him mercy. Letter of Rabbi Abraham Ginsberg, Aug. 7, 2011, Exhibit D.

D.     **Mr. Weingarten Suffers From Serious Health Issues**

Mr. Weingarten is 61 years old, with a slight build. The medical records from MDC and FCI Petersburg, excerpts of which have been supplied to the Probation

Department and which are filed herewith[9] make clear that he has special health needs that pose unique hardships. Specifically, Mr. Weingarten feels no sensation when he needs to urinate, and when he does urinate it is painful. There is no medical treatment and the condition is not reversible. The condition can only be managed by self-catherization which Mr. Weingarten is required to do eight times daily to empty his bladder. Thus, Mr. Weingarten is required to spend a good part of his day attending to this bodily function. As a result of the condition he also suffers from frequent urinary tract infections, blood in his urine and bouts of edema (which is more difficult to treat because diuretics are contraindicated by the condition).

Self-catherization under normal circumstances is difficult and painful. It requires not only the necessary supplies, but also a sterile environment within which to perform the procedure. Mr. Weingarten often has to perform the procedure in an open toilet area, in view of other inmates, where he is without access to products to sterilize either the fixtures or the area in which he has to perform the procedure. Mr. Weingarten frequently runs short of supplies and has, on occasion, had to appeal a determination that he only needs sufficient supplies to perform the procedure once per day.

Mr. Weingarten has a lesion, measuring about 1.5 cms, on his back – "a

---

[9] The medical records appear in Exhibit A filed herewith as an attachment to the August 25, 2011 letter to the Probation Department.

hyperpigment flat lesion," with an irregular border.  BOP medical staff has said that

procedures are necessary to rule out ("RO") melanoma, but to date no biopsy has been

performed.  Mr. Weingarten suffers from a hearing loss which remains undiagnosed

and thus, he has been unable to obtain the necessary hearing aid.

E.   **Mr. Weingarten's Strict Adherence To Satmar Beliefs
        And Practices**

Mr. Weingarten is a life-long follower of the most ultra-Orthodox Jewish Sect,

Satmar, it is the most orthodox among Orthodox adherents.  Satmar insist on stringent

observance of the laws in all aspects of life and beliefs as they relate to family, study,

communal life, and visions of the State of Israel.  They are uncompromising and

unyielding of their demands upon themselves and other community members.  For

example, Satmar represent the epitome of the prohibition on male and female

commingling.  Even in the family setting, between husband and wife, and parents and

children, fraternizing and socializing – males with females – is highly circumscribed

and regulated.  Even at weddings and funerals there is always a barrier, a wall of some

kind, separating the men and women, the boys and girls.  Communication of any kind

between males and females and all form of personal contact are frowned upon.  The

schools, the studies, access to news of world events are all controlled by the rabbinical

authorities that dictate application of religious law.  Satmar follow these rules because

they uniformly believe that they promote an enclosed environment that will protect

30

the community and thus allow it to survive and flourish.

Satmar ways of life are ingrained in the fibre of Mr. Weingarten's being and he will not sacrifice his commitment to Satmar principles or requirements even to save himself from harm.

## ARGUMENT

## A SENTENCE WHICH IS BELOW THE APPLICABLE GUIDELINES RANGE BUT CERTAINLY NO GREATER THAN 168 MONTHS MEETS THE SENTENCING GOALS SET FORTH IN 18 U.S.C. §3553(a).

## APPLICABLE LAW

The sentencing court is directed to "impose a sentence sufficient, but not greater than necessary" to comply with the need for the sentence to: (A) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct;  (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In determining the appropriate sentence, in light of the aforementioned, courts must consider the advisory Sentencing Guidelines and their policy statements, the nature and circumstances of the offense, the history and  characteristics of the defendant, the kinds of sentences available, the

31

need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1-7).

After the Supreme Court's opinion in *United States v. Booker*, 543 U.S. 220 (2005), this Court is free to vary from the Guideline sentence where the applicable guidelines fail properly to reflect § 3553(a) considerations, reflect an unsound judgment, do not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless. *Rita v. United States*, 551 U.S. 338, 351, 357 (2007). Judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks and citations omitted). Whether a judge may draw any useful advice from a guideline depends first on whether the Commission, in promulgating or amending it, acted in "the exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109. As described in *Rita*, the exercise of this role has two basic components: (1) reliance on empirical evidence of pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and consultation with participants in and experts on the criminal justice system. *Rita*, 551 U.S. at 348-350. Where a guideline was not developed based on this "empirical data and national experience," it is not an abuse

of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve

§ 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 109-10.

