

*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

AG:RJN
F.#2007R01082

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

September 7, 2011

By Hand Delivery and ECF

The Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:  United States v. Israel Weingarten
            Criminal Docket No. 08-571 (JG)

Dear Judge Gleeson:

      The government submits this letter in opposition to the defendant's August 30, 2011 memorandum ("Def. Mem.") in which he requests that the Court re-sentence the defendant to a term of incarceration of fourteen years or below.  On May 8, 2009, the defendant was sentenced to thirty years' incarceration, after his conviction by a jury of five counts of an indictment charging him with transporting and traveling with a minor - his own daughter - in order to sexually abuse her, in violation of 18 U.S.C. § 2423(a) and 18 U.S.C. § 2423(b).  On January 18, 2011, the Second Circuit reversed the conviction on Count Three on the grounds that the travel charged in that Count did not have a sufficient nexus to the United States.  Because of this determination, the case was remanded for re-sentencing.  United States v. Weingarten, 632 F.3d 60 (2d Cir. 2011).

      The defendant now submits that a sentence at the low end of the United States Sentencing Guidelines range should be imposed because (1) the defendant is well-respected and loved by certain community and family members; (2) the defendant's religious obligations and illness make prison life difficult for him; and (3) the defendant is not likely to be a recidivist.  The defendant further argues that the Court may not impose sentence on each Count of conviction because, according to the defendant, Counts One and Two cover the same conduct charged in Counts Four and Five.  The government respectfully submits that these arguments should be rejected and that the defendant's horrific treatment of his daughter warrants the thirty years' incarceration that was previously imposed by the Court.

I.   Procedural History

On March 11, 2009, the defendant was convicted by a jury verdict of two counts of transporting a minor in foreign commerce with the intent that she engage in sexual activity for which he could be charged with a crime in the United States, in violation of 18 U.S.C. § 2423(a) (Counts One and Two), and three counts of traveling in foreign commerce for the purpose of engaging in sexual conduct with a minor, in violation of 18 U.S.C. § 2423(b) (Counts Three, Four and Five).  Counts One and Four relate to Weingarten's transportation of and travel with his daughter, Jane Doe, from Israel to New York, between July and August 1997, for the purpose of sexually abusing her.  Counts Two and Five relate to Weingarten's transportation of and travel with Jane Doe, from New York to Belgium, between August and September, 1997, for the purpose of sexually abusing her.  Count Three, the sole count reversed by the Second Circuit, related to Weingarten's travel with Jane Doe, from Belgium and Israel, between April and July 1997, for the purpose of sexually abusing her.

On May 8, 2009, this Court sentenced Weingarten to 10 years of imprisonment on Counts One through Three (the maximum term of imprisonment permissible under the 1997 statutes that apply), to run consecutively, and 10 years of imprisonment on Counts Four and Five, to run concurrently with each other and with Counts One through Three.

After appeal by the defendant, the Second Circuit reversed the defendant's conviction on Count Three on the grounds that "travel by a United States citizen between two foreign countries, absent any territorial nexus to the United States, does not constitute travel in foreign commerce" within the meaning of 18 U.S.C. § 2423(b).  United States v. Weingarten, 632 F.3d 60, 61-62 (2d Cir. 2011).

II.  The Probation Department's Presentence Investigation Report

In light of the Second Circuit's ruling, the Probation Department issue a second addendum to the Presentence Investigation Report ("PSR Add.") which omits Count Three of the indictment from the Guidelines calculation.  Prior to the Second Circuit's decision, the total offense level was calculated to be 39, with a corresponding range of imprisonment of 262 to 327 months.  As amended, based on the omission of Count Three, it is calculated to be 37, with a corresponding range of imprisonment of 210 to 262 months.  PSR Add. ¶ 178.  However, the addendum

notes that the conduct charged pursuant to Count Three can be considered an aggravating factor at sentencing. PSR Add., Part E.

The defendant challenges the addendum to the PSR for failing to update his medical condition. However, the primary illness from which he suffers, namely, the urethral stricture which requires self-catherization throughout the day, was covered in the first PSR issued after Weingarten's conviction. Moreover, the Probation Department has reported that it contacted the Bureau of Prisons and was informed that the majority of complaints it has received from the defendant relate to issues surrounding his ability to practice his religion while incarcerated, and not to his medical issues. Therefore, the government respectfully submits that this objection to the PSR addendum is without merit.

