UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

UNITED STATES OF AMERICA,                    Case No: 08-CR-571 (JG)

              -against-

ISRAEL WEINGARTEN,

                          Defendant.

------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ISRAEL WEINGARTEN'S MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)

**TWERSKY PLLC**
747 Third Avenue, 32nd Floor
New York, New York  10017
(212) 425-0149

*Attorneys for Defendant Israel Weingarten*

Of Counsel:
      Aaron Twersky, Esq.
      Jason Lowe, Esq.
      Ilana Neufeld, Esq.

## **TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ................................................................. 2

**BACKGROUND AND FACTS** ................................................................. 3

   **A.** Procedural History ................................................................. 3
   **B.** Israel Weingarten's Severe Medical Issues ................................. 5
   **C.** The Heightened Risk Of COVID-19 Inside Prisons And Jails ............ 8
   **D.** The Heightened Risk Of Contracting COVID-19 At Fort Dix ............ 9

**ARGUMENT** ........................................................................................ 15

**POINT I**

**THIS COURT HAS AUTHORITY TO RESENTENCE
WEINGARTEN UNDER 18 U.S.C. § 3582(c)(1)(A)(i) FOR
THE "EXTRAORDINARY AND COMPELLING REASONS"
CREATED BY THE COVID-19 PANDEMIC AND PRISON CONDITIONS
WHICH PREVENT SELF-CARE FOR A HIGH RISK PATIENT** ...................... 15

**POINT II**

**THE COURT CAN WAIVE THE 30-DAY REQUIREMENT FOR
EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER 18 U.S.C. §
3582 (c)(1)(A) BECAUSE OF THE URGENT RISK OF FATAL INFECTION** .... 17

   **A.** Exhaustion Is A Claim Processing Rule That Is
       Waived For COVID-19 Compassionate Release Applications ........................... 17
   **B.** The Court May Also Waive Exhaustion Under The Concepts
       Of Futility, Inability To Grant Relief And Undue Prejudice .............................. 20
       1. Requiring Administrative Exhaustion
          Would Be Futile In This Case .................................................... 21
       2. Weingarten Will Suffer Irreparable Harm
          If Forced To Exhaust Administrative Remedies ................................ 24
   **C.** Weingarten Should Be Deemed To Have Exhausted His Remedies .................. 26

**POINT III**

**THE COVID-19 OUTBREAK PRESENTS A COMPELLING
AND EXTRAORDINARY CIRCUMSTANCE THAT
WARRANTS COMPASSIONATE RELEASE FOR
WEINGARTEN, WHO IS A HIGH-RISK FATALITY PATIENT** ...................... 29

   **A.** COVID-19 Response And Cases In New Jersey ................................. 29
   **B.** Guidance From The Centers For Diseases Control And Prevention

Requires Granting Israel Weingarten's Request For Compassionate Release .... 30

**C.** The Two Attorney General Memorandums And Case Law Require
Granting Israel Weingarten's Request For Compassionate Release.................. 31

**POINT IV**

**THE CONDITIONS OF BOP INCARCERATION FOSTER
THE SPREAD OF COVID-19, AND WEINGARTEN'S AGE
AND PREEXISTING MEDICAL CONDITIONS RENDER HIM
PARTICULARLY SUSCEPTIBLE TO AN UNREASONABLE
RISK OF DEATH AND AN INABILITY TO TAKE PREVENTATIVE
MEASURES OR SELF-CARE RECOMMENDED BY THE CDC** ........................ 36

**A.** The Conditions At Fort Dix Prevent Weingarten From Protecting Himself ....... 37

**POINT V**

**THE RELEVANT § 3553(a) FACTORS FAVOR RESENTENCING** .................... 40

**CONCLUSION** ........................................................................... 46

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

UNITED STATES OF AMERICA,                          Case No: 08-CR-571 (JG)

                      -against-

ISRAEL WEINGARTEN,

                              Defendant.
------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ISRAEL WEINGARTEN'S
MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

Defendant Israel Weingarten ("Weingarten"), by and through his counsel of record,

Twersky PLLC, submits this memorandum of law in support of his Motion for Compassionate

Release (the "Motion").  Weingarten respectfully requests that the Court grant the Motion under

18 U.S.C. § 3582(c)(1)(A) and order the remainder of his sentence to be served under home

confinement and incarceration.  The motion should be granted due to the "extraordinary and

compelling reasons" confronting the federal prison system by the pandemic of COVID-19 and

the fact that Weingarten, at the advanced age of 70, suffers from a host of very serious medical

issues and is not a danger to the community.  Further, given the cataclysmic events of the current

pandemic, this Motion should also be granted because respect for the law, general deterrence and

other notable 18 U.S.C. § 3553(a) factors would not be undermined by converting the remainder

of Weingarten's sentence to home incarceration.  We respectfully ask the Court to consider this

motion on an expedited basis as each day in custody brings renewed and unthinkable risk to

Israel Weingarten's life.

## PRELIMINARY STATEMENT

As the Court is well aware, we are in the middle of an unprecedented pandemic, as COVID-19 sweeps across our nation, killing people in its wake.  As of May 12, 2020 at 2:20 p.m., "[t]he coronavirus pandemic has sickened more than 4,195,100 people, according to official counts . . . [and] at least 288,300 people have died" worldwide.[1]  By the time the Court reviews this application that number will have significantly increased.  The exponential rate of COVID-19 infection is unparalleled in our lifetime.

There are certain groups of people who are at a higher risk of getting seriously ill and potentially dying if they contract COVID-19.  "Data from China have indicated that *older adults, particularly those with serious underlying health conditions*, are at higher risk for severe COVID-19 associated illness and death than are younger persons."[2]  Additionally, those in prison are even more susceptible to COVID-19 than the average person.[3]  *Therefore, Israel Weingarten, a 70 year old man who suffers from a host of medical conditions and is currently incarcerated, is extremely vulnerable to the COVID-19 pandemic and this Motion for Compassionate Release must be granted*.

---

[1]  *See Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times, available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (updated regularly).

[2]  *See Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16, 2020*, Centers for Disease Control and Prevention Report, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm (emphasis added).

[3]  *See Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap; *see also An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues*, The New York Times (March 16, 2020), available at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.

## BACKGROUND AND FACTS

### A. Procedural History

Weingarten was found guilty and was convicted of various sexual abuse crimes, including two counts of 18 U.S.C. § 2423(a)[4] and three counts of 18 U .S.C. § 2423(b).[5]  Upon direct appeal, one count of 18 U .S.C. § 2423(b) was dismissed.  These offenses arose out of allegations lodged against Weingarten by his oldest daughter, relating to conduct which was alleged to have happened in 1997.  Following the guilty verdict and after his first appeal, on September 12, 2011, the Court re-sentenced Weingarten to 30 years of imprisonment, followed by three years of supervised release, with various special conditions of supervision.  Following his conviction, Weingarten also filed a Motion to Vacate pursuant to 28 U.S.C. § 2255 (D.E. 114-116) which was denied.  Weingarten has been in custody and incarcerated since October 6, 2008, when he was first arrested.  Currently he is being held at the Federal Bureau of Prisons ("BOP") facility at FCI Fort Dix in Fort Dix, New Jersey ("Fort Dix").  His expected date of release, as calculated by the BOP, is April 29, 2034.

On April 14, 2020, Chaneh Berkovits, on behalf of her father, Israel Weingarten, filed an administrative relief application with the warden of Fort Dix, likewise seeking compassionate release on the same grounds as submitted herein.  *See* Exhibit A to the Declaration of Aaron Twersky ("Twersky Decl."), Berkovits E-mail to Warden, dated April 14, 2020 ("Berkovits E-mail").  On or about April 16, 2020, Weingarten himself also filed an administrative relief application with the warden, Warden David Oritz.

On April 24, 2020, Weingarten's counsel likewise emailed and faxed a letter to Warden Ortiz, again reiterating Weingarten's potentially life-saving request.  *See* Exhibit B to the

---

[4]        18 U.S.C. § 2423(a) makes it a crime to transport a minor with intent to engage in criminal sexual activity.
[5]        18 U.S.C. § 2423(b) makes it a crime to travel with intent to engage in sexual activity with a juvenile.

3

Twersky Decl., Letter to Warden, dated April 24, 2020 ("Letter").  On April 27, 2020, the
Warden confirmed receipt of the Letter and Weingarten's request.  *See* Exhibit C to the Twersky
Decl., Warden Confirmation Email, dated April 27, 2020.

Because of the urgency of the spread of COVID-19 across the United States and the state
of New Jersey (the second hardest hit state in the United States, which as of May 12, 2020 has
reported 140,743 COVID-19 cases and over 9,500 deaths[6]), as well as its rapid entrance and
continued spread into BOP facilities (as of May 12, 2020, there are 2,817 federal inmates and
262 staff within BOP who currently have positive cases of COVID-19 [which does not include
1288 inmates and 279 staff who the BOP claims have "recovered"] and 50 inmates have died
from COVID-19[7]), we respectfully ask the Court to waive the exhaustion requirement.  As
explained below, there is a plethora of case law which permits the Court to do so, in extenuating
circumstances such as these.  ***Waiting for a response could cost Israel Weingarten his life***.

In sentencing Israel Weingarten to 30 years in prison, though an extremely long sentence,
the Court did not intend to impose a death sentence on him and indeed, at Weingarten's re-
sentencing, Judge Gleeson stated: "I deliberately imposed a sentence that would give him hope
of not dying in jail."  However, in light of the COVID-19 pandemic, if Weingarten is not
released from prison now, he will certainly die in prison – sooner, rather than later.  Because of
his extreme medical diagnosis and conditions, coupled with the unthinkable spread of a global
pandemic that is killing people with pre-existing medical conditions at alarming rates,
***Israel Weingarten faces a serious risk of dying in prison if infected with COVID-19***.[8]

---

[6]     *See New Jersey COVID-19 Dashboard*, available at https://covid19.nj.gov/#live-updates (updated daily).
[7]     *See COVID-19 Tested Positive Cases*, available at https://www.bop.gov/coronavirus/ (updated daily).
[8]     *See Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States,
February 12-March 16, 2020*, CDC Report, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm
("Data from China have indicated that *older adults, particularly those with serious underlying health conditions*, are
at higher risk for severe COVID-19–associated illness and death than are younger persons") (emphasis added).