A. **Calculation and Application of the Advisory Sentencing Guidelines Result In A Guideline Range of 168 to 210 months**

The Probation Department erred in its application of the multiple count Guideline,§ 3D1.2[10] because it failed to group as one Group, Counts One and Four , and failed to group as another Group, Counts Two and Five. Proper application of the Guidelines results in an Adjusted Sentencing Guidelines Level of 35 not 37 as found by the Probation Department. *See* Second Addendum PSR at ¶ 89.

Guideline § 3D1.1 instructs that when a defendant has been convicted of more than one count, the court shall group the counts resulting in conviction into distinct Groups by applying the rules specified in § 3D1.2.  That section states that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. § 3D1.2.  In subsection (a) -(d), the guideline provides guidance as to which counts of conviction can be considered to  "involve substantially the same harm" and thus, fall within the meaning of the multiple count rule.  *Id*.

PSR takes the position that none of the Counts of conviction can be grouped because each instance of the abuse of the daughter were separate instances of fear and

---

[10]Unless otherwise stated, all references to Sentencing Guidelines are to the 1997 edition of the U.S. Sentencing Guidelines Manual.

risk of harm. *Id.* Under their interpretation to the counts of conviction, application of the Guidelines, each count received one unit, adding four units to to defendant's total offense level of 33. The resulting calculation is Combined Adjusted Offense Level at 37. *Id.*  This is error.

While Counts One and Four are separate instances of fear and risk of harm from Counts Two and Five, it can not be said that Counts One and Four present separate instances of harm or risk of harm from each other. The same must be said about Counts Two and Five.  One and Four concern the same trip from Israel to Brooklyn and Counts Two and Five concern the same trip from Brooklyn to Belgium. Mr. Weingarten was not charged with specific instances of sexual abuse, *e.g.* rape, but rather with travel – her travel and his travel at the same time, by the same mode, and during the same instances.  Leah Weingarten was not put in any separate harm or risk of harm by Mr. Weingarten's travel as opposed to his transportation of her, particularly as he was with her for her travel.

Certainly under § 3D1.2 (d) grouping of these Guideline Chapter Two, Part A offenses is not appropriate since all offenses in Chapter Two, Part A are specifically excluded from the application of subsection (d).  U.S.S.G. §3D1.2(d).   However, exclusion from (d) does not preclude grouping under the other subsections. U.S.S.G. § 3D1.2. *See United States v. Tank*, 200 F.3d 627 (9th Cir. 2000) (Probation incorrectly

34

concluded that simply because Guideline "§ 2G2.1 is in the list of fifty offenses excluded from grouping under subsection § 3D1.2(d), conduct punishable under § 2G2.1 can *never* be grouped..") *Id.* at 632 (Emphasis in the original). The Guideline clearly states that "[e]xclusion of an offense from grouping under this subsection does not necessarily preclude grouping under another subsection." U.S.S.G. § 3D1.2; *see also*, *Id.*, comment.(n.3)("Counts are to be grouped together into a single Group if *any one or more of the subsections provide for such grouping."*)(emphasis added)). Application of either subsection (a) or (b) to the factual basis for the counts of conviction here require the grouping of Counts One and Four and the grouping of Counts Two and Five.

Subsection (a) requires grouping "when counts involve the same victim and the same act or transaction." U.S.S.G. § 3D1.2(a). The Commission explains that under subsection (a), "counts are to be grouped together when they represent essentially single injury or *are part of single criminal episode or transaction involving the same victim."Id.*, comment. (n.3)(emphasis added). The examples indicate that under this subsection grouping is warranted where "[t]he defendant is convicted of three counts of unlawfully bringing aliens into the United States, all counts arising out of a single incident." *Id.* In this case, Mr. Weingarten's transportation of his daughter from Israel to Brooklyn and his simultaneous travel from Israel to Brooklyn both with the intent

to engage her in sexual activity does not present any additional or different harm or risk to the victim. Both charges stem from the same episode (travel from Israel to Brooklyn) and of course the same victim. The same analysis applies with equal force to Counts Two and Five.  Grouping of Counts One and Four and the grouping of Counts Two and Five is required by application of subsection (a) of § 3D1.2.