The defendant further objects to the grouping analysis set forth in the addendum to the PSR. According to the defendant, Counts One and Four should be grouped together, as should Counts Two and Five. The defendant argues that because Counts One and Four cover sexual abuse inflicted during the trip from Israel to New York between July and August 1997, those counts should be grouped. Similarly, the defendant argues that because Counts Two and Five cover sexual abuse inflicted during the trip from New York to Belgium, between August and September 1997, those counts too should be grouped. The government agrees that this is a close question. However, the government concurs with the Probation Department's analysis because Counts One and Five each cover the defendant's transportation of Jane Doe, while Counts Two and Four cover his own travel.

Moreover, regardless of whether the base offense level is 37, or 35, as proposed by the defendant, the government respectfully submits that the egregious nature of the defendant's sexual and emotional abuse of his daughter warrants a sentence above the applicable Guidelines range pursuant to 18 U.S.C. § 3553(b)(2)(A)(i) (permitting the Court to find that aggravating circumstances require a sentence above the Guidelines range); U.S.S.G. §§ 5K2.0 (setting forth the policy for upward departures based on aggravating or other circumstances not adequately considered by the Sentencing Commission) and 5K2.8 (permitting an upward departure for behavior that was "unusually heinous, cruel, brutal or degrading to the victim"). Although the conduct charged in Count Three is no longer applicable to the Guidelines calculation, it is appropriate for the Court to consider that conduct as an aggravating factor. Indeed, as described below, Weingarten's sexual abuse of his daughter Jane Doe spanned almost

a decade, whereas the charged conduct occurred only during 1997. The government respectfully submits that the Court should consider the entirety of Weingarten's sexual abuse in determining an appropriate sentence. See 18 U.S.C. § 3661.

III. Weingarten's Conduct Warrants a Thirty-Year Sentence

    A. The Facts of This Case Have Not Changed

The Second Circuit's reversal of Count Three in no way altered the facts that this Court may consider when imposing sentence. The Second Circuit's decision was based only on whether the relevant statute covered purely international travel. The decision did not question at all the factual basis for Count Three, or any of other counts of conviction. Although the government agrees that the sentencing must be *de novo*, in this case, "the factual mosaic related to those offenses," has not changed. Nor has the defendant produced any new facts pursuant to 18 U.S.C. § 3553 that warrants a reduction in his sentence. Rather, the arguments he presents relating to his character, health, ability to adjust to incarceration and likelihood of recidivism were all presented to this Court during the prior proceeding. See Def. Sentencing Mem., 4.28.2009, Docket Number 75 (arguing that *inter alia*, that the defendant's character, reputation in the community, support of his family members, age, health, susceptibility to abuse in prison, chances of recidivism and ability to be rehabilitated all supported a sentence below the Guidelines range). Thus, the previously-imposed sentence of thirty years' incarceration is still appropriate. United States v. Quintieri, 306 F.3d 1217, 1227-1228 (2d Cir. 2002); United States v. Rigas, 583 F.3d 108, 115 (2d Cir. 2009) ("If the court determines that the 'factual mosaic' related to a count of conviction has not been altered, no further proceeding as to that count is necessary, except to the extent it affects the aggregate sentence.)

    B. A Sentence of Thirty Years Does Not Violate Double Jeopardy

The defendant further argues that the Court is not permitted to impose a sentence above twenty years because, according to the defendant, Counts Four and Five, charging violations of 18 U.S.C. § 2423(b), are multiplicitous of Counts One and Two, charging violations of 18 U.S.C. § 2423(a). Def. Mem. at 46. In other words, Weingarten argues that because the four counts cover conduct that occurred during the same two trips, conviction and punishment on all four counts constitutes double jeopardy by punishing Weingarten for the same offenses

4

twice. However, the defendant's analysis with respect to multiplicity is flawed, and his argument is without merit.

The test for determining whether counts are multiplicitous is whether each statutory provision requires "proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304 (1932); United States v. Khalil, 214 F. 3d 111, 118 (2d Cir. 2000) (holding that if one statute "requires proof of at least one fact that the other does not, there are two offenses, and it is presumed that the legislature intended to authorize prosecution and punishment under both. In that circumstance, the imposition of multiple punishments does not violate the Double Jeopardy Clause.") As long as the statutes involve different elements, this test is satisfied, regardless of whether there is a substantial overlap in the evidence used to prove the two offenses. See e.g., Ianelli v. United States, 420 U.S. 770, 786 n. 17 (1975); United States v. Sessa, 125 F.3d 68, 72 (2d Cir. 1997); United States v. Brooks, 610 F. 3d 1186, 1195 (9th Cir. 2010) (holding that the defendant, a pimp who traveled with and transported two underage girls for the purposes of prostitution, could be convicted for the same trips under both 18 U.S.C. § 1959(a) and 18 U.S.C. § 2423(a)).