**B.** **Israel Weingarten's Severe Medical Issues**

Weingarten is 70 years old, which in it of itself puts him in the high risk category for becoming critically ill if he were to contract COVID-19.  Further, his health is extremely fragile and his multiple health issues have left him severely immuno-compromised; therefore his medical condition also puts him at a higher risk of becoming critically ill if he were to contract COVID-19.  Weingarten suffers from multiple kidney, bladder and urinary conditions, pericarditis and heart problems.  Weingarten is further vulnerable to severe lung problems, as many of his family members, including both of his parents, have died from lung disease.  These conditions leave him unusually susceptible to terrible outcomes if he were to contract COVID-19 in Fort Dix, which as of the date of filing this Motion, has had 63 confirmed cases of COVID-19 (of which 35 the BOP claims have "recovered").[9]

Due to of his extensive diagnoses and medical conditions, Dr. Arthur Lentnek, an Internal Medicine and Infectious Diseases physician, states, "[t]here is *immediate concern for Mr. Weingarten's safety*.  This individual is appropriately classified as being at "high risk" to acquire and succumb to this infection while at a federal prison facility during this pandemic . . . *Should Mr. Weingarten be infected with SARS-CoV2 he is at markedly increased risk of severe morbidity or mortality* . . . More specifically, should Mr. Weingarten become infected with SARS-CoV2 virus, he has between 29-44% likelihood of requiring hospitalization, between 8-19% likelihood of requiring admission to an ICU, and between 2.5-5% likelihood of succumbing to this illness."  *See* Exhibit D to the Twersky Decl., Letter from Dr. Arnold L. Lentnek, MD, dated May 11, 2020 (emphasis added).

Weingarten suffers from a host of serious medical conditions and issues, including:

---

[9] *See COVID-19 Tested Positive Cases*, available at https://www.bop.gov/coronavirus/ (updated daily).

Unspecified Neurocognitive Disorder, chronic neurogenic (dysfunctional) bladder, urinary retention with chronic bladder outflow tract obstruction, large urinary bladder base mass, posterior calcification, right mid-kidney indeterminate lesion, Stage 3 Chronic Kidney Disease and chronic gout.  *See* Exhibit E to the Twersky Decl., Bureau of Prisons – Health Services – Clinical Encounter Note, dated February 27, 2020; *see also* Exhibit D, Letter from Dr. Arnold L. Lentnek, MD.

Weingarten also has high levels of uric acid in his body, a history of renal stones, CKD-3 and intermittent painful swelling of proximal PIP joints of right hand.  *See* Exhibit E, Bureau of Prisons – Health Services – Clinical Encounter Note, dated February 27, 2020.  Because of his bladder and kidney function problems, Weingarten is unable to urinate normally and does self-urinary bladder catheterization 4 times a day.  *See id*.  As a result of this, he suffers from recurrent urinary tract infections.  *See id*.  A CT scan of Weingarten's abdomen and pelvis done on December 12, 2017 showed extensive urinary bladder calculi and diffuse urinary bladder wall thickening which suggests chronic outflow tract obstruction versus cystitis.  *See id*.  Further, a retroperitoneal ultra sound done on February 8, 2019 found a large urinary bladder base mass and posterior calcifications and a right mid kidney indeterminate lesion.  *See id*; *see also* Exhibit D, Letter from Dr. Arnold L. Lentnek, MD.  Weingarten also has a history of pericarditis, having sustained a myocardial infarct (heart attack) at age 45.  *See* Exhibit D, Letter from Dr. Arnold L. Lentnek, MD; *see also* Exhibit F to the Twersky Decl., Bureau of Prisons – Health Services – Clinical Encounter Note, dated July 16, 2009.

Besides for the diagnoses and conditions above, Weingarten also suffers from Disorder of the Prostate—unspecified, Folate Deficiency Anemia, Hyperlipidemia, Hyperparathyroidism, Vitamin B12 deficiency and Vitamin D deficiency.  *See* Exhibit G to the Twersky Decl., Bureau

of Prisons – Health Services – Health Problems List.  Because of his many medical conditions,

Weingarten has been hospitalized three times in the past year.  *See* Exhibit H to the Twersky

Decl., Bureau of Prisons – Health Services – Clinical Encounter Note, dated July 11, 2019.

Dr. Lentnek further states that,

[b]eyond his age, Mr. Weingarten has a neurogenerative disease of unknown etiology, urinary retention with chronic outflow obstruction, renal insufficiency, possible ***bladder and/or renal cancer*** based on his retroperitoneal ultrasound and PSA level of 7.1, and prior myocardial infarction [heart attack] with pericarditis. To a reasonable degree of medical certainty, ***each of these conditions is independently likely to increase both the severity and mortality from coronavirus infection***.

*See* Exhibit D, Letter from Dr. Arnold L. Lentnek, MD (emphasis added).  Weingarten's cancer

has most likely gone undiagnosed and untreated in Fort Dix, which gives further cause for

concern for Weingarten during this pandemic.  It is now a known fact that "[c]ancer patients . . .

have a higher risk of death or other severe complications from covid-19 compared with those

without cancer."[10]  Further,

cancer patients who developed covid-19 had nearly a threefold higher death rate from the virus than that estimated for the general population. Cancer patients also were more likely to experience 'severe events,' such as being admitted to intensive care units and needing mechanical ventilation, than people without cancer.  Risk factors included not just age, but also the kind of cancer, the stage and the treatment . . . These findings suggest that patients with cancer are a much more vulnerable population in the current covid-19 outbreak.[11]

Additionally, the CDC has documented that patients with serious heart conditions, like

Weingarten, who had a heart attack at age 45 with pericarditis, are also "at higher risk for severe

illness from COVID-19."[12]  It is clear that ***given his age and serious medical conditions, we are***

---

[10]     *See* Laurie McGinley, *Patients with certain cancers are nearly three times as likely to die of covid-19, study says*, The Washington Post (April 28, 2020), available at https://www.washingtonpost.com/health/2020/04/28/coronavirus-cancer-deathrates/.
[11]     *See id.*
[12]     *See Coronavirus Disease 2019 (COVID-19)*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#chronic-kidney-disease.

*extremely concerned that when (and not if) the COVID-19 virus spreads through Fort Dix,*
*more than it already has, it will be a death sentence for Israel Weingarten.*[13]

C. **The Heightened Risk Of COVID-19 Inside Prisons And Jails**

The unparalleled health crisis our country is currently facing and its deadly arrival in the nation's prisons present "extraordinary and compelling reasons" to grant Israel Weingarten's Motion. One of the most dangerous places to be during this COVID-19 outbreak is a prison or jail, as "[p]risons and jails are amplifiers of infectious diseases such as COVID-19, because the conditions that can keep diseases from spreading - such as social distancing - are nearly impossible to achieve in correctional facilities."[14] "We know the coronavirus spreads quickly in closed spaces, like cruise ships, nursing homes – and jails and prisons . . . Many people who are incarcerated also have chronic conditions . . . which makes them vulnerable to severe forms of COVID-19."[15] "'Prisons are almost perfectly designed to promote the transmission of communicable disease,' says Homer Venters, the former chief medical officer at New York City's Rikers Island. Forget about social distancing: Prisoners eat together, use the same showers, work or watch television side by side, and often sleep in the same dorm room with dozens of other inmates."[16] The New York Times also recently explained why jails and prisons are one of the most unsafe places to be during the current pandemic, even more hazardous than a

---

[13]    *See Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16, 2020*, CDC Report, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm ("Data from China have indicated that *older adults, particularly those with serious underlying health conditions*, are at higher risk for severe COVID-19–associated illness and death than are younger persons") (emphasis added).

[14]    *See Responses to the COVID-19 pandemic*, Prison Policy Initiative, (March 31, 2020), available at https://www.prisonpolicy.org/virus/virusresponse.html.

[15]    *See Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at https://bit.ly/2TNcNZY.  https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap.

[16]    *See* Barbara Bradley Hagerty, *Innocent Prisoners Are Going to Die of the Coronavirus*, The Atlantic (March 31, 2020), available at https://www.theatlantic.com/ideas/archive/2020/03/americas-innocent-prisoners-are-going-die-there/609133/.

cruise ship in the current pandemic.[17]  Simply put, "experts call prisons petri dishes because illnesses proliferate easily in close quarters."[18]

Further, "[p]eople in jails and prisons also may not be able to regularly wash their hands, which may promote the spread of disease.  Hand sanitizer, which contains alcohol, is usually considered contraband."[19]  Soap and other personal hygiene products can only be purchased from the prison's commissary.  In fact, it was only on March 26, 2020, weeks after many cities and states had closed restaurants and non-essential businesses, restricted travel and ordered people to shelter in place, that the BOP Director announced that the BOP had merely taken an inventory of soap, rather than taken steps to distribute it to inmates at no cost or even at a reduced cost.[20]

Besides for the obvious health risks awaiting Weingarten if he were to contract COVID-19 in prison, the Section 3553(a) factors also weigh in favor of granting this Motion and ordering Weingarten to finish his sentence under strict home incarceration.

### D.  <u>The Heightened Risk Of Contracting COVID-19 At Fort Dix</u>

Specifically, there are now multiple confirmed reports regarding the atrocious and deplorable conditions occurring right now at Fort Dix, which will very likely lead to a massive outbreak of COVID-19.  "'The picture that's emerging of conditions at Fort Dix is really alarming and likely deadly,' said Tess Borden, a staff attorney with the ACLU of New Jersey.

---

[17]     *See An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues*, The New York Times (March 16, 2020), available at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html

[18]     *See* Collen O'Dea, *COVID-19 Horror Stories Prompt ACLU-NJ to File for Temporary Release of Medically Fragile Prisoners*, NJ Spotlight (May 6, 2020), available at https://www.njspotlight.com/2020/05/covid-19-horror-stories-prompt-aclu-nj-to-file-for-temporary-release-of-medically-fragile-prisoners/#.XrOPL0pULso.email.

[19]     *See Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at https://bit.ly/2TNcNZY.  https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap.

[20]     On that day, the BOP Director issued a statement that "all cleaning, sanitation, and medical supplies have been inventoried. Ample supplies are on hand and ready to be distributed or moved to any facility as deemed necessary."  *See Statement from BOP Director*, Fed. Bureau of Prisons (March 26, 2020), available at https://www.bop.gov/resources/news/20200326_statement_from_director.jsp.