Subsection (b) provides that counts involve substantially the same harm "when counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(b). The Commission instructs that " counts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim are to be grouped together, even if they constitute legally distinct offenses occurring at different times.  *Id.*, commentary (n. 4). This Guideline does not apply where the defendant is, for example, convicted of two counts of rape for raping the same person on different days. *Id*, commentary (n. 4). Mr. Weingarten was not charged or convicted of separate instances of rape; he was not convicted of sexual abuse for specific acts on specific dates. Rather, he  was convicted of transporting his daughter and simultaneously traveling with her to the same place during a specific period of time for a single criminal objective, *i.e.*, sexual abuse. Therefore, application of subsection (b) results in the grouping of Counts One and

Four and the grouping of Counts Two and Five.

Accordingly, the correct application of U.S.S.G. § 3D1.1 results in two Groups: Counts One and Four as one group and Counts Two and Five as one group. *See* U.S.S.G. §3D1.2. Each group is assigned one unit and this results in raising his total adjusted Guideline level from 33 to 35.  Mr. Weingarten's Guideline sentencing range based on a combined total adjusted offense level of 35 and a criminal history category of I is 168 to 210 months (a range from 14 to 17.5 years).

### B.    **Other § 3553(a) Factors Warrant The Requested Sentence**

Mr. Weingarten's religious obligations expose him to unjust conditions of confinement. For example, the Satmar prohibition on co-mingling prohibits Mr. Weingarten from accepting directly anything that a female corrections officer attempts to hand to him.  She must first put it down before he will pick it up.  When he is addressed by a female within the institution, he must look away while she speaks and when he responds.  None of this is meant in disrespect, but it is often interpreted as such, exposing Mr. Weingarten to sanctions within the institution.  Similarly, Mr. Weingarten's dietary needs are far more stringent than what is commonly understood in institutional contexts to be kosher.  Most kosher foods are not sufficiently clean to permit Mr. Weingarten to eat them.  Where most Orthodox Jews will accept the common rabbinical supervision designating that a food product is kosher this is not

sufficient for Satmar.[11]  Mr. Weingarten can only eat fruits and vegetables that he has washed and peeled with plastic cutlery presented to him in sealed packages. Similarly, Satmar require certain facilities for washing before eating, *i.e.*, the wash basin must be within a certain close proximity to the food and the vessel used for washing (a pitcher) must not only be clean, but smooth and free of any breach in its surface.  When Mr. Weingarten does not have access to appropriate food and  proper facilities to wash, as documented in the medical records, he will not eat.  These hardships, no doubt not envisioned by the Court at sentencing, are exacerbated because of BOP's failure to designate Mr. Weingarten to a facility housing Orthodox Jews in general and having experience with Satmar in particular.

Mr. Weingarten is in poor health, appears much older than his age, is  frail, and small in stature, any of which individually and collectively make him vulnerable to abuse from other inmates.  Mr. Weingarten health issues also cause him to endure excessive  humiliation every time he must self - catheterize as this must done in open area before other inmates who already view him with suspicion and disdain resulting from his appearance and habits. His isolation in prison is exacerbated by his religion requirement to wear certain clothing and eat only limited kinds of food. His halting

---

[11] The common designations, insufficient for Satmar, are a circle with a capital "U" inside (by the Orthodox Union), the circle with a capital "K" inside (by The Organized Kashrus Laboratories), the triangle with a "KSA" inside (by the Kosher Supervision of America).

speech in English only invites further bullying by the other inmates most of him are twice his size and are  in prison as a result of violent crimes.

His religious choice is obvious from his dress, the frequency and manner of his prayers, and his restricted diet. He can not hide who he is, he can not meld into the prison society. He lacks the physical presence to stave- off the prison gang members and prays he has money in his commissary to pay for protection. There is no one in prison who he can turn to for protection, nonetheless, for company.

The threat of physical abuse by other inmates, the lack of privacy to perform his required medical care, and the lack of food, all add to conditions of confinement that make everyday of incarceration "a living hell."

C.   **The Court Should Vary From The Guidelines On Policy Grounds And Because The Guidelines  Are Not Based On Empirical Data Past Practices**

Mr. Weingarten's Guideline sentence included a specific offense characteristic 2 level increase based on the fact that his sexual abuse involved his daughter. *See* U.S.S.G. § 2A3.1 (b)(3).  However, the research strongly suggests that those whose conduct involved incest presents a lower risk of recidivism. *See e.g.*  U.S. Sentencing Commission, *Special Report To Congress: Sex Offenses Against Children: Findings and Recommendations Regarding Federal Penalties* 1995 at 24.[12] As reported by the

---

[12]  *See* http://www.usc.gov/Legislative_and_Public_Affairs/Congressional_ Testimony.