Here, Counts One and Two required the government to prove that Weingarten physically transported Jane Doe in foreign commerce. 18 U.S.C. § 2423(a) (1997). Counts Four and Five, on the other hand, do not require the government to prove the actual transport of the victim. Rather, the government was required to prove that Weingarten traveled in foreign commerce with the purpose of engaging in a criminal sexual act with a minor. 18 U.S.C. § 2423(b) (1997). In other words, section 2423(a) required proof of a fact that Section 2423(b) does not – namely, the physical transportation of another individual. Accordingly, it would have been possible for the jury to find that, on each trip, Weingarten was not responsible for actually transporting Jane Doe, but that he undertook his own travel in order to engage in illicit sexual acts with her.

This distinction has been recognized by other Courts. For example, in United States v. Barrington, the defendant challenged as multiplicitous her convictions for interstate travel with the intent to promote prostitution, in violation of 18 U.S.C. § 1952(a)(3) and for transportation of minors in interstate commerce for the purposes of prostitution, in violation of 18 U.S.C. § 2423(a)(1). United States v. Barrington, 806 F.2d 529, 534 (5th Cir. 1986). The violations of the two statutes covered the same prostitution trips with the same minors on the same dates. Nevertheless, the Court

5

distinguished between the defendant's own travel and the defendant's transportation of others, and therefore held that there was no double jeopardy violation. Id; see also, United States v. Williams, 291 F.3d 1180, 1187 (9th Cir. 2002) (holding that defendant could be convicted of violating both 18 U.S.C. § 2422(a) and 18 U.S.C. § 2423(a) because 2423(a) requires the defendant to actually transport the victim whereas 2422(a) requires the defendant to persuade, induce, entice or coerce the victim to travel)(overruled on other grounds in United States v. Gonzales, 506 F.3d 940 942 (9th Cir. 2007)); McKinney v. United States, 11-CV-207 (CAS), 2011 WL 2472569, at * 7 (E.D.Mo. June 21, 2011) (holding that convictions for 18 U.S.C. § 2241(c) and 18 U.S.C. § 2423(a) did not violate double jeopardy because section 2241(c) required that the defendant travel with the intent of engaging in a criminal sexual act with a person under twelve years old, whereas section 2423 required the defendant to transport an individual with the intent that the individual engage in a sexual activity for which the defendant could be charged with a crime.)

The defendant fails to address any of these relevant cases, and relies instead on Bell v. United States, 349 U.S. 81 (1955), which is not applicable here. In Williams, the Courts specifically distinguished Bell, explaining that Bell prohibits more than one conviction under the same statute when the defendant transported more than one victim on the same trip. Williams, 291 F. 3d at 1188. In contrast, in Weingarten's case, as in Williams and in the other the cases set forth above, "[t]he same conduct can support convictions for two separate offenses" where "the same trip, the same conduct, violated two different statutes containing different elements." Id.

C.  Weingarten's Sexual Abuse of Jane Doe

The defendant devotes a substantial portion of his submission to a description of his relationship with his family, mainly his children Chayeh, Yakev, Chana, and Sheindl. He fails, however, to address the need for his sentence to reflect the seriousness of the torture he inflicted on his daughter Jane Doe, the victim in this case. While the Court is no doubt familiar with the details of the sexual abuse the defendant committed while traveling with and transporting his daughter to and from the United States, the government respectfully submits that a summary of his egregious conduct entirely undermines the picture of a serene and loving household portrayed in the defendant's submission. The government submits that the evidence of Weingarten's sexual abuse of Jane Doe fully supports the thirty year sentence previously impose by this Court.

From a young age, approximately seven or eight years old, the defendant treated his daughter Jane Doe differently from his other children. While lavishing her with excessive attention, he simultaneously isolated her from other friends and family members and branded her a liar, setting the stage early to protect himself from the possibility that she might confide in someone else about the sexual abuse she would soon begin to suffer.