'They are housed in conditions that make the spread of the virus exponential and therefore exponentially dangerous.'"[21]  Sick inmates are still around others, as "[a] 75-year-old food server visibly ill with COVID-19 continued working for days."[22]  There are "[e]mpty soap dispensers and no paper towels . . . [and] "virtually no cleaning supplies, including hand sanitizer or paper towels."[23]

It has further been reported that at the prison at Fort Dix, "a man collapsed during temperature checks.  As he lay on the floor, a staff member sprayed him with disinfectant, another incarcerated man who witnessed it said.  'They took close to 15 minutes getting him out,' he wrote in a message to his sister on April 20.  'A senior staff member sprayed his body with disinfectant and then sprayed his pillow and his bed, all while the guy lay there on the floor.'"[24]  Though the BOP denies this story, further reports from Fort Dix paint the same grim picture.  "[T]hree people inside [Fort Dix] and four people with loved ones inside described potentially life-threatening conditions inside the facility.  They say prisoners are unable to socially distance, lack sufficient protective equipment, and are not receiving adequate medical care."[25]  The warden of Fort Dix himself has acknowledged the significant safety issues facing inmates at Fort Dix.  "In a memo to inmates last month, [W]arden David E. Ortiz acknowledged

---

[21]     *See* Elizabeth Weill-Greenberg, *Coronavirus is Ready to Explode Inside Fort Dix Federal Prison, Incarcerated People and Their Loved Ones Say*, The Appeal (April 23, 2020), available at https://theappeal.org/fort-dix-prison-new-jersey-coronavirus/.
[22]     *See* Collen O'Dea, *COVID-19 Horror Stories Prompt ACLU-NJ to File for Temporary Release of Medically Fragile Prisoners*, NJ Spotlight (May 6, 2020), available at https://www.njspotlight.com/2020/05/covid-19-horror-stories-prompt-aclu-nj-to-file-for-temporary-release-of-medically-fragile-prisoners/#.XrOPL0pULso.email.
[23]     *See id*. (internal quotation marks omitted).
[24]     *See* Elizabeth Weill-Greenberg, *Coronavirus is Ready to Explode Inside Fort Dix Federal Prison, Incarcerated People and Their Loved Ones Say*, The Appeal (April 23, 2020), available at https://theappeal.org/fort-dix-prison-new-jersey-coronavirus/.
[25]     *See id*.

that 'social distancing is not possible in this environment.'"[26]  Weingarten has confirmed this to his family and counsel as well.

Additionally, "[a]t Fort Dix, they have not been permitted to go outside . . . 'The day to day is absolutely nothing . . . No visitation.  No programs.  No recreation.  It is a warehouse and nothing more.  It's been 3 weeks like this and it's impossible to see a point where it changes back as we can't get virus free.'"[27]  "The facility's 3,000 inmates mostly live in 12-person rooms in buildings that house up to 300 people.  They spend their days crowded into the same TV rooms, phone booths, bathrooms, and mealtime pickup lines.  Soap dispensers are routinely empty and inmates have taken to pooling meager supplies of shampoo that they've bought from the commissary to fill them."[28]  Further, upon information and belief, Fort Dix has limited commissary purchases for people in the main facility and has terminated it entirely for people at the Camp, including Weingarten.

Inmates "live in a dormitory with more than a hundred other men . . . They share eight showers, ten toilets, and six urinals . . . Twice a day, prisoners stand at their bunks to have a staff member take their temperatures with a thermometer placed on their head . . . [However,] [t]he person does this from inmate to inmate . . . [n]ot cleaned at all."[29]  Weingarten is housed in the minimum security satellite camp as Fort Dix, there inmates live in large dorms with rows of

---

[26]    *See* Jeremy Roebuck, *As COVID-19 spreads behind bars at Fort Dix, inmates turn to contraband cellphones, social media for help,* , The Philadelphia Inquirer (updated May 4, 2020), available at https://www.inquirer.com/ news/coronavirus-fort-dix-federal-prison-new-jersey-lawsuit-aclu-20200504.html.

[27]    *See* Elizabeth Weill-Greenberg, *Coronavirus is Ready to Explode Inside Fort Dix Federal Prison, Incarcerated People and Their Loved Ones Say*, The Appeal (April 23, 2020), available at https://theappeal.org/fort-dix-prison-new-jersey-coronavirus/.

[28]    *See* Jeremy Roebuck, *As COVID-19 spreads behind bars at Fort Dix, inmates turn to contraband cellphones, social media for help,* , The Philadelphia Inquirer (updated May 4, 2020), available at https://www.inquirer.com/ news/coronavirus-fort-dix-federal-prison-new-jersey-lawsuit-aclu-20200504.html.

[29]    *See* Elizabeth Weill-Greenberg, *Coronavirus is Ready to Explode Inside Fort Dix Federal Prison, Incarcerated People and Their Loved Ones Say*, The Appeal (April 23, 2020), available at https://theappeal.org/fort-dix-prison-new-jersey-coronavirus/.

bunks less than three feet apart.  "Fifty men share one bathroom with soap dispensers that run out daily and are often empty.  Typically 30 men use the TV room . . . but now closer to 100 watch the news daily to get updates on the pandemic.  The [inmates] are eating in their rooms but all walk together to the dining hall to get their food."[30]  "'Without significant changes,' ACLU attorney Tess Borden wrote, '***Fort Dix is speeding toward catastrophe***.'"[31]  Under these horrid conditions, it is just a matter of time before every inmate currently held at Fort Dix will contract COVID-19, which will then likely kill inmates like Weingarten.

Such conditions at numerous facilities across the country have led BOP employees, including corrections officers, to file a complaint with the Occupational Safety and Health Administration (OSHA), alleging unsafe conditions at numerous federal prisons nationwide, including Fort Dix.[32]  Among other things, the officers' OSHA complaint points to the BOP having "directed staff through the Bureau of Prisons who have come in contact with, or been in close proximity to, prisoners who show or have shown symptoms of COVID-19, to report to work and not be self-quarantined for 14 days per the CDC guidelines."[33]  It also complains that the BOP has failed to undertake any workplace or administrative controls to address transmission of COVID-19, to require social distancing or other measures in the CDC guidance, or to provide sufficient personal protective equipment ("PPE").[34]

Furthermore, the atrocious and extremely dangerous conditions at Fort Dix has

---

[30]     *See* Collen O'Dea, *COVID-19 Horror Stories Prompt ACLU-NJ to File for Temporary Release of Medically Fragile Prisoners*, NJ Spotlight (May 6, 2020), available at https://www.njspotlight.com/2020/05/covid-19-horror-stories-prompt-aclu-nj-to-file-for-temporary-release-of-medically-fragile-prisoners/#.XrOPL0pULso.email.

[31]     *See* Jeremy Roebuck, *As COVID-19 spreads behind bars at Fort Dix, inmates turn to contraband cellphones, social media for help*, , The Philadelphia Inquirer (updated May 4, 2020), available at https://www.inquirer.com/news/coronavirus-fort-dix-federal-prison-new-jersey-lawsuit-aclu-20200504.html (emphasis added).

[32]     *See* Notice of Alleged Safety or Health Hazards (March 31, 2020), *available at* https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf.

[33]     *See id*.

[34]     *See id*.

"prompted the American Civil Liberties Union of New Jersey to file a lawsuit Monday [May 4, 2020], seeking the immediate, temporary release of all medically fragile individuals . . . 'FCI Fort Dix is speeding toward a public health catastrophe,' said ACLU-NJ Legal Director Jeanne LoCicero.  'Our clients are unable to take even the most basic precautions to protect themselves against the virus.  The government is failing in its obligation to keep people in its custody safe from harm, putting them – and the wider community – at risk.'"[35]  The lawsuit is captioned *Troy Wagg et al. v. David E. Ortiz in his capacity as Warden of the Federal Correctional Institution, Fort Dix and Michael Carvajal, in his capacity as Director of the Bureau of Prisons*, Case No. 1:20-cv-05496, filed May 5, 2020 in the United States District Court for the District of New Jersey.  The lawsuit requests the immediate "release of all those over age 50 and those whose health would put them at greater risk of complications from the virus."[36]  At age 70 and with a myriad of health issue, Weingarten fits squarely into that description.

Additionally, Dr. Joe Goldenson, MD, a physician with decades of experience in correctional health, cautions: "It is difficult to overstate the devastation that a COVID-19 outbreak could inflict on a correctional facility such as Fort Dix."  *See* Exhibit I to the Twersky Decl., Declaration of Dr. Joe Goldenson, MD, dated April 29, 2020 ("Goldenson Decl."), ¶ 32. "The infection rate will increase substantially before it starts to diminish without major interventions. The number at risk for death is substantial."  *See* Exhibit I, Goldenson Decl. ¶ 36.

After studying the conditions currently at Fort Dix, the layout of the prison and other factors, in the attached declaration Dr. Goldenson underscores the serious health issues facing

---

[35]     *See* Collen O'Dea, *COVID-19 Horror Stories Prompt ACLU-NJ to File for Temporary Release of Medically Fragile Prisoners*, NJ Spotlight (May 6, 2020), available at https://www.njspotlight.com/2020/05/covid-19-horror-stories-prompt-aclu-nj-to-file-for-temporary-release-of-medically-fragile-prisoners/#.XrOPL0pULso.email.

[36]     *See id*.

medically vulnerable inmates currently held at Fort Dix, and states:

> It is my professional opinion that **conditions in FCI Fort Dix threaten the health and safety of every individual within the prison** – detained persons and staff alike – and in their surrounding communities.  It is my professional opinion that **a necessary component of bringing FCI Fort Dix into compliance with the recommendations of the CDC to minimize the risk of COVID-19 transmission within the facility and to the larger community is to substantially reduce the population**.  Doing so will allow the facility to significantly reduce the risk of infection for both incarcerated people and correctional officers, which in turn protects the communities where corrections staff live.  It is my professional opinion that **those who are medically vulnerable need to be moved out of FCI Fort Dix to the absolute maximum extent possible**.  In addition, the overall population needs to be significantly lowered to reduce the density in the jails to allow for adequate social distancing, minimize the strain on the jail's medical care system, ensure adequate space is available for necessary quarantining.

*See* Exhibit I, Goldenson Decl., ¶¶ 38-40 (footnote omitted) (emphasis added).

In the unprecedented time that we are living through right now, the humane and compassionate thing to do is to convert Israel Weingarten's sentence to home confinement for the remainder of its term.  In light of the fact that there have already been 63 confirmed cases of COVID-19 at Fort Dix[37] and the horrible conditions present there, at Weingarten's current advanced age and with his medical conditions, if he were to contract COVID-19 he will not have much of a chance to survive.  As Dr. Lentnek writes, Weingarten "has several co-morbidities which **place him at risk of death should he be infected with COVID-19**."  *See* Exhibit D, Letter from Dr. Arnold L. Lentnek, MD (emphasis added).

---

[37]     *See COVID-19 Tested Positive Cases*, available at https://www.bop.gov/coronavirus/ (updated daily).

**ARGUMENT**

**POINT I**

**THIS COURT HAS AUTHORITY TO RESENTENCE WEINGARTEN UNDER 18 U.S.C. § 3582(c)(1)(A)(i) FOR THE "EXTRAORDINARY AND COMPELLING REASONS" CREATED BY THE COVID-19 PANDEMIC AND PRISON CONDITIONS WHICH PREVENT SELF-CARE FOR A HIGH-RISK PATIENT**

Pursuant to 18 USC § 3582(c)(1)(A)(i), a Court, "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction." *See* 18 USC § 3582(c)(1)(A)(i).[38]  Under 18 USC § 3582(c), Courts are authorized to consider a defendant's motion, even if the BOP opposes it, and order resentencing or modification if it finds that "extraordinary and compelling reasons" warrant a reduction and such a reduction is consistent with the Section 3553(a) factors.  *Id*.