Commission, the average term of imprisonment where incest was involved was 22 months, yet by adding specific offense adjustment referenced above, an offender for this type os sexual crime is raised substantially above the past practice sentence. Accordingly, the Court is free to disregard the advisory guideline calculations here. *See Kimbrough*, 552 U.S. at 109-10.

In addition, the guideline does not consider Mr. Weingarten's personal characteristics, including his age. Yet, data collected by the Sentencing Commission reveals that "[r]ecidivism rates decline relatively consistently as age increases." *Ibid; see also,* discussion supra. That this factor is not incorporated into the Guidelines does not mean it is not relevant to the sentencing determination. To the contrary, a sentencing court should consider age and its correlation to recidivism. *See, e.g., Gall,* 128 S.Ct. at 601 (2008); *see also United States v. Hamilton*, 323 Fed.Appx 27 (2d Cir. 2009) (Sentencing court has discretion to consider age and its correlation with recidivism in its sentencing determination).

The Court should also consider that if it agrees with the Probation Department that the multiple count Guideline prohibits the grouping of any of the counts of conviction, should also conclude that failure to group in this case is contrary to the very policy behind the multiple count Guideline. As the Commission stated the multiple count Guidelines purpose is "to limit the significance of the formal charging

decision and to prevent multiple punishment for substantially identical offense conduct." U.S.S.G. Part D, Multiple Counts, *Introd. Comment.*

These reasons should factor into the Court's sentencing determination whether to sentence outside the advisory guideline range or within the applicable advisory Guidelines range.

C.   **A Sentence No Greater Than 168 Months Would Best Satisfy The Goals of 18 U.S.C. § 3553(a)**

A sentence of even less than 14 years will more than adequately meet the goals of sentencing.

There are numerous factors that indicate that Mr. Weingarten presents a low risk of recidivism and thus does not threat to the public. This is essentially a sexual abuse crime. It is therefore significant that now Mr. Weingarten is 61 and if sentenced to the low end of the Guidelines, 14 years, he will not be released until he is close to 75. Research demonstrates that age is factor generally with respect to risk of re-offending but also in particular as to crimes of incest. See e.g. *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, A Component of the Fifteen Year Report on the U.S.Sentencing Commission's Legislative Mandate at 12, & at Exhibit 9 (May 2004)[13] ; R. Karl Hanson, Ph.D., *What Do We Know About Sex Offender Risk Assessment?*, 4 PSYCHOLOGY, PUBLIC POLICY AND LAW at

---

[13] Available at http://www.ussc.gov/publicat/Recidivism_General.pdf.

67(1998)(Finding based on a sampling of over 1,000 offenders that only 10 to 15% of sex offenders commit new sexual offenses five years after their release); *See* U.S. Sentencing Commission Special Report To Congress: *Sex Preferences Against Children: Findings and Recommendations Regarding Federal Penalties* (1996)(Finding offenders whose offense concerned a intra-familial member are less likely to re-offend than offenders whose sexual offense involved strangers).

Of notable interest with respect to the prospect of Mr. Weingarten's risk of recidivism is his extremely low score on the STATIC-99. The STATIC-99[14] was developed by Dr. Hanson, of the office of the Solicitor General of Canada, David Thornton, Ph.D, with Her Majesty's Prison Service, England, Andrew Harris, Ph.D, Senior Research Officer with Corrections Directorate Solicitor General Canada and Amy Phenix. It is an actuerial assessment instrument for use with adult male sexual offenders. According to its authors, the strength's of the STATIC-99 is that it uses risk factors that have been empirically shown to be associated with sexual recidivism. *See* STATIC-99 Coding Rules Revised-2003 at 3. The research by these authors demonstrated that offenders who offend only against family members are at a low risk to recidivate as a compared with those offenders whose offense involved victims outside of their immediate family. *Id*. at 52. Their research also revealed that the

---

[14] Accessible at http://www.static99.org.

length of time which elapses  from the time of the offense to the time when the offender was in the community without  re-offending is a strong indicator that offender presents a low risk of recidivism. *Id*. at 59-60.  Mr. Weingarten was not only in the community before his arrest in 2008 for at least 10 years and from his daughter's last allegation of sexual abuse, but he was with his other children virtually continuously throughout the period.  Indeed, for a portion of this time, he had  custody of his minor children. Other factors considered in scoring, which produce Mr. Weingarten's low score, included his age and his lack of any criminal history.