The abuse started slowly. When Jane Doe was approximately nine or ten years old, her parents purchased a device for giving massages, and Jane Doe was instructed to give back massages to both her mother and Weingarten. (Trial Tr. 200-01). Eventually, Weingarten complained of stomach aches and asked Jane Doe to massage his stomach through his clothes. (Trial Tr. 202). Then, one night, Weingarten called Jane Doe into his bedroom and asked her to give him a massage on his stomach, but this time, Weingarten also lifted his shirt and put Jane Doe's hand on his bare skin. (Trial Tr. 203). Weingarten took Jane Doe's hand, pushed it down his pants and forced her fingers to wrap around his erect penis; then he pushed her hand "up and down." (Trial Tr. 203-04). This confused Jane Doe because she did not know that a man's penis "[could] get that big and hard and I [had] never felt pubic hair before." (Trial Tr. 204).

The sexual abuse by Weingarten worsened over time. Instead of simply forcing Jane Doe to grab his erect penis, Weingarten pulled down Jane Doe's tights and underwear and touched the outside of her vagina. (Trial Tr. 219). Eventually, Weingarten forced Jane Doe to lie on her stomach on his bed and instructed her to listen for people approaching while he lowered her tights and underwear and fondled her vagina and buttocks. (Trial Tr. 218-20).

During this period of sexual abuse, Jane Doe spoke to her mother, Feige, in confusion and fear. (Trial Tr. 220-21). Jane Doe told her mother that "daddy is touching me" and, because she did not know the appropriate words to use, she pointed towards her vagina. (Trial Tr. 221). Feige recalled that Jane Doe approached her "very shocked, very lost" and told her that Weingarten was "touching her in very unusual places. She showed me with her hands in the direction downward." (Trial Tr. 693).

It was also common for Weingarten to physically abuse Jane Doe in other ways. (Trial Tr. 530). When Weingarten learned that Jane Doe had told her mother about the sexual abuse, he beat Jane Doe, kicking her with his shoes between her legs,

pushing her to the floor, pinching and punching her with his fists. He also struck Jane Doe on the head with a hard vegetable approximately twelve to fifteen inches long until the vegetable broke. (Trial Tr. 222-23).

Jane Doe threatened to tell other people about the abuse, but Weingarten responded that no one would believe her because he never had sexual intercourse with her and because he was a respected rabbi and she merely a "liar and fantisizer." (Trial Tr. 237). While Jane Doe became resigned to the abuse, she nevertheless asked Weingarten why he was abusing her. His explanations reflect his power to manipulate her, a power he used repeatedly on her and other family members as the years passed. When she was young, Weingarten told Jane Doe that it was because she was beautiful. (Trial Tr. 224). As Jane Doe got older, the explanation changed. Weingarten insisted that the abuse was Jane Doe's fault, among other things. For example, Weingarten told Jane Doe that her eyes were seducing him. He chastised her and demanded that she stop seducing him. (Trial Tr. 228). In fact, on Yom Kippur, Weingarten would instruct Jane Doe to be modest and to stop causing him to sin. (Trial Tr. 229). He also blamed his wife, causing Jane Doe to have feelings of hatred towards her own mother. (Trial Tr. 224-25).

Of course, his attempt to blame Jane Doe and his wife for causing him to sin did nothing to stop the abuse, and it only became worse. As Jane Doe approached puberty, Weingarten warned her to look for menstrual blood and to advise him when she saw it. (Trial Tr. 230). When Jane Doe eventually began to menstruate, she told Weingarten, who inspected her vagina and digitally penetrated her, causing her pain. (Trial Tr. 231). Weingarten also examined Jane Doe's breasts as she was developing and commented that she should "never let a man look at me in the light, because I don't look nice." (Trial Tr. 231).

As Jane Doe got older, she began reacting to the sexual abuse, which caused her even more shame and embarrassment. One night in particular, after Weingarten had removed Jane Doe's clothes, "he started touching me with his fingers, and he rubbed me so hard, and then I felt like I pee'd myself, and I was so embarrassed." (Trial Tr. 233).

One night Jane Doe's mother observed Weingarten and Jane Doe together in bed. Weingarten and Feige had argued earlier that evening, and Feige was sleeping in another room. (Trial Tr. 694). Weingarten entered Jane Doe's room and pleaded with her to come to his bed. When Jane Doe heard her mother approaching Weingarten's bedroom, she did not warn him. (Trial

8

Tr. 238-44). Weingarten told Feige that Jane Doe was in the bed because she was cold (Trial Tr. 694-95), but Feige could see Weingarten's bare mid-section (Trial Tr. 737). Weingarten attempted to coerce Jane Doe into telling her mother that nothing had happened, but, instead, Jane Doe told her mother that she would explain everything at a later time. (Trial Tr. 240-41).