The first modern form of the compassionate release statute, codified at 18 U.S.C. § 3582, was enacted as part of the Comprehensive Crime Control Act of 1984.  However, Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c), but legislative history gives an indication of how Congress thought the statute should be employed by the federal courts.  The Senate Committee stressed how some individual cases may warrant a second look at resentencing and stated:

---

[38]     Prior to the enactment of the First Step Act in 2018, defendants could not make a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons," rather courts had to await a motion from the Director of the BOP to resentence prisoners under the statute.  However, after passage of the First Step Action, defendants can now make the motion directly.

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment ***is justified by changed circumstances***.  These would include cases of severe illness, ***cases in which other extraordinary and compelling circumstances justify a reduction*** of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

*See* S. Rep. No. 98-225, at 55-56 (1983) (emphasis added).

Congress intended that the circumstances listed in Section 3582(c) would act as "safety valves for modification of sentences," *id*. at 121, enabling judges to provide second looks for possible sentence reductions when justified by various factors that previously could have been addressed through the abolished parole system.  Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly compelling situations."  *Id*. (emphasis added).

Congress delegated the responsibility for outlining what qualifies as "extraordinary and compelling reasons" to the United States Sentencing Commission (the "Commission").  *See* 28 U.S.C. § 994(t).  In 2007, after considerable time, the Commission acted with the very general guidance that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and "other reasons."  *See* USSG § 1B1.13, app. n.1(A).  The Commission amended its policy statement on "compassionate release" in November 2016.  *See* USSG § 1B1.13 Amend. 11/1/2016.  Notably, in the new policy statement, the Commission concluded that reasons beyond medical illness, age and family circumstances could qualify as "extraordinary and compelling reasons" for resentencing.  *See* USSG § 1B1.13, n.1 (including a category for "Other Reasons," when there is "an extraordinary and compelling reason other than, or in combination with the reasons described in subdivisions (A) through (C)").

16

For the many reasons mentioned above and which will be outlined below, the 2020 COVID-19 pandemic unquestionably qualifies as an extraordinary and compelling reason under the statute and Sentencing Guidelines, which requires the immediate modification of Israel Weingarten's sentence, from a term of imprisonment to a term of home incarceration and confinement.  Though 30 days have not yet elapsed since the warden's receipt of Weingarten's request for compassionate release due to the threat of COVID-19 infection, this Court can construe the exhaustion requirement as futile and waive it given the urgency of this national emergency and rapid spread of the pandemic.

## POINT II

### THE COURT CAN WAIVE THE 30-DAY REQUIREMENT
### FOR EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER
### 18 U.S.C. § 3582(c)(1)(A) BECAUSE OF THE URGENT RISK OF FATAL INFECTION

### A.  Exhaustion Is A Claim Processing Rule That Is
### Waived For COVID-19 Compassionate Release Applications

Israel Weingarten filed his petition and request for compassionate release with the warden of Fort Dix, Warden Ortiz, on or about April 16, 2020.  Similarly, on April 24, 2020, counsel for Weingarten made the same request to Warden Ortiz.  *See* Exhibit B, Letter to Warden.

18 USC § 3582 contains a so-called "exhaustion of remedies" provision, and a defendant ordinarily cannot make a motion for sentence modification unless he has "exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  *See* 18 U.S.C. § 3582(c)(1)(A).[39]

---

[39]    The entire argument below may be academic since by the time this Motion is fully briefed and heard before the Court, 30 days will have elapsed from the time Weingarten first made his compassionate relief request to the Warden.

However, the exhaustion requirement of Section 3582 is not jurisdictional.  *See United States v. Haney*, No. 19-cr-541, Dkt. No. 27, at 3 n.1 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.); *see also United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020); *see also United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *5 (S.D.N.Y. Apr. 20, 2020); *see also United States v. Valencia*, No. 15 CR. 163 (AT), 2020 WL 2319323, at *2 (S.D.N.Y. May 11, 2020).  Rather, the requirement is better understood as a claim processing rule.  *See United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020); *see also United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *5 (S.D.N.Y. Apr. 20, 2020); *see also United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *7 (W.D.N.Y. Apr. 22, 2020); *see also United States v. Valencia*, No. 15 CR. 163 (AT), 2020 WL 2319323, at *2 (S.D.N.Y. May 11, 2020).  In fact, the government has waived the exhaustion requirement in many cases, such as those listed above.  If the government has the power to waive exhaustion, the Court has a similar power to deem exhaustion waived.  *Id*.

In *United States v. Russo*, Judge Liman performed a thorough review of the exhaustion requirement in the First Step Act ("FSA").  *See United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020).  The Court went on to note that the statutory language of the FSA "evinces congressional intent that a defendant has a right to a prompt and meaningful judicial determination of whether she should be compassionately released, regardless of whether administrative remedies have been exhausted . . . It would be ironic, and certainly inconsistent with congressional intent, for the thirty days to serve as a substantial obstacle to effective judicial relief."  *United States v. Russo*, *supra*, 2020 WL 1862294, at *6.  Thus, the court in *Russo* found that exhaustion must be deemed waived for COVID-19 compassionate

18

release applications.  *See id*.

Subsequently, in *United States v. Scparta*, Judge Nathan overruled a previous decision she made, relying on the reasoning in *Russo*.[40]  *See United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *5 (S.D.N.Y. Apr. 20, 2020).  The *Scparta* court agreed that the FSA's exhaustion requirement is a claim processing rule and noted that its exhaustion requirement is "like no other of which the Court is aware."  *United States v. Scparta*, *supra*, 2020 WL 1910481, at *5.  Judge Nathan also noted that "[w]ithout the application of equitable exceptions, prisoners bringing compassionate-release motions due to COVID-19 may never obtain timely judicial review before the virus takes its toll," which would frustrate the purpose of the FSA.  *Id*.  In the context of a COVID-19 application for compassionate release, waiting "could be the difference between life and death" and thus an equitable exception applies and the application should be heard on the merits.  *Id*., *see also United States v. Alberto Pena*, No. 15-CR-551 (AJN), 2020 WL 2301199, at *3 (S.D.N.Y. May 8, 2020) (adopting *Scarpata*).  Momentum has begun to build for waiving the exhaustion requirement generally for COVID-19 compassionate release applications.  *See United States v. Quintero*, No. 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) ("This Court accepts and relies on those numerous cases cited by Quintero which waive for a variety of reasons exhaustion condition").

Therefore, it is clear that Second Circuit courts deem exhaustion waived for COVID-19 compassionate release applications.  Hence, if the government makes a failure to exhaust argument with regards to this application, the Court must overrule such objection.

---

[40]     Other courts have also overruled their previous decisions finding exhaustion not waived.  In *United States v. Paul Gileno*, No. 3:19-CR-161-(VAB)-1, 2020 WL 1916773, at *5 (D. Conn. Apr. 20, 2020), the court effectively overruled a previous decision denying an application for compassionate release on exhaustion grounds.  This is yet more authority that Second Circuit courts are more heavily moving towards waiving the exhaustion requirement.

**B. The Court May Also Waive Exhaustion Under The Concepts Of Futility, Inability To Grant Relief And Undue Prejudice**

Even absent the claims processing analysis above, Second Circuit precedent supports waiver of the administrative exhaustion requirements under many circumstances. "First, exhaustion may be unnecessary where it would be futile, either because agency decision makers are biased or because the agency has already determined the issue. Second, exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief. Third, exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *United States v. Wilson Perez*, No. 17-CR-513-3 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (internal citations and quotations omitted); *quoting Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019); *see also United States v. Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (adopting the reasoning in *Perez*); *see also United States v. John McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (adopting the reasoning in *Colvin* and *Perez*).

Courts in New York have also "excuse[d] exhaustion if . . . the appeals process is shown to be inadequate to prevent irreparable harm to the defendant" which may come from a delay incident to pursuing administrative remedies. *United States v. Basciano*, 369 F. Supp. 2d 344, 348 (E.D.N.Y. 2005) (addressing Section 2241 habeas claim regarding circumstances of confinement despite defendant's failure to exhaust administrative remedies); *accord United States v. Khan*, 540 F. Supp. 2d 344, 350 (E.D.N.Y. 2007) (under PLRA, "[a] court may, however, excuse the exhaustion requirement if a petitioner demonstrates that pursuing appeals through the administrative process would be futile or that the appeals process is inadequate to prevent irreparable harm to the petitioner"). Similarly, if one has been pursuing internal processes diligently, exhaustion may be waived. *See United States v. Bess*, No. 16-CR-156,

20

2020 WL 1940809, at *7 (W.D.N.Y. Apr. 22, 2020); *United States v. Valencia*, No. 15 CR. 163
(AT), 2020 WL 2319323, at *2 (S.D.N.Y. May 11, 2020) ("Valencia has diligently pursued his
rights, having filed a request with Danbury's warden on April 19, 2020.  The BOP has taken no
action on that request, despite the extraordinary threat posed by COVID-19 at Danbury, and
Valencia's particular susceptibility to the virus . . . Accordingly, the Court holds in the
alternative that equitable principles call for excusing Section 3582(c)(1)(A)'s 30-day waiting
period").

It is evident that these exceptions to the exhaustion requirement apply in this case and the
Court should excuse the exhaustion requirement even if it finds it is not generally waived for
COVID-19 compassionate release applications.  In fact, requiring "administrative exhaustion
would defeat, not further, the policies underlying § 3582(c)" in this case.  *See United States v.
Wilson Perez*, *supra*, 2020 WL at *3.

### 1.  <u>Requiring Administrative Exhaustion Would Be Futile In This Case</u>

As is indicated above, one circumstance in which exhaustion is frequently waived by
Courts is in the event of futility.  *See United States v. Wilson Perez*, No. 17-CR-513-3 (AT),
2020 WL 1546422, *supra*, at *3; *see also United States v. Sawicz* No. 08-CR-287 (ARR), 2020
WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020)(Ross); *see also United States v. Morris
Zuckerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *3 (S.D.N.Y. Apr. 3, 2020); *see also
USA v. Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020)
(adopting the reasoning in *Perez*); *see also United States v. John McCarthy*, No. 3:17-CR-0230
(JCH), 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (adopting the reasoning in *Colvin* and
*Perez*); *see also Charboneau v. Menifee*, No. 05-CIV-1900 (MBM), 2005 WL 2385862, at *2 n.3
(S.D.N.Y. Sept. 28, 2005) (in addressing petition for determining eligibility for placement in a

halfway house, the court excused the defendant's failure to exhaust administrative remedies "on the grounds of futility, and the likelihood of irreparable injury before further appeals could be exhausted"); *accord Drew v. Menifee*, No. 04 CIV. 9944HBP, 2005 WL 525449, at *3 n.1 (S.D.N.Y. Mar. 4, 2005) (granting, in part, motion "to release petitioner to community confinement in a halfway house when petitioner has six months remaining on his sentence after deduction of good time credits," explaining that any failure to exhaust administrative remedies "should be excused on the ground of futility"); *accord Terry v. Menifee*, No. 04 CIV. 4505 (MBM), 2004 WL 2434978, at *2 (S.D.N.Y. Nov. 1, 2004) (excusing failure to exhaust administrative remedies "on the grounds of futility and irreparable injury" in 2241 habeas corpus petition).