Upon release Mr.Weingarten will no longer be a threat to his daughter or even his wife, as permanent order of protection are filed and insofar as any perceived  threat to others, he will be required to register as a sex offender[15.]  Accordingly, based on all these factors,  there is no need to sentence Mr. Weingarten to a lengthier sentence for the purpose of protecting the public from further crimes he might commit.  *See* 18 U.S.C. § 3553(a)(1)(C).

Likewise a sentence of the magnitude of 14 years, which is substantial and harsh( particularly for Mr. Weingarten as discussed above) meets concerns that the sentence reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense as well as afford adequate deterrence to criminal

---

[15] There is absolutely no evidence or other reason to believe that Mr. Weingarten posed a risk of danger to any other children.

43

conduct. *See* 18 U.S.C. § 3553(a)(1)(A-B). Medical treatment or any other treatment, for Mr. Weingarten are best obtained outside prison.

Finally, there is also concerns of the cost of incarcerating Mr. Weingarten who is already 61 and with numerous severe maladies whose severity will only increase with age will be costly to incarcerate. *See* 18 U.S.C. § 3553(a)(1)(D).

In sum, a sentence of no greater than 168 months meets all the goals and policy objectives set forth in 18 U.S.C. § 3553(a).

D.    **Twenty Years Is The Maximum Sentence That Can Be Imposed Without Violating Mr. Weingarten's Constitutional Protection Against Double Jeopardy**

The Double Jeopardy Clause in the Constitution precludes putting any person twice "in jeopardy of life or limb" for the same offense. U.S.Const. Amend. V. It protects a defendant from being punished for the same offense twice. *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006)(quoting *Illinois v. Vitale,* 447 U.S. 410, 415 (1980); *Rutledge v. United Sates*, 517 U.S. 292, 297 (1996)(the Clause protects against multiple punishments for the same offense). Where an indictment is multiplicitous, *i.e.,* "it charges an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed" sentencing on the multiplicitous counts violates double jeopardy rights. *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999); *see Josephberg*, 459 F.3d . at 355.

44

"[W]here the same act is a violation of two distinct statutory provision, the test to be applied to determine whether the same act or transaction constitutes a violation of two distinct offenses or only one, is whether each provision require proof of an additional fact which the other does not." *Blockburger v United States*, 284 U.S. 299, 304 (1932). When the same statutory offense is charged as two separate counts, the proper question is whether Congress intended the counts to constitute separate "unit[s] of prosecution." *Bell v. United States,* 349 U.S. 81 (1955). In *Bell* the Supreme Court held that where a single federal statute is involved, any ambiguity in congressional intent regarding imposition of multiple punishments for a single transaction must be resolved in the defendant's favor. *Id*. at 84. The Second Circuit  further explains that although the statutes may not exactly satisfy the *Blockburger* test, sometimes the facts may nonetheless require a finding of multiplicity. *United States v. Zvi*, 168 F.3d 49, 57 (2d Cir. 1999).

In *Ball v. United States*, 470 U.S. 856 (1985), the Court held that a felon possessing a firearm may not be convicted under both § 922(h) and § 1202(a) for possessing and receiving the same weapon. 470 U.S. at 859. In *Bell* the Supreme Court held that the transportation of two women simultaneously in the same vehicle across state lines for the purpose of prostitution was a single offense under the Mann Act and not two as charged.  *Bell v. United States,* 349 U.S. at 84. The Second Circuit

45

in *Zvi* sustained a multiplicity challenge to charges of both domestic money laundering and foreign money laundering involving same transaction under different subsection because the charge involved the same transaction. *Zvi*, 168 F.3d 49, 57; see also *United Sates v. Tann*, 577 F.3d 533, 538 (3d Cir. 2009) (simultaneous possession of a firearm and ammunition constitutes a single unit of prosecution under § 922(g)(1)).