Shortly thereafter, Weingarten traveled to England, giving Jane Doe the chance to confide in her mother. Jane Doe detailed Weingarten's abuse to her mother. Feige recalled that Jane Doe told her that Weingarten had "put it in her mouth so she became disgusted for the rest of her life." (Trial Tr. 700). Jane Doe also told her mother that Weingarten had instructed her "to lie down on her side with his legs between her legs, one on top of the other. That was exactly what he was doing with me, that's why I could believe it." (Trial Tr. 700, 246). Jane Doe also advised Feige that because of Weingarten's ejaculate, "she was unable to eat chicken soup afterwards. He made it disgusting for her, all kinds of foods that she liked before Shabbas. He made her life disgusting." (Trial Tr. 701). In response to Jane Doe's description of the abuse, Feige told Jane Doe that she would confront Weingarten with a letter. (Trial Tr. 246, 701).

When Feige finally confronted Weingarten about the abuse, Jane Doe overheard Weingarten say that "he was going to kill [Jane Doe]" (Trial Tr. 702), and when Jane Doe went to her room, Weingarten charged at her and began striking her. Weingarten beat Jane Doe for approximately thirty to forty-five minutes, leaving marks over "every part" of her body. (Trial Tr. 249). The beating was so severe, and Weingarten's desire to silence Jane Doe so complete, that Jane Doe was unable to attend school for close to two weeks. (Trial Tr. 250-51, 702).

Eventually, with the assistance of a rabbi, Chaim David Weiss, the same rabbi who now apparently intends to submit an affidavit supporting Weingarten,[1] Jane Doe testified against her father in a rabbinical court (Trial Tr. 253) and in 1996, she traveled to England to escape her father. (Trial Tr. 539, 255, 703). There, Jane Doe began attending an all-girls religious school in Manchester (Trial Tr. 259), but Weingarten continued to call Jane Doe constantly, insisting that she return to Belgium. (Trial Tr. 262).

---

[1] To date, the government has not received a copy of the affidavit referred to the defendant's submission.

9

Eventually, Rabbi Royde advised Jane Doe that she would not be permitted to continue her studies at the school in Manchester because of rumors circulating about her. (Trial Tr. 270). Consequently, Jane Doe returned to Belgium, at which time Weingarten informed her that the family was moving to Israel because Jane Doe had "caused him a bad name and everyone is talking about him." (Trial Tr. 271). In part to escape his reputation and continue his sexual abuse of Jane Doe, on April 14, 1997, Weingarten traveled to Israel with his entire family, with the exception of Jane Doe's older brother, Yoinesun, who was already there. (Trial Tr. 272).

In Israel, Jane Doe was not permitted to leave the house alone and was forced to sleep in the living room. (Trial Tr. 705). Weingarten sexually abused Jane Doe in Israel on an almost daily basis. Among other things, he vaginally and anally penetrated her with his fingers, and he forced her to masturbate him, at which time he would ejaculate. (Trial Tr. 273-75).

On May 13, 1997, Weingarten, Feige, Jane Doe and Weingarten's youngest children returned to Belgium to pack the house for the permanent move to Israel. There, Weingarten continued to sexually abuse Jane Doe almost every night. (Trial Tr. 278). In the mornings, Weingarten would beat Jane Doe, then complain that she was "burying him alive." (Trial Tr. 279-80). The family eventually returned to Israel, where the sexual abuse continued. (Trial Tr. 281-82).[2]

On July 30, 1997, upon being informed that his father was gravely ill, Weingarten had Jane Doe accompany him to Brooklyn, New York, where the two of them stayed in Weingarten's brother's home. (Trial Tr. 284-85, 712). There, Weingarten sexually abused Jane Doe (Trial Tr. 285), at the same time ordering her to tell her dying grandfather that she would be "a modest girl from now on" (Trial Tr. 286-87). When Weingarten's father passed away, Jane Doe was not even allowed to attend the funeral.