Futility is found where "legitimate circumstances beyond the prisoner's control preclude him from fully pursuing his administrative remedies." *Carmona* v. *US. Bur. Of Prisons*, 243 F. 3d 629, 634 (2d Cir. 2001) (federal prisoners must exhaust their administrative remedies except when it appears exhaustion would be futile). Further, district courts have "excused exhaustion if it appears that an administrative appeal would be futile, or because the appeals process is shown to be inadequate to prevent irreparable harm to the defendant." *United States* v. *Basciano*, *supra*, 369 F. Supp. 2d at 348.

Specifically, "undue delay, *if it in fact results in catastrophic health consequences*, could make exhaustion futile." *United States v. Wilson Perez*, No. 17-CR-513-3 (AT), 2020 WL 1546422, *supra*, at *3 (emphasis added); *quoting Washington v. Barr*, *supra*, 925 F.3d at 119; *see also Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (holding that irreparable injury justifying the waiver of exhaustion requirements exists where "the ordeal of having to go through the administrative process may trigger a severe medical setback") (internal quotation marks,

citation and alterations omitted); *see also Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) ("if

the delay attending exhaustion would subject claimants to deteriorating health . . . then waiver

may be appropriate"); *see also New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (holding

that waiver was appropriate where "enforcement of the exhaustion requirement would cause the

claimants irreparable injury" by risking "deteriorating health, and possibly even . . . death").

     In this case, just like in *United States v. Wilson Perez*, **Israel Weingarten risks extreme**

**health consequences and even death if there is a delay in hearing his application for**

**compassionate release, which is even more compounded by the fact that there are already**

**many confirmed cases of COVID-19 within the prison facility at Fort Dix**.[41]  In fact, the health

consequences seem even more extreme here than in *Perez*, a case decided very recently in the

Southern District.  The medical issues in *Perez* were relating to a reconstructive surgery to the

inmate's face after an attack, which is not specifically noted as a COVID-19 risk factor,

compared to the immuno-compromised condition of Israel Weingarten.  *See United States v.*

*Wilson Perez*, *supra*, 2020 WL 1546422.  Weingarten's listed conditions are specifically

indicated as giving him an increased risk of death due to COVID-19 if he were to contract the

deadly virus.

     Though it is incontrovertible that the health consequences to Weingarten make any

administrative review futile, there is yet another reason administrative review is futile – the BOP

has not released specific written guidelines for reviewing compassionate release requests due to

the COVID-19 pandemic and its health consequences to inmates in its custody, specifically those

more vulnerable to COVID-19.  In addition, although the BOP issued guidance in February on

its plan to mitigate the COVID-19 outbreak, the BOP has failed to update that guidance, despite

---

[41]    *See COVID-19 Tested Positive Cases*, available at https://www.bop.gov/coronavirus/ (updated daily).

new regulations issued to the general public nearly daily, from Federal, State and local

governments throughout the country.  The BOP's failure to adequately address compassionate

release requests it has been receiving relating to COVID-19, and its failure to update mitigation

plans for the COVID-19 outbreak, further shows the futility in waiting for the BOP to act with

regards to Weingarten's request.

### 2. Weingarten Will Suffer Irreparable Harm If Forced To Exhaust Administrative Remedies

Requiring Israel Weingarten to wait 30 days to exhaust his administrative remedies

before bringing this application would certainly result in irreparable harm to him, namely,

possible death.  Weingarten seeks this emergency relief to avoid contracting COVID-19 at Fort

Dix where he has a high risk of infection and serious medical complications if he is infected.

"Social distancing" is impossible in the crowded facility, and soap, hand sanitizer and

disinfectant products are extremely scarce.  Waiting for Weingarten to exhaust his administrative

remedies would only compound his risk of exposure to COVID-19.  Should he contract the virus

while waiting for an administrative response, any remedy will come too late.  Weingarten will be

in mortal danger, causing him potentially irreparable physical harm and rendering this

compassionate release request utterly moot.  *See United States v. Livingston*, No. 18-CR-416

(ENV), 2020 WL 1905202, at *2 (E.D.N.Y. Apr. 17, 2020) ("In the context of [the COVID-19]

extraordinary life-threatening circumstances, the crafting of judge-made exceptions to a statutory

exhaustion requirement is not only appropriate, but compelled by the higher authority and God-

made injunction to act, as the statute would otherwise permit, to save human life"); *see also*

*United States v. Sawicz* No. 08-CR-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10,

2020) ("The delay that the defendant would experience if he had to wait for thirty days to expire

before pursuing a motion for compassionate release in this court would put him at significant risk

24

of suffering catastrophic health consequences . . . In fact, given the COVID-19 outbreak at FCI Danbury, any delay at all puts the defendant at an increased risk."); *see also United States v. Bin Wein*, No. 6:17-CR-06173, 2020 WL 1845104, at *8 (W.D.N.Y. Apr. 13, 2020); *see also Sorbello v. Laird*, No. 06 CV 948 (JG), 2007 WL 675798, at *3 n.8 (E.D.N.Y. Feb. 28, 2007) (where the court refused to dismiss petition requesting designation to halfway house "for failure to exhaust administrative remedies" where delay in processing administrative remedies would "result in the irreparable harm of late designation to community confinement"); *see also Pimentel v. Gonzales*, 367 F. Supp. 2d 365, 371 (E.D.N.Y. 2005) (addressing merits of request for designation to halfway house, where "not only would an administrative appeal be futile, but without immediate relief by this court, Pimentel could suffer irreparable harm").[42] Like the defendant in *United States v. Wilson Perez*, even "***a few weeks' delay carries the risk of catastrophic health consequences***" for Weingarten. *United States v. Wilson Perez, supra*, 2020 WL 1546422, at *3 (emphasis added).

The Bureau of Prisons has known for months of the impending COVID-19 crisis, creating a further reason to excuse Weingarten's failure to exhaust all administrative remedies. The BOP has had ample opportunity to adequately prepare Fort Dix for this emerging health crisis, which would have obviated the need for Weingarten's emergency compassionate release petition. Because the BOP was on notice of the potential dangers to inmates with underlying health issues like him, Weingarten should not be required to wait while the BOP takes additional time addressing his administrative request. *See United States* v. *Basciano, supra*, 369 F. Supp.

---

[42] The factual questions at issue regarding the rapid spread of COVID-19, the serious danger to certain high risk individuals and Weingarten's health conditions placing him squarely in the highest fatal risk group, are well-developed in the record before this Court, thus rendering administrative exhaustion all but pointless. *See United States v. Gurzi*, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212, at *2 ("given the clear circumstances here, a principal purpose of administrative exhaustion, the development and crystallization of the factual record, is not implicated in this case") (internal quotation marks and citations omitted).

2d at 349 (despite failure to exhaust administrative remedies, because "the BOP ha[d] not addressed [his] request for relief in a timely fashion," despite "ample opportunity" to do so, the court found that "[t]he administrative appeals process would thus, in the circumstances of this case, be an empty formality that would risk exposing Basciano to irreparable harm"). Weingarten should not be forced to bear the brunt of the facility's failure to adequately prepare for COVID-19.  In these extraordinary circumstances, the Court should waive the administrative exhaustion requirement in Section 3582.

### C.  <u>Weingarten Should Be Deemed To Have Exhausted His Remedies</u>

In light of the unprecedented COVID-19 outbreak and pandemic – an unparalleled spread of a new disease that the compassionate release statute did not anticipate – and the severe health consequences COVID-19 can cause to people like Israel Weingarten, courts across the country have waived the exhaustion of remedies requirement under various other circumstances in deciding motions for compassionate release relating to COVID-19.

Courts have waived the requirement when there was no one to process the request at the BOP.  *See United States v. Teresa Ann Gonzalez*, 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *1 (E.D. Wash. Mar. 31, 2020) (BOP could not process request because inmate was not in BOP custody); *see also United States v. Eli Dana*, 1:14-cr-00405-JMF (S.D.N.Y.) (Furman, J) (docket entry 108, the Court did not address exhaustion but as part of the motion, docket entry 105, petitioner argued that seeking administrative remedies was futile because he was not held by the BOP but was rather an inmate at a contract facility).  Receiving a simple email denying a request was deemed sufficient rather than requiring further administrative appeals, as would usually be required.  *See United States v. Campagna*, 16-CR-78-01 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (finding that the defendant had exhausted his administrative remedies

after emailing the Resident Reentry Manager seeking a compassionate release and receiving an email denying such relief). Further, even if the BOP does not consent to the request, if the prosecutor consents, exhaustion of administrative remedies is deemed waived. *See United States v. Webb*, 15-CR-00252-PKC-RML-8 (E.D.N.Y.) (Chen, J) (docket entry dated 3/30/2020).[43]

Similarly, in *United States v. Bess*, the Court found exhaustion waived when the defendant made a showing similar to what is required for equitable tolling of habeas petitions, "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *7 (W.D.N.Y. Apr. 22, 2020).

In *Bess*, as is the case here, there was no question that the defendant had been diligently pursuing his administrative rights. *United States v. Bess*, *supra*, 2020 WL 1940809, at *7. Similarly, the Court in *Bess* found that the COVID-19 pandemic presents "extraordinary circumstances" that are "beyond [Bess's] control." *Id.*; *see also*, *United States v. Brandon Washington*, No. 14-CR-215, 2020 WL 1969301, at *3 (W.D.N.Y. Apr. 24, 2020) (adopting reasoning in *Bess*); *see also United States v. Lucas*, No. 15-CR-143, 2020 WL 2059735, at *3 (W.D.N.Y. Apr. 29, 2020) (same). The same standard should be applied to this case.

Finally, in *United States v. Haney*, Judge Rakoff found generally that a Court may waive the exhaustion requirement in light of COVID-19, noting "Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances,

---

[43]   Note, cases where exhaustion was not deemed waived are distinguishable because those cases did not present compelling information on the petitioners' medical condition that deemed them at risk. *United States v. Wilson Perez, supra*, No. 17-CR-513-3 (AT), 2020 WL 1546422, at *3 (distinguishing cases where exhaustion was not deemed waived and noting "in none of them did the defendant present compelling evidence that his medical condition put him at particular risk of experiencing deadly complications from COVID-19"). In this case, there is overwhelming evidence of the risk to Weingarten. In addition, in this case, it is already confirmed that COVID-19 has already infected both inmates and staff at Fort Dix. *See id.* (distinguishing cases where exhaustion was not deemed waived and noting "in several of those cases, the defendant was not in a facility where COVID-19 was spreading").

actually favors such waiver, allowing courts to deal with the emergency before it is potentially too late." *United States v. Haney*, No. 19-CR-541 (JSR), 2020 WL 1821988, at *4 (S.D.N.Y. Apr. 13, 2020).