Here Mr. Weingarten was charged and convicted in Counts One and Two of violating 18 U.S.C. § 2423(a) by his transporting his daughter Leah ("the defendant transported" his daughter) from Israel to Brooklyn and from Brooklyn to Antwerp, respectively, with the intent that she engage in sexual activity with him. *See* Indictment Counts One & Two, PSR ¶ 2 & 3. Counts Four with Five charged him with the identical travel for the identical purpose at the identical time as he was charged with in Counts One and Two. The charges in Counts One and Two subsume the charges in Counts Four and Five because for the jury to find Mr. Weingarten guilty as charged, they found he transported Leah as alleged in those counts, i.e. he traveled with her. *See Zvi*, 168 F.3d 49, 57. Thus, similar to *Ball,* Mr. Weingarten's conviction for Counts Four and Five, the 18 U.S.C. § 3423(b) violations, can not stand as an independent basis for punishment. *See Ball*, 470 U.S. at 861( statutes directed at "receipt" and "possession" of a firearm amounted to the "same offense," in that

46

proof of receipt "necessarily" included proof of possession).

The language of the statute and  the legislative history could yield a clear answer as to whether Congress intended  multiple punishments for  the same offense charged under two subsections of a statute. As the Supreme Court observed: "When Congress has the will [to define a particular offense] it has no difficulty in expressing it..." *United States v. Coiro*, 922 F.2d 1008, 1014 (2d Cir. 1991(quoting, *Bell*, 349 U.S. at 83)).  However, where neither source informs as to Congressional intent and there is doubt as to Congressional intent, the rule of lenity requires that "only one offense may be charged." *Id.* (citing *Bell* at 83) (remainder of citations omitted). The "Lenity principle"demands resolution of ambiguities in criminal statutes in favor of the defendant." *Hughey v. United States*, 495 U.S. 411, 422 (1990); *Missouri v. Hunter*, 459 U.S. 359, 366-67 (1983)(If the legislative history does not clearly reveal whether the legislature intended that multiple punishments be imposed for the same conduct, the court applies the presumption that multiple convictions contravene legislative intent.)

The language of 18 U.S.C. § 2423(a) and (b) does not indicate that Congress intended that two punishments be imposed in these circumstances. For example, unlike, 18 U.S.C. § 924( c)(1) where the various subparts (i-iii) instruct as to incremental punishment, there is nothing in this statute which provides a similar

47

instruction. Rather both subpart (a) and (b) of §2423 simply advise as to the maximum sentence and the fine to be imposed. Indeed under the 1997 version of the statute, both subsections had identical provisions as to the penalties that could be imposed. The legislative history likewise fails to clarify the issue of multiple punishments as presented here. Subsection (b)  of § 2423 was added to §2423  as part of the1994 Violent Crimes Control and Law Enforcement Act of 1994; Pub.L. 103-322, §160001(g)(2).  The subsection was intended to expand thestatute's  protection of minors from sexual abuse by extending the act to cover  mere "travel" interstate if the defendant traveled "for the purpose of engaging in any sexual act." *United States v. Vang*, 128 F.3d 1065, 1069 (7th Cir. 1997). Moreover, although the statutory antecedents of § 2423(b) can be traced to  The Mann Act of 1910(*codified* at 18 U.S.C. § 2421), because the issues raised by application of the subsections here (*i.e.*, the multiple punishment of the two subsections on these facts) relate to a new offense, the history of the Act does not inform as to the question posed in this case. Accordingly, the rule of lenity proscribes that only two counts can remain – Counts One and Two or Counts Four and Five – or more precisely Mr. Weingarten can be sentenced on only two counts. Therefore, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the maximum sentence that can be imposed here is 20 years.

48

## CONCLUSION

The Yiddish word for compassion or mercy is rachmones, and that is what Mr. Weingarten's children, his friends and supporters, and he himself asks this Court in the exercise of its discretion to dispense.   For all the foregoing reasons, we respectfully urge this Court to sentence Mr. Weingarten to a term of imprisonment for no greater than 168 months.

Dated:        August 30, 2011
              New York, New York

                                        Respectfully submitted,

                                             /s/
                                        _____
                                        Donna R. Newman
                                        Donna R. Newman, Esq.
                                        111 Broadway, Suite 1805
                                        New York, NY 10006
                                        (212) 229-1516
                                        donnanewmanlaw@aol.com


                                             /s/
                                        _____
                                        Jill R. Shellow
                                        Law Offices of Jill R. Shellow
                                        111 Broadway, Suite 1305
                                        New York, NY 10006
                                        (212) 792-4911
                                        jrs@shellowlaw.com

                                        Attorneys for Israel Weingarten