On August 19, 1997, Weingarten and Jane Doe returned to Belgium, where she experienced the worse period of sexual abuse at her father's hand. Jane Doe testified that "[Weingarten] abused me night and day, every day . . . it was non-stop, hardly

---

[2] These trips between Israel and Belgium were the subject of Count Three. As set forth above, although this Count was reversed, the Court may consider this conduct in determining the appropriate sentence.

remember getting dressed . . . . I don't remember eating or sleeping much. It was . . . a long fog." (Trial Tr. 290-91). Weingarten would simulate sex and ejaculate near Jane Doe's vagina. (Trial Tr. 291). For the very first time, Weingarten also sat on top of his daughter and forced her head near his penis, and eventually forced his penis into her mouth. (Trial Tr. 291). He so frequently forced her to perform oral sex that she lost count. (Trial Tr. 297).

On September 12, 1997, Jane Doe returned to Israel, where Feige noticed that Jane Doe looked "pale, very changed, very different [and] tortured." (Trial Tr. 714). Feige assisted in her daughter's return to England (Trial Tr. 300), but shortly thereafter, Weingarten traveled to England to kidnap Jane Doe, and Jane Doe sought refuge in Rabbi Royde's home. There, Weingarten physically attacked Rabbi Royde, and when the police arrived, Jane Doe confided in them about the sexual abuse she had suffered for so many years. (Trial Tr. 301-303; Trial Tr. 657-660.) After this incident, Jane Doe obtained a order of protection against Weingarten and later moved permanently to New York.[3] (Trial Tr. 661.)

> D. Weingarten's Manipulation of His Family and Community Members

In addition to establishing beyond all doubt the sexual abuse that Weingarten inflicted on Jane Doe, the evidence at trial also demonstrated Weingarten's remarkable control over his wife and children and even other members of his community. This further undermines the credibility of the statements submitted by his other children and friends on his behalf. Tellingly, the defendant's sentencing memorandum does not address Yoinesun's

---

[3] Weingarten's sentencing memorandum devotes substantial attention to the custody battle between Weingarten and his wife and the investigations of Child Protective Services into abuse of the Weingarten children. Weingarten entirely mischaracterizes CPS's findings, stating, "time after time they found no evidence of abuse. Quite the contrary, they found a loving home where the children were well cared for and safe." Def. Mem. at 8. In fact, it is clear that although CPS was apparently unable to make a final determination as to the defendant's conduct, grave concerns were raised regarding his treatment of the children. PSR §§ 126-134. However, what is most relevant here is that during these proceedings, Jane Doe subjected herself to a deposition in which she described the sexual abuse set forth above.

11

powerful testimony about his father's manipulation, which contradicts the portrayal Weingarten's other children have provided of him.

For example, Weingarten shamelessly used Yoinesun in a cruel attempt to shield himself from Jane Doe's allegations. Weingarten repeatedly told Yoinesun that it was Jane Doe who was "overheated and she was always jumping on me"; *i.e.,* that "she seduced him." (Tr. 543) Furthermore, Weingarten made Yoinesun feel he had acted inappropriately when he and Jane Doe played "doctor," as children. Having made Yoinesun feel guilty about this entirely innocent child's play, he then insisted that Yoinesun record a scripted conversation with Jane Doe that Weingarten planned to use to convince Feige that Jane Doe had sexual relations with other people in the house. (Trial Tr. 42, 543; See also, Opinion and Order Denying Rule 33 Motion, Docket Number 78, at p. 7 n 8.)

In another effort to manipulate Yoinesun, Weingarten insisted that Yoinesun convince Feige that Jane Doe was lying about the abuse, by making Yoinesun feel responsible for keeping the family together. To Yoinesun, who was brought up in the Sat Mar tradition to believe that children of broken homes were "second-grade kids," (Trial Tr. 536), this was a tremendous burden. He felt that to disobey his father's instructions would leave him responsible for the break-up of the family and what he believed to be their inevitable ostracism from their close-knit community.

In a similar vein, Weingarten took pains to make his relationship with Jane Doe appear normal to the outside community and to discredit Jane Doe's allegations. For example, after forcing Jane Doe to accompany him, alone, to Belgium in August 1997, Weingarten insisted that they leave the apartment to appear together publicly, to "show everyone I have no problems with him."[4] (Trial Tr. 292). He also sought to ensure that Jane Doe would be the one branded as promiscuous, in order to shield himself from suspicion. Thus, a short time later, when Jane Doe wanted to return to the rest of her family in Israel, Weingarten

---

[4] Weingarten told Yoinesun that he had accompanied Jane Doe during these outings for two reasons. First, it was the only way Weingarten could prevent Jane Doe from speaking to people about the sexual abuse. Second, it was an attempt to show the Satmar community that his sister was lying about the sexual abuse because "she's spending time with him and being with him there by themselves means that everything is fine." (Trial Tr. 546).