In this case, both Weingarten and his attorneys have desperately sought an immediate response from the warden of Fort Dix, and reached out to the Government regarding his compassionate release request, in light of the COVID-19 pandemic, but no determination has been forthcoming and counsel has not been provided with a time-frame for a decision. This is similar to the BOP not being able to process a request in a timely manner, which deemed the exhaustion requirement waived in *United States v. Teresa Ann Gonzalez. See United States v. Teresa Ann Gonzalez, supra*, 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *1. Nevertheless, it is clear that courts have been flexible in deeming the administrative process waived with respect to inmates seeking compassionate relief because of COVID-19.[44]  In this case, the requirement should be waived, as Weingarten has made extraordinary efforts to have an immediate determination of this issue and the possible deadly health consequences to Weingarten if none is forthcoming.

---

[44]       Also of note is *Chun v. Edge*, 20-CV-1590 (RPK) (E.D.N.Y.) where on April 2, 2020, the court directed "the parties to make themselves available today for discussions with Magistrate Judge Mann, in order to explore whether the parties can reach an agreement on any of the matters at issue in petitioners' application for a temporary restraining order. The Court specifically requests that the parties consider whether an agreement is possible to enable petitioners to promptly obtain adjudication of claims for release under the compassionate-release provision at 18 U.S.C § 3582(c)(1)(A), or any other mechanism that countenances early release of prisoners." The order wanted the conference to explore whether "prompt review under Section 3582(c)(1)(A) could be obtained through, for example, an agreement on the part of the BOP to adjudicate petitioners' compassionate-release requests in an expedited fashion." In addition, in *United States v. Murgio*, 1:15-cr-00769 (S.D.N.Y.), after an inmate noted issues with applying to the BOP and receiving a response for compassionate release, the Court allowed for the government to respond but directed the government to specifically respond to the questions: "Does Defendant currently have the ability to make administrative requests? . . . If so, how may he do so under current conditions? . . . How long will it take for him to receive a response?" (ECF 754, April 2, 2020). Thus, though Weingarten believes that exhaustion is waived, even if the Court disagrees and finds that it has not been, it is requested that this Court follow what other courts in E.D.N.Y. and S.D.N.Y. have done to ensure a prompt response from the BOP.

## POINT III

## THE COVID-19 OUTBREAK PRESENTS A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE THAT WARRANTS COMPASSIONATE RELEASE FOR WEINGARTEN, WHO IS A HIGH-RISK FATALITY PATIENT

On March 11, 2020, the World Health Organization ("WHO") officially classified the new strain of coronavirus, COVID-19, as a pandemic.[45]  As of May 12, 2020 COVID-19 has infected over four million people worldwide, leading to over 286,000 deaths.[46]  In the United States, approximately 1,363,839 people have been infected, leading to 81,507 deaths nationwide.[47]  These numbers almost certainly underrepresent the true scope of the crisis; test kits in the United States have been inadequate to meet demand.

### A. COVID-19 Response And Cases In New Jersey

On March 19, 2020 the governor of New Jersey (where Fort Dix is located), Governor Phil Murphy, declared a state of emergency in New Jersey.[48]  A few days later, on March 13, 2020, the White House declared a national emergency, under Section 319 of the Public Health Service Act, 42 U.S.C. § 247(d).[49]  On March 16, 2020, the White House issued guidance to all citizens recommending that, for the next eight weeks, gatherings of ten or more people be canceled or postponed.[50]  The entire state of New Jersey is under a "Stay-At-Home Order,"

---

[45]     *See WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020), available at https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[46]     *See Coronavirus Map: Tracking the Global Outbreak*, New York Times, available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (updated regularly).

[47]     *See id.*

[48]     *See Governor Murphy Declares State of Emergency, Public Health Emergency to Strengthen State Preparedness to Contain the Spread of COVID-19* (March 9, 2020), available at https://www.nj.gov/governor/news/news/562020/20200309b.shtml.

[49]     *See The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (March 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergencyconcerning-novel-coronavirus-disease-covid-19-outbreak/.

[50]     *See* Sheri Fink, *White House Takes New Line After Dire Report on Death Toll*, New York Times (March 17, 2020), available at https://www.nytimes.com/2020/03/17/us/coronavirus-fatality-ratewhitehouse.html?action=click&module=Spotlight&pgtype=Homepage.

29

which was issued on March 21, 2020 and remains in effect.[51]  These drastic measures came

following the issuance of a report by British epidemiologists, concluding from emerging data

that 2.2 million Americans could die without drastic intervention to slow the global spread of the

deadly disease.[52]

As of May 12, 2020, there have been approximately 140,743 confirmed cases of COVID-

19 in the State of New Jersey overall, with 3,697 cases in Burlington County where Fort Dix is

located and at least 9,508 deaths.[53]  Additionally, COVID-19 has already been introduced into

the prison facility at Fort Dix, where 58 inmates and 5 staff members have already tested positive

(some of whom the BOP states have "recovered").[54]

### B.  Guidance From The Centers For Diseases Control And Prevention Requires Granting Israel Weingarten's Request For Compassionate Release

The CDC has also issued guidance related to the deadly effects of COVID-19 on certain

high-risk patients of the population.  The CDC has identified the population most at risk of

severe illness or death from the disease to include "older adults and people of any age who have

serious underlying medical conditions," as well as those "who live in a nursing home or long-

term care facility." [55]  Those with chronic medical conditions, such as lung disease, heart disease,

and diabetes, as well as those who are immune-compromised, are also at a higher risk.[56]  For

---

[51]       *See* Brent Johnson, *Murphy orders N.J. residents to stay home, closes non-essential retail businesses in state lockdown to fight coronavirus*, N.J.com (March 21, 2020, updated March 24, 2020, available at https://www.nj.com/coronavirus/2020/03/murphy-orders-nj-residents-to-stay-home-closes-non-essential-businesses-in-state-lockdown-to-fight-coronavirus.html.

[52]       *See* Sheri Fink, *White House Takes New Line After Dire Report on Death Toll*, New York Times, (March 17, 2020), available at https://www.nytimes.com/2020/03/17/us/coronavirus-fatality-ratewhitehouse.html?action=click&module=Spotlight&pgtype=Homepage.

[53]       *See New Jersey COVID-19 Dashboard*, available at https://covid19.nj.gov/#live-updates (updated daily).

[54]       *See COVID-19 Tested Positive Cases*, available at https://www.bop.gov/coronavirus/ (updated daily).

[55]       *See People At Risk for Serious Illness from COVID-19*, CDC (March 31, 200), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html .

[56]       *See id.*

30

these individuals, the CDC warned to take immediate preventative actions, including avoiding

crowded areas and staying at home as much as possible.[57]

Israel Weingarten falls into all the categories described by the CDC as having a "higher

risk for severe illness" if he were to contract COVID-19.  He is severely immuno-compromised

and has a multitude of other "serious underlying medical conditions," as outlined above.  At age

70, he is also an "older adult" who is being held in a "long-term care facility."  For these reasons,

there is a very real possibility that if Weingarten were to contract COVID-19 while being held at

Fort Dix, which is more than likely, the outcome will not be a good one.

### C.  The Two Attorney General Memorandums And Case Law Require Granting Israel Weingarten's Request For Compassionate Release

Further, on March 26, 2020, Attorney General William P. Barr issued guidelines to the

Bureau of Prisons, encouraging the release of eligible inmates.  The Office of the Attorney

General distributed a Memorandum to the Director of the Bureau of Prisons, with the subject

"Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic"

("First AG Memo").  *See* Exhibit J to the Twersky Decl., First AG Memo.  Additionally, on

April 3, 2020, the Office of the Attorney General issued a second memorandum to the Director

of the Bureau of Prisons, titled "Increasing Use of Home Confinement at Institutions Most

Affected by COVID-19" ("Second AG Memo").  *See* Exhibit K to the Twersky Decl., Second

AG Memo.  ***Both of the Attorney General Memorandums are specifically instructive here and

greatly favor allowing Weingarten to finish his sentence in home confinement, in light of the

COVID-19 pandemic***.

The First Attorney General Memorandum specifically states:

there are some ***at-risk inmates who are non-violent and pose minimal likelihood
of recidivism and who might be safer serving their sentences in home***

---

[57]        *See id.*

31

*confinement rather than in BOP facilities*.  I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

*See* Exhibit J, First AG Memo, p. 1 (emphasis added).

Under the heading, "Transfer of Inmate to Home Confinement Where Appropriate to Decrease the Risks to Their Health," the First Attorney General Memorandum goes on to state:

One of BOP's tools to manage the prison population and *keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances*.  I am hereby *directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-1 9 pandemic* . . . for some eligible inmates, home confinement might be more effective in protecting their health.

*See* Exhibit J, First AG Memo, p. 1 (emphasis added).

In the Second Attorney General Memo, Attorney General William P. Barr himself acknowledges the "significant levels of infection [of COVID-19] at several of our [BOP] facilities."  *See* Exhibit K, Second AG Memo, p. 1.  Attorney General Barr goes on to state that "the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons.  I hereby make that finding and *direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates*."  *See* Exhibit K, Second AG Memo, p. 1 (emphasis added).  It is patently clear that Israel Weingarten falls squarely into this category of "most vulnerable inmates."

In the Second Attorney General Memo, Attorney General Barr continues,

I am therefore directing you to *immediately review all inmates who have COVID-19 risk factors, as established by the CDC* . . .  *your review should include all at-risk inmates-not only those who were previously eligible for transfer*.  For all inmates whom you deem suitable candidates for home confinement, *you are directed to immediately process them for transfer and then immediately transfer them* following a 14-day quarantine at an appropriate BOP facility, or, *in appropriate cases subject to your case-by-case discretion, in the*

*residence to which the inmate is being transferred* . . . Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that *inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations*.

*See* Exhibit K, Second AG Memo, p. 2 (emphasis added).

When asked about the First Attorney General Memorandum, BOP spokesman Justin Long said, "We will be working to ensure we utilize home confinement, consistent with the memo, to protect the health and safety of BOP staff and inmates in our custody."[58]

Israel Weingarten is the exact type of inmate whom the Attorney General is seeking to protect, in directing the BOP to "*grant certain eligible prisoners home confinement . . . in connection with the ongoing COVID-1 9 pandemic*." *See* Exhibit J, First AG Memo, p. 1. His major health problems put him "at-risk" if he contracts COVID-19, he is "non-violent" and poses zero "likelihood of recidivism." *See* Exhibit J, First AG Memo, p. 1.