12

conditioned that return on Jane Doe's willingness to make an incriminating recording of her neighbor. (Trial Tr. 294). Jane Doe was to give the impression that she had an improper sexual relationship with the neighbor, which Weingarten intended to use to clear his name with the rabbis. (Trial Tr. 294). Jane Doe made the tape and gave it to her father. Weingarten stated that he was going to present it to the rabbis as proof that the neighbor, and not Weingarten, had molested her. (Trial Tr. 298).

Yoinesun's testimony, along with Feige's testimony and Jane Doe's testimony, put the letters of support that Weingarten has received in context and undermine the credibility of descriptions provided by people like Moshe Krause, who wrote in support of Weingarten that he witnessed the "extraordinary happy and calm atmosphere I felt whilst being in his house." Def. Mem. at 25. Even Jane Doe's sisters, who testified on Weingarten's behalf at trial, did not describe such a serene household atmosphere, but rather, one of turmoil and friction. Accordingly, the government respectfully submits that the Court should give little weight to the descriptions of the defendant that have been provided by his other children and family friends.

Indeed, at the time of Weingarten's sentencing, this Court rejected the statements provided by Weingarten's other children as perjury. See Sentencing Tr. at 76. Weingarten now addresses that finding, arguing that the Court erroneously interpreted Chayeh's reference to the mafia. Def. Mem. at 12. However, as absurd as Chayeh's mafia reference was, that was not the Court's only basis for rejecting her testimony and the affidavit she submitted for sentencing. Rather, the Court noted that the children gave "robotic, almost identical incantations of wild physical and sexual abuse by your former wife -- of really the whole family." Sentencing Tr. at 75. The current letters submitted by Weingarten's children, while somewhat less outlandish, are similarly suspect in terms of the almost saint-like qualities they ascribe to the defendant. See Def. Mem. Exhibits C and D.

The letters submitted by Weingarten's community members are equally suspect. As this Court previously noted, nobody wants to believe that one of his friends is capable of the kind of crimes Weingarten committed. Sentencing Tr. At 75. This Court also observed, "I'm sure you were never out there regaling them with stories of your sexual victimization of your own daughter, and when the rumors began to swirl that you were doing it, you vehemently denied it and you lashed out at your accusers." Id. It is no surprise then, that some individuals continue to deny the truth, despite all of evidence demonstrating

13

Weingarten's protracted abuse of Jane Doe. It is especially troubling, though unfortunately, not all that surprising, that Rabbi David Weiss, who once assisted Jane Doe in escaping her father, now apparently wishes to submit an affidavit in his support. As described in the government's opposition to the defendant's Rule 33 Motion, Rabbi Royde also attempted to come to Weingarten's defense after the trial, despite the assistance he gave at one time to Jane Doe. Gov. Opp. To Rule 33 Motion, Docket Number 71 at 46-47. As it did when Rabbi Royde submitted his letter on Weingarten's behalf, the government can only surmise that either the defendant's supporters, who objected to the resolution of this case in the secular courts, have exerted pressure on Rabbi Weiss to come to Weingarten's aid or that Weiss was willing to help Jane Doe only as long as she did not speak of Weingarten's abuse outside their close-knit community. For these reasons, the government respectfully submits that the letters submitted on Weingarten's behalf should receive little weight.

IV. Conclusion

The government submits that Weingarten's sentence should reflect the seriousness of Weingarten's continuous torment of his daughter, through his sexual abuse of her, and through the emotional and physical abuse that he used to maintain his control over her. Moreover, as this Court previously observed, Weingarten's sentence is also crucially important for making other victims of sexual abuse understand that by speaking out, they can ultimately receive protection through the justice system. Sentencing Tr. 78. For these reasons and the reasons set forth above, the government respectfully submits that the

sentence of thirty years' incarceration previously imposed by the Court is warranted.

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney

                    By:       S/
                              Rachel J. Nash
                              Assistant U.S. Attorney
                              (718) 254-6072

cc: Clerk of the Court (JG) (By ECF)
    Donna Newman (By ECF)
    Patricia Sullivan, U.S. Probation (By Email)