The First Attorney General Memorandum lists factors in which the BOP should use in "assessing which inmates should be granted home confinement pursuant to this Memorandum." *See* Exhibit J, First AG Memo, p. 1. The BOP is instructed to "to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement," and a "non-exhaustive list of discretionary factors" which include:

• The *age and vulnerability of the inmate to COVID-19*, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

• The security level of the facility currently holding the inmate, with *priority given to inmates residing in low and minimum security facilities*;

• The *inmate's conduct in prison*, with inmates who have engaged in violent or

---

[58]     *See* Shayna Jacobs, *N.Y. halfway house hit by coronavirus balked at judge's order to release at-risk inmate, his lawyers say*, The Washington Post (April 1, 2020), a https://www.washingtonpost.com/world/national-security/coronavirus-brooklyn-halfway-house-bureau-of-prisons/2020/04/01/45a38912-737b-11ea-87da-77a8136c1a6d_story.html.

gang related activity in prison or who have incurred a BOP violation within the
last year not receiving priority treatment under this Memorandum;

• The inmate's score under PATTERN, with inmates who have anything above a
minimum score not receiving priority treatment under this Memorandum;

• Whether the inmate has a demonstrated and *verifiable re-entry plan* that will
prevent recidivism and maximize public safety, including verification that the
conditions under which the inmate would be confined upon release would present
a lower risk of contracting COVID-19 than the inmate would face in his or her
BOP facility.

*See* Exhibit J, First AG Memo, p. 1-2 (emphasis added).

All of these factors weigh heavily in favor of allowing Israel Weingarten to serve out his

sentence under home confinement.  His age and extensive medical history and diagnoses make

him extremely vulnerable to COVID-19.  Israel Weingarten is being held at Fort Dix, a

minimum security facility, where he has a "low level classification" and status.  *See* Exhibit L to

the Twersky Decl., Inmate Profile for Israel Weingarten ("Inmate Profile").  Further, his Inmate

Profile shows he is at the "minimum risk recidivism level."  *See* Exhibit L, Inmate Profile.

Weingarten's conduct while incarcerated has been perfect and he has not been in any trouble.

His inmate score under PATTERN is "minimum risk," favoring release to home confinement.

*See* Exhibit L, Inmate Profile.  His re-entry plan would consist of going straight to an address

approved by the Department of Probation, to be confined under G.P.S. monitor, where he would

stay alone.  It is clear that following the Attorney General's directive and recommendation, Israel

Weingarten's Motion must be granted and he should be ordered to serve the remainder of his

sentence on home confinement.

Further, according to the Second AG Memo, *it is clear that Weingarten is an at-risk*

*inmate who should be immediately released on home confinement*.  It is also appropriate in this

case to immediately transfer him to the residence where he will be confined to and not quarantine

him within the BOP.  Given his medical conditions, Weingarten's confinement plan consists of

living in an apartment alone in Monsey, New York, in complete isolation.  If released to home

confinement, he will be picked up by a family member who will have an N95 and appropriate

personal protective gear for Weingarten to wear during the car ride.  The driver will also be

appropriately wearing the appropriate gear.  Weingarten will be driven straight to the apartment

where he will live alone under home confinement and G.P.S. monitoring.

The Second AG Memo also "recognizes that BOP has limited resources to monitor

inmates on home confinement" and that the U.S. Probation Office faces similar challenges.  *See*

Exhibit K, Second AG Memo, p. 2.  However, Attorney General Barr still orders the immediate

transfer of "inmates to home confinement even if electronic monitoring is not available, so long

as BOP determines in every such instance that doing so is appropriate and consistent with our

obligation to protect public safety."  *See* Exhibit K, Second AG Memo, p. 2.  In other words,

even if electronic G.P.S. monitoring is not available, that fact should not be an impediment or

deterrent to the release and transfer of Israel Weingarten.

In the Second Attorney General Memorandum, Attorney General Barr concludes, "Given

the speed with which this disease has spread through the general public, ***it is clear that time is of

the essence***.  ***Please implement this Memorandum as quickly as possible*** and keep me closely

apprised of your progress."  *See* Exhibit K, Second AG Memo, p. 2 (emphasis added).

Based upon the Attorney General's guidance and directives, under both the First and

Second AG Memos, ***Israel Weingarten should be released from Fort Dix and transferred to

home confinement immediately***.  He is a "vulnerable inmate" and has multiple COVID-19 risk

factors, which have been extensively documented.  His confinement plan explained above is

suitable and will accomplish the goal of the Attorney General, to "not inadvertently contribute to

the spread of COVID-19." *See* Exhibit K, Second AG Memo, p. 2 (emphasis added).  This

Motion must be granted and Weingarten must be released to home confinement.  It will save his

life.

In addition, recent case law supports the fact that an increased risk of severe illness or

death due to the COVID-19 outbreak, constitutes extraordinary and compelling reasons under

Section 3582(c)(1)(A) and U.S.S.G. § 1B1.13.  *USA v. Colvin*, No. 3:19CR179 (JBA), 2020 WL

1613943, at *4 (D. Conn. Apr. 2, 2020) (noting the defendant met the extraordinary and

compelling reason requirement due the fact that she had a "serious . . . medical condition," which

substantially increases her risk of severe illness if she contracts COVID-19).  Further, Courts

have recognized the "expectation that the COVID-19 pandemic will continue to grow and spread

over the next several weeks" necessitating home release.  *USA v. Colvin*, No. 3:19CR179 (JBA),

2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020); *United States v. Wilson Perez*, No. 17-CR-

513-3 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (noting factors that point towards

extraordinary and compelling reasons to justify compassionate release including the vulnerability

of the defendant and that prison is particularly dangerous place with regards to COVID-19); *see

also USA v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1,

2020) (same).

## POINT IV

**THE CONDITIONS OF BOP INCARCERATION FOSTER THE SPREAD
OF COVID-19, AND WEINGARTEN'S AGE AND PREEXISTING MEDICAL
CONDITIONS RENDER HIM PARTICULARLY SUSCEPTIBLE TO AN
UNREASONABLE RISK OF DEATH AND AN INABILITY TO TAKE
PREVENTATIVE MEASURES OR SELF-CARE RECOMMENDED BY THE CDC**

It is undeniable that COVID-19 has already entered Fort Dix, where Israel Weingarten is

housed.  Conditions of confinement at Fort Dix, like other prisons, create an optimal

environment for the transmission of contagious disease.[59]  People who work in the facility leave

and return daily and there are regular deliveries of supplies made to Fort Dix, coming from all

over.  Up until the BOP suspended visits to all of its facilities on March 13, 2020, inmates were

having social, legal and medical visits regularly, even after the initial spread of the virus.[60]

Public health experts are unanimous in their opinion that incarcerated individuals "are at special

risk of infection, given their living situations," and "may also be less able to participate in

proactive measures to keep themselves safe," and "infection control is challenging in these

settings."[61]  This rings even more true for inmates like Israel Weingarten, who have underlying

health issues, which make them even more susceptible to COVID-19.

### A.  The Conditions At Fort Dix Prevent Weingarten From Protecting Himself

Israel Weingarten is powerless to take the preventative self-care measures directed by the

CDC for his high-risk group to remain safe from COVID-19 infection.  He cannot self-

quarantine or partake in "social distancing" in his prison facility.  "At Fort Dix, they have not

been permitted to go outside . . . 'No visitation.  No programs.  No recreation.  It is a warehouse

and nothing more . . . '"[62]  Inmates "live in a dormitory with more than a hundred other men . . .

They share eight showers, ten toilets, and six urinals . . . Twice a day, prisoners stand at their

---

[59]      *See* Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(8):
1047-1055 (2007), available at https://academic.oup.com/cid/article/45/8/1047/344842; *see also Prisons and Jails
are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at
https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap; *see also
An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues*, The New York Times (March 16,
2020), available at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.
[60]      *See Federal Bureau of Prisons Covid-19 Action Plan*, available at
https://www.bop.gov/resources/news/20200313_covid-19.jsp.
[61]      *See Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike
Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the
United States* (March 2, 2020), available at
https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_
legal_experts.pdf.
[62]      *See* Elizabeth Weill-Greenberg, *Coronavirus is Ready to Explode Inside Fort Dix Federal Prison,
Incarcerated People and Their Loved Ones Say*, The Appeal (April 23, 2020), available at https://theappeal.org/fort-
dix-prison-new-jersey-coronavirus/.

bunks to have a staff member take their temperatures with a thermometer placed on their head . . . [However,] [t]he person does this from inmate to inmate . . . [n]ot cleaned at all."[63]  In essence, inmates are forced to spend all of their time in close proximity to many others – and there is no telling if anyone of them have the virus or have been exposed to COVID-19 in some manner, as there are many confirmed cases within Fort Dix already.  Israel Weingarten is powerless to protect himself properly.

High-density places such as prisons are precisely the kind of spaces that have caused the alarmingly high-spread rates of COVID-19.  Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is not allowed at Fort Dix.  Correctional health experts worry that no matter what precautions are taken by crowded prisons, these facilities may become incubators for the COVID-19 disease.[64]

During the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases because they could not maintain the level of separation and sanitation necessary to prevent widespread infection.[65]  During this current COVID-19 pandemic, the Prison Policy Initiative has called on American jails and prisons to release medically fragile and older adults, noting that these persons are at high risk for serious complications and even death from COVID-19.[66]

Similarly, members of Congress have written to the Department of Justice and BOP, to urge that efforts be made to allow immediate release of non-violent, elderly inmates.[67]

---

[63]     See id.
[64]     See Michael Kaste, Prisons and Jails Worry About Becoming Coronavirus 'Incubators,'" NPR (March 13, 2020), available at https://www.npr.org/2020/03/13/815002735/prisons-and-jailsworry-about-becoming-coronavirus-incubators.
[65]     See Prisons and Jails are Vulnerable to COVID-19 Outbreaks, The Verge (Mar. 7, 2020), available at https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap.
[66]     See Peter Wagner & Emily Widra, No Need to Wait For Pandemics: The Public Health Case for Criminal Justice Reform, Prison Policy Initiative (March 6, 2020), available at https://www.prisonpolicy.org/blog/2020/03/06/pandemic.
[67]     See Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020), available at https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_covid19.pdf.

Representatives Nadler and Bass state, "DOJ and BOP must also do all they can to **release as many people as possible who are currently behind bars and at risk of getting sick**.  Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for extraordinary and compelling reasons.[68]

Given that Israel Weingarten is 70 years old and suffers from significant underlying health issues that make him exceptionally vulnerable to COVID-19, numerous compelling and extraordinary circumstances exist to support compassionate release at this unique time in our country's history.  There is an urgent need to act now, before the virus spreads even further in Fort Dix and Weingarten becomes infected.  As described in the attached declaration of Dr. Jamie Meyer, an infectious disease specialist and Assistant Professor of Medicine at Yale School of Medicine, inmates are uniquely vulnerable: "[t]he risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected."  *See* Exhibit M to the Twersky Decl., Declaration of Dr. Jamie Meyer, dated March 15, 2020.  Dr. Meyer describes the inadequate pandemic preparedness plans in many detention facilities and the difficulty of separating infected or symptomatic inmates from others.  *See* Exhibit M, Declaration of Dr. Jamie Meyer, dated March 15, 2020.  In summary, the COVID-19 virus is highly transmissible, extraordinarily dangerous and poses a severe threat of death to the high-risk medical profile of Israel Weingarten.  The conditions at Fort Dix do not allow Weingarten to take the self-care measures required by the CDC to protect his safety and therefore the Court must step in and modify his sentence to home incarceration, so that his life is not put in danger.

---

[68]       *See id*. (emphasis added) (internal quotation marks omitted).

## POINT V

## THE RELEVANT § 3553(a) FACTORS FAVOR RESENTENCING

Once extraordinary and compelling reasons are established, the Court must consider the

relevant sentencing factors in §3553(a) to determine whether a sentencing reduction is

warranted.  *See* 18 U.S.C. § 3582(c)(1)(A)(i).  The relevant factors listed in 18 U.S.C. § 3553(a)

include:

> (1) the nature and circumstances of the offense and the history and characteristics
> of the defendant;
> (2)the need for the sentence imposed—
> > (A) to reflect the seriousness of the offense, to promote respect for the
> > law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant . . .

*See* 18 U.S.C. § 3553(a).

Here, a review of the Section 3553(a) factors, along with Weingarten's release plan of

home confinement and incarceration under electronic G.P.S. monitoring for the remainder of his

unserved original term of imprisonment, favor granting Weingarten's compassionate release.

Firstly, the charged offenses were Weingarten's first and only brush with the law.  Next,

he has already served over eleven (11) years of his sentence, which is a severe punishment.  If

Weingarten were to serve the remainder of his sentence under terms of restrictive home

confinement, this would still certainly reflect the seriousness of the offenses and afford adequate

deterrence to Weingarten.  Lastly, if released to home confinement, Weingarten would not pose a

credible threat to the safety of the public and is not a danger to the community.  As a 70 year old

man who has been in prison for the past eleven years, he has zero chance of recidivism.  In fact,

his Inmate Profile shows he is at the "minimum risk recidivism level."  *See* Exhibit G, Inmate

Profile.  Further, Weingarten's inmate score under PATTERN is "minimum risk."  These facts,

coupled with his physical impairments and medical infirmities, ensures that the public does not have to be protected from him.  Israel Weingarten simply wishes to finish his sentence – under continued home confinement and incarceration, with strict conditions, without the elevated threat of COVID-19 hanging over his head.  All of these Section 3553(a) factors weigh in favor of modifying Israel Weingarten's sentence to home confinement and incarceration, in light of the COVID-19 pandemic.

Indeed, any Section 3553(a) factor which the Court may view as disfavoring to resentencing or modifying Weingarten's sentence, is largely overcome by the unreasonable threat of death in Weingarten's current conditions of confinement, should he contract COVID-19.  Since there are conditions of home detention which can still provide a "sufficient but not greater than necessary" sanction of punishment, the Court can comfortably resentence Weingarten to home confinement.  *See* 18 U.S.C. § 3553(a).  Weingarten has been serving his sentence at Fort Dix as a sick and immuno-compromised man, with many diagnoses and medication taken daily.  He deals with much more than an average prisoner, on a daily basis.  As the court noted in *McGraw*, *infra*, "his sentence has been significantly more laborious than that served by most inmates."  *United States v. McGraw*, No-02-Cr.-18, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019).

At this point in time, Weingarten has been imprisoned for over eleven (11) years. Though there are still many more years left to his sentence, the circumstances since his sentencing have changed drastically.  The Government cannot dispute the serious physical danger created by the current pandemic to someone with Israel Weingarten's medical profile.  It also cannot guarantee or provide any sense of confidence that this widespread virus will not overtake the federal prison at Fort Dix, where it has already begun to spread.  ***When the virus***

*spreads even further inside the prison, and this is not alarmist hyperbole, it likely will kill Israel Weingarten*.  This Court never intended to impose such a risk at the time of Weingarten's original sentencing.

We propose that as part of Weingarten's continued punishment in this case, that the Court convert the remaining years of his expected term of imprisonment to strict home detention as a condition of supervised release.  In this way, Weingarten will continue to face confinement as a measure of due punishment, but without the serious risk to his physical health looming over him. The recently amended compassionate release statute, at 18 U.S.C. § 3582(c)(1)(A), authorizes the Court to extend supervised release in this way.  *See* 18 U.S.C. § 3582(c)(1)(A) (the court "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment").  Such a prolonged period of home incarceration definitely meets Section 3553(a)'s purpose to give due respect for the law and to acknowledge the seriousness of the offense.

Congress's expansion of the compassionate release statute by Section 603(b) of the First Step Act reflects congressional intent for courts to have greater flexibility in reducing sentences when compelling circumstances justify a later review.  The title of the amendment, "Increasing the Use and Transparency of Compassionate Release," accentuates that intent.  The evolving case law also demonstrates that courts have construed their discretion generously to effectuate Congressional desire to increase the use of the compassionate release statute encouraged by this amendment.

Significantly, courts weighing Section 3553(a) factors have granted release to defendants with convictions for serious crimes and with histories of violence, finding that changed health circumstances, aging defendants, post-offense rehabilitation and carefully crafted conditions of

supervised release ameliorate public safety concerns.  In *United States v. Bailey*, for example, the defendant was sentenced to 30 years for "an extensive racketeering scheme," including a specific finding that the defendant committed offenses relating to a murder.  *United States v. Bailey*, No. 94-cr-481 (N.D. Ill. July 24, 2019) (slip op. at 1).  The parties agreed that the defendant, who was almost 90 years old and suffered from multiple health issues, had satisfied the statutory requirements for compassionate release.  *See id*.  However, the government opposed release under the Section 3553(a) factors due to the "reprehensible nature of the offense."  *See id*.

The court acknowledged that the defendant's criminal history and serious offense conduct supported a denial of the requested reduced sentence.  *See id*.  But the court weighed the more recent factors in the defendant's favor, including his institutional adjustment, lack of disciplinary infractions, his advanced age, and his release plan, and concluded that they "point in the opposite direction."  *See id*.  In weighing these more recent favorable factors over the defendant's past criminal history, the court granted the reduced sentencing request, concluding that release at this stage of the defendant's life would not minimize the severity of the offense and the defendant no longer posed any credible threat to the public. *See id*. at 2.  This is exactly what the Court should do in this case.

In a District of Oregon case, the court likewise granted compassionate release to a defendant, who was also serving a 30-year sentence for leading a "major drug conspiracy." *United States v. Spears*, No. 3:98-Cr.-208-SI-22, 2019 WL 5190877, at *4 (D. Or. Oct. 15, 2019).  As explained in the court's opinion granting release there, the defendant's history included crimes of violence, his performance on supervised release had been poor and he committed the last serious offense for which he was serving imprisonment when he was in his fifties.  *See id*.  Despite these findings, the district court found that the defendant was now 76

years old and suffered from "multiple chronic serious medical conditions and limited life expectancy." *Id*. at *1.  Although the government persisted that the defendant remained dangerous, the court disagreed.  The court concluded that, in light of the defendant's strong family support, the age of his prior convictions and his diminished physical condition, "appropriate supervision conditions can mitigate any limited risk" to public safety and provide sufficient specific deterrence.  *Id*. at *5.

Similarly, in *United States v. McGraw*, the court granted compassionate release from the defendant's life sentence for a drug trafficking conspiracy based on the defendant's serious health concerns and diminished ability to provide self-care under commentary note 1(A)(ii) of USSG § 1B1.13.  *See United States v. McGraw*, No-02-Cr.-18, 2019 WL 2059488 (S.D. Ind. May 9, 2019).  The defendant, who was approximately 55 years old at the time of the offense, was 72 years old at the time of the court's release opinion and suffered from limited mobility, diabetes, and chronic kidney disease.  *See id*. at *2.  The government argued that the defendant remained a danger to the community because of his leadership in a notorious motorcycle gang, noting that he could continue his criminal activity with simple access to a telephone.  *See id*. at *4.  The court, however, concluded that given the defendant's frail health, his positive record at the institution, and the ability of the court to impose conditions that would reasonable assure the safety of the community upon release, the more flexible compassionate release statute, as amended by the First Step Act, favored granting the defendant's motion.  *See id*.  With respect to the Section 3553(a) factors, the court concluded that the "significant sanction" the defendant had already served was sufficient:

> But further incarceration is not needed to deter Mr. McGraw from further offenses; nor for reasons described above, is it necessary to protect the public from future crimes. ***Finally, Mr. McGraw has served much of his sentence while seriously ill and in physical discomfort. This means that his sentence has***

44

> ***been significantly more laborious than that served by most inmates***.  It also
> means that further incarceration in his condition would be greater than necessary
> to serve the purposes of punishment set forth in § 3553(a)(2).

*Id*. at *5 (emphasis added).

The court imposed lifetime supervision to "continue to serve as a sanction and general deterrent, appropriately recognizing the seriousness of Mr. McGraw's conduct."  *Id*. at *4.

As amplified in the cited cases above, the release of Israel Weingarten, an aged and infirm man, extremely susceptible to severe illness if infected by COVID-19, under the current extraordinary and compelling circumstances of the threat of a novel contagion contaminating the prison, would not serve to diminish the seriousness of the offense of conviction, but would instead fulfill Congress's intent in offering courts greater flexibility to reduce sentences when changed circumstances justify a later review.  Weingarten's pre-existing health conditions, his age and the rapidly advancing COVID-19 outbreak, together with the prison's inflexibility to give Weingarten the ability to take self-care measures directed by the CDC to remain safe during the outbreak, warrant a reduced and modified sentence in his case.

## CONCLUSION

WHEREFORE, for the foregoing reasons, I respectfully request that the Court: a) grant

Defendant Israel Weingarten's Motion for Compassionate Release, pursuant to 18 U.S.C.A. §

3582(c)(1)(A)(i), in its entirety; b) issue an Order reducing and modifying Weingarten's sentence

to time served with an extended period of supervised release to cover the unserved portion of his

prison term, with a condition of home incarceration and confinement and G.P.S. monitoring; and

c) grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
     May 12, 2020

                            **TWERSKY PLLC**

By:        _(signature)_
                 Aaron Twersky, Esq.
                 Jason Lowe, Esq.
                 Ilana Neufeld, Esq.
                 747 Third Avenue, 32nd Floor
                 New York, New York 10017
                 (212) 425-0149
                 atwersky@twerskylaw.com (email)
                 jlowe@twerskylaw.com (email)
                 ineufeld@twerskylaw.com (email)

                 *Attorneys for Defendant Israel Weingarten*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

UNITED STATES OF AMERICA,                              Case No: 08-CR-571 (JG)

              -against-

ISRAEL WEINGARTEN,

                    Defendant.

-------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ISRAEL WEINGARTEN'S
MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

**TWERSKY PLLC**
747 Third Avenue, 32nd Floor
New York, New York 10017
(212) 425-0149

*Attorneys for Defendant Israel Weingarten*