MEG:JMS
F.#2014V02206

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

08-CR-571 (BMC)

- against -

ISRAEL WEINGARTEN,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x


MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO
REDUCE SENTENCE


RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


JENNIFER M. SASSO
Assistant U.S. Attorney
        (Of Counsel)

PRELIMINARY STATEMENT

Defendant Israel Weingarten was convicted following trial of two counts of transporting a minor in foreign commerce for the purpose of engaging in criminal sexual activity, in violation of Title 18, United States Code, Section 2423(a), and three counts of traveling in foreign commerce for the purpose of engaging in sexual conduct with a minor, in violation of Title 18, United States Code, Section 2423(b).  His conviction stemmed from his long-standing sexual abuse of his daughter, beginning when she was just nine years old.  In 2009, the defendant was sentenced to 30 years' incarceration.  After having served less than half of that sentence, the defendant now moves the Court for early compassionate release pursuant to the First Step Act ("FSA") and § 3582(c)(1)(A)(ii), claiming that his health conditions (including various kidney and bladder conditions, as well as pericarditis) bode in favor of his immediate release to home confinement.  This application is the latest installment in the defendant's near decade-long campaign—including retention of at least half a dozen different counsel, three Second Circuit appeals, a resentencing, and several habeas-related hearings—to cut short the sentence that has been several times affirmed as just and commensurate with his abhorrent conduct.  As set forth below, this Court should deny the defendant's request because several of his stated health and age concerns were already considered at the time of his sentencing and during the course of post-sentencing proceedings, and the defendant has not demonstrated new "extraordinary and compelling" reasons warranting the extreme relief he seeks.

1

<u>BACKGROUND</u>

I.    <u>Introduction</u>

Israel Weingarten is a Satmar rabbi, who lived in Europe, Israel and the United States.  While residing in Antwerp, Belgium, Weingarten ran a yeshiva and raised eight children with his wife.  When his eldest daughter, "Jane Doe," reached the age of nine or ten, Weingarten began to abuse her sexually.  It is this abuse that formed the basis of the Government's case at trial, as outlined in more detail below.  The Grand Jury indicted the defendant on five charges:  Count One of the indictment charged the defendant with transporting Jane Doe from Israel to Brooklyn with the intent that she engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a).  Count Two alleged the same offense, and focused on the trip from Brooklyn to Antwerp.  Counts Three through Five charged the defendant with traveling in foreign commerce (Antwerp to Israel, Israel to Brooklyn, and Brooklyn to Antwerp, respectively) for the purpose of engaging in illicit sexual conduct with Jane Doe, in violation of 18 U.S.C. § 2423(b).

A.    <u>The Government's Case-in-Chief at Trial</u>

At a six-day trial, during which Weingarten represented himself, including cross-examining his victim daughter, the government proved the following:

1.    <u>Family Background Information</u>

Weingarten, a United States citizen, was married to Feige Weingarten and is the father of eight children.  (T 170-71, 712).[1]  Jane Doe (or, "Doe"), born on February 10,

---

[1] The statement of facts is drawn largely from the facts asserted in the Government's brief on direct appeal before the Second Circuit.

2

1981, is Weingarten's second oldest child and his eldest daughter.  (T 171).  Weingarten and

his family are Satmars, members of an ultra-orthodox Jewish community.  (T 172-73).[2]  In

addition to following the traditions of this sect, Weingarten imposed a number of other rules

on his family that were strict even by Satmar standards.  (T 175-78).  For example,

Weingarten required his daughters to follow specific rules regarding their dress and

appearance.  They were not allowed to wear anything red because Weingarten said this

reminded a man of a woman's "private parts." (T 174).  Weingarten also insisted that his

daughters wear their hair in braids because he believed that the movement of a girl's hair was

"distracting to a male."  (T 175).  He refused to allow his daughters to wear dresses with

seams that pointed downwards as he deemed them too suggestive, and he chose fabrics for

his daughters that were "very distracting" in the hopes that men would avoid looking at them.

(T 177).

Doe lived with her family in Belgium from age three until age sixteen. Her

home life was "nice" until about the age of six.  (T 179).  Doe's mother was very

affectionate, and Weingarten, although "more feared," was also good to Doe.  (T 199).  Doe

attended the only all-girls Satmar school in Belgium. However, Weingarten restricted many

of her nonreligious activities, such as swimming, to preserve her modesty.  (T 182).  Failure

to abide by these conditions led to a beating.  (T 183-87).

Weingarten also treated Doe differently from other family members.  When

Doe was around seven or eight, Weingarten gave her the responsibility of withdrawing

money from the bank.  (T 190).  He also frequently spoke to her alone about things that were

---

[2] References to "T" are to the trial transcript.

not "related to children."  (T 190-91).  These almost daily, one-on-one conversations

occurred in the family's study or in Weingarten's bedroom.  (T 192, 528).  The excessive

amount of time Weingarten spent with Doe led her mother to call her "second wife."  (T

193).

At or around this time, Weingarten also began to isolate Doe from other family

members. He referred to her generally as a "liar" and "fantisizer" (T 193, 195-96, 529), and

he advised his oldest son, Yoinesum, with whom Doe had a very close relationship, that such

closeness was inappropriate (T 527).  According to Yoinesum, around the time Weingarten

started spending more time with Doe, she "seemed to be more and more into herself . . . more

sad, and not happy."  (T 530).  As Doe got older, Weingarten continued to treat Doe

physically in much the same way as he had when she was younger.  For example, he

continued to hold her on his lap much as he would a child (T 199, 529, 692), which was

uncommon in the Satmar community (T 199).  Doe, in turn, felt very awkward about this

behavior because Weingarten would also "pull" her close.

## 2.   The Defendant's Sexual Abuse of Jane Doe

When Doe was approximately nine or ten years old, her parents purchased a

device for giving massages, and Doe was instructed to give back massages to both her

mother and Weingarten.  (T 200-01).  Eventually, Weingarten complained of stomach aches

and asked Doe to massage his stomach through his clothes.  (T 202).  Then, one night,

Weingarten called Doe into his bedroom and asked her to give him a massage on his

stomach, but this time, Weingarten also lifted his shirt and put Doe's hand on his bare skin.

(T 203).  Weingarten took Doe's hand, pushed it down his pants and forced its fingers to

wrap around his erect penis; then he pushed her hand "up and down."  (T 203-04).  This

confused Doe because she did not know that a man's penis "[could] get that big and hard and I [had] never felt pubic hair before." (T 204).

The sexual abuse by Weingarten worsened over time. Instead of simply forcing Doe to grab his erect penis, Weingarten pulled down Doe's tights and underwear and touched the outside of her vagina. (T 219). Eventually, Weingarten forced Doe to lie on her stomach on his bed and instructed her to listen for people approaching while he lowered her tights and underwear and fondled her vagina and buttocks. (T 218-20).

### 3. The Sexual Abuse Comes To Light

During this period of sexual abuse, Doe spoke to her mother, Feige, in confusion and fear. (T 220-21). Doe told her mother that "daddy is touching me," and, because she did not know the appropriate words to use, she pointed towards her vagina. (T 221). Feige recalled that Doe approached her "very shocked, very lost" and told her that Weingarten was "touching her in very unusual places. She showed me with her hands in the direction downward." (T 693). When Weingarten learned that Doe had told her mother about the sexual abuse, he beat Doe, kicking her with his shoes between her legs, pushing her to the floor, pinching and punching her with his fists. He also struck Doe on the head with a hard vegetable approximately twelve to fifteen inches long until the vegetable broke. (T 222-23). In fact, it was common for Weingarten to physically abuse Doe. (T 530).

While Doe became resigned to the abuse, she nevertheless asked Weingarten why he was abusing her. When she was young, Weingarten told Doe that it was because she was beautiful. (T 224). But as Doe got older, Weingarten insisted that the abuse was Doe's fault, among other things. For example, Weingarten told Doe that her eyes were seducing him. He also said that Feige was not a "good wife" because she was not "giving him any,"

which caused Doe to have feelings of hatred towards her own mother.  (T 224-25).
Weingarten continued to sexually abuse Doe on a habitual basis, and, because of the physical
abuse, she did not tell anyone.  (T 221-22).  Occasionally, however, Weingarten would stop
for a period of time, chastising Doe to stop seducing him, claiming that what they were doing
was "wrong," and purifying himself at the mikvah, a place for religious cleansing.  (T 228).

Despite these attempts to stop the abuse, it only became worse.  As Doe
approached puberty, Weingarten warned her to look for menstrual blood and to advise him
when she saw it.  (T 230).  When Doe eventually began to menstruate, she told Weingarten,
who inspected her vagina and digitally penetrated her, causing her pain.  (T 231).
Weingarten also examined Doe's breasts as she was developing and commented that she
should "never let a man look at me in the light, because I don't look nice."  (T 231).  As Doe
got older, she began reacting to the sexual abuse, which caused her even more shame and
embarrassment.  One night in particular, after Weingarten had removed Doe's clothes, "he
started touching me with his fingers, and he rubbed me so hard, and then I felt like I pee'd
myself, and I was so embarrassed."  (T 233).

Despite having been long resigned to the abuse, Doe nevertheless attempted to
resist it when she turned thirteen or fourteen.  (T 236).  She would tell Weingarten that she
did not want to "do it" anymore and would push or pinch him.  (Id.).  Doe also threatened to
tell other people about the abuse, but Weingarten responded that no one would believe her
because he had never had sexual intercourse with her and because he was a respected rabbi
and she merely a "liar and fantisizer."  (T 237).

One night, Doe's mother had an opportunity to see Weingarten and Doe
together in bed.  Weingarten and Feige had argued earlier that evening, and Feige was

6

sleeping in another room.  (T 694).  Weingarten entered Doe's room and pleaded with her to

come to his bed.  When Doe heard her mother approaching Weingarten's bedroom, she did

not warn him.  (T 238-44).  Weingarten told Feige that Doe was in the bed because she was

cold (T 694-95), but Feige could see Weingarten's bare midsection (T 737).  Weingarten

attempted to coerce Doe into telling her mother that nothing had happened, but, instead, Doe

told her mother that she would explain everything at a later time.  (T 240-41).

    A few days later, Weingarten traveled to London to attend a wedding and

invited Yoinesum, who was studying in England, to accompany him.  (T 533).  At the

wedding, Weingarten told Yoinesum that:

> Something went on that your sister is accusing me of, something very dirty and
> inappropriate.  And what happened was that your mother walked in our bedroom
> -- in his bedroom, our parents' bedroom, and that my sister was in the same bed
> with him, and the blanket covered them both.  And when my mom walked in
> she asked for an explanation. And my father told her that nothing was going on.
> And my sister, instead of telling the same, she went to my mom and told her that
> my father did some inappropriate stuff with her.

(T 534).  Weingarten also instructed Yoinesum to "convince [his mother] to be on his side

and to believe him and not my sister."  (Id.).  Yoinesum, in turn, believed he had a

responsibility to keep his family intact by siding with his father, because in the Satmar

community, children of broken homes were considered to be "second-grade kids."  (T 536).

    In the meantime, while Weingarten was in London, Doe detailed Weingarten's

abuse to her mother.  Feige recalled that Doe told her that Weingarten had "put it in her

mouth so she became disgusted for the rest of her life."  (T 700).  Doe also told her mother

that Weingarten had instructed her "to lie down on her side with his legs between her legs,

one on top of the other. That was exactly what he was doing with me, that's why I could

believe it."  (T 700, 246). Doe also advised Feige that because of Weingarten's ejaculate,

"she was unable to eat chicken soup afterwards.  He made it disgusting for her, all kinds of foods that she liked before Shabbas.  He made her life disgusting."  (T 701).  In response to Doe's description of the abuse, Feige told Doe that she would confront Weingarten with a letter.  (T 246, 701).

When Weingarten returned to Antwerp, Feige confronted him and they argued. (T 247).  Doe overheard Weingarten say that "he was going to kill [Doe]" (T 701-02), and when Doe went to her room, Weingarten charged her and began striking her.  Weingarten beat Doe for approximately thirty to forty-five minutes, leaving marks over "every part" of her body.  (T 249).  The beating was so severe, and Weingarten's desire to silence Doe so complete, that Doe was unable to attend school for close to two weeks.  (T 250-51, 702). Weingarten eventually permitted Doe to return to school, where the Principal Mordechai Stauber sought confirmation of rumors that had been circulating about Doe in her absence. As a result, Doe did not return home.  (T 251-52).  In the meantime, Weingarten instructed Yoinesum to return to Belgium to help convince Feige that Doe was lying about the abuse. (T 537).

Eventually, with the assistance of a rabbi (Chaim David Weiss), Doe testified against her father in a rabbinical court.  (T 253).  Weingarten told Yoinesum that he had received a call from Rabbi Weiss, who had demanded that Weingarten give him Doe's passport.  (T 539).  Yoinesum accompanied Weingarten to Rabbi Weiss's house to turn over the passport (id.), which Doe later used to return to England (T 255, 703).  In England, Doe stayed in Rabbi Weiss's daughter's attic, but when Weingarten discovered where Doe was living, he contacted Doe to tell her to "stop lying and making up stories" and to come home. (T 256).  Eventually, Doe began attending an all-girls religious school in Manchester (T

8

259), but Weingarten continued to call Doe constantly, insisting that she return to Belgium (T 262).

### 4.   The Relocation To Israel

Eventually, Weingarten told Doe that she had to return to Belgium for Purim, threatening that he could obtain custody of her against her will because of her age.  (T 262-63, 349).  Doe confided in her principal, Rabbi Royde, to no avail (T 263), and eventually returned to Belgium (T 264).  Although Weingarten did not sexually abuse Doe on this trip, he plied her with alcohol and interrogated her in the hopes of finding out who had been helping her.  (T 265-66).  Weingarten also forced Doe to telephone Rabbi Royde to tell him that "nothing [had] happened."  (T 269).

Weingarten permitted Doe to return to school, but eventually Rabbi Royde advised Doe that she would not be permitted to continue her studies there because of rumors circulating about her.  (T 270).  Consequently, Doe returned to Belgium, at which time Weingarten informed her that the family was moving to Israel because Doe had "caused him a bad name and everyone is talking about him."  (T 271).  On April 14, 1997, Weingarten traveled to Israel with his entire family, with the exception of Doe's older brother, Yoni, who was already there.  (T 271-72).  In Israel, Doe was not permitted to leave the house alone and was forced to sleep in the living room.  (T 272, 705).  Weingarten sexually abused Doe in Israel on an almost daily basis.  Among other things, he vaginally and anally penetrated her with his fingers, and he forced her to masturbate him, at which time he would ejaculate.  (T 273-75).

On May 13, 1997, Weingarten, Feige, Doe and Weingarten's youngest children returned to Belgium to pack the house for the permanent move to Israel.  There,

Weingarten continued to sexually abuse Doe almost every night.  (T 278).  In the mornings, Weingarten would beat Doe, then complain that she was "burying him alive."  (T 279-80). The family eventually returned to Israel, where the sexual abuse continued.  (T 281-82).

### 5.   The Trips To And From Brooklyn

On July 30, 1997, upon being informed that his father was gravely ill, Weingarten had Doe accompany him to Brooklyn, New York, where the two of them stayed in Weingarten's brother's home.  (T 284-85, 712).  There, Weingarten sexually abused Doe (T 285), at the same time ordering her to tell her dying grandfather that she would be "a modest girl from now on" (T 286-87).  When Weingarten's father passed away, Doe was not allowed to attend the funeral.  (T 287).

### 6.   The Belgium Period

On August 19, 1997, Weingarten and Doe returned to Belgium, where she experienced the worse period of sexual abuse at her father's hand.  Doe testified that "[Weingarten] abused me night and day, every day . . . [i]t was non-stop, hardly remember getting dressed . . . . I don't remember eating or sleeping much.  It was . . . a long fog."  (T 290-91).  Weingarten would simulate sex and ejaculate near Doe's vagina.  (T 291). Weingarten also sat on top of his daughter and forced her head near his penis, and eventually forced his penis into her mouth.  (T 291).  He so frequently forced her to perform oral sex that she lost count.  (T 292).

Eventually, Weingarten permitted Doe to leave the apartment with him to "show everyone I have no problems with him."  (T 292).  Sometime afterward, Weingarten was hospitalized for alleged "heart problems."  (T 292).  Doe, however, remained in the apartment to complete packing and to oversee the movers.  (T 293-94).  Doe told her father

10

that she wanted to return to Israel to be with her family.  Weingarten, however, conditioned

that return on Doe's willingness to make an incriminating recording of her neighbor.  (T

294).  Doe was to give the impression that she had had an improper sexual relationship with

the neighbor, which Weingarten intended to use to clear his name with the rabbis.  (T 294).

Doe made the tape and gave it to her father.  Weingarten stated that he was

going to present it to the rabbis as proof that the neighbor, and not Weingarten, had molested

her.  (T 297-98).

### 7.   The Return To England And Attempt To Retrieve Doe

On September 12, 1997, Doe returned to Israel, where Feige noticed that Doe

looked "pale, very changed, very different [and] tortured."  (T 300, 714).  On September 23,

1997, with the help of her mother and some rabbis, Doe returned to England.  (T 300).  Doe

also eventually returned to school in Manchester and was adjusting when, on February 14,

1999, she was informed that her father was in England looking for her.  "[C]ompletely panic

stricken," Doe ran to Rabbi Royde's house for help.  (T 301).  Rabbi Royde told Doe to hide

in his bedroom upstairs and lock herself inside when they heard loud banging at the door.  (T

302).

When Weingarten and Feige entered Rabbi Royde's house, Weingarten began

breaking the rabbi's belongings, and both Weingarten and Feige beat Rabbi Royde.  (T 717).

Rabbi Royde was "very frightened" during this incident.  (T 759).  Hiding in Rabbi Royde's

bedroom, Doe recognized her father's and mother's voices yelling, "[g]ive me back my

daughter.  I know she's here."  (T 302-03).  "Petrified," Doe called the police.  Eventually

"the door just flung open and my father stormed into the room, his face was completely red,"

and she thought, "[O]h my God, this is the end.  This is where it's all going to end.  He's going to choke me, do something to me, it's going to be over."  (T 303).

The police responded to the emergency call.  When they arrived, one of the officers, Constable Longman, remained downstairs while another officer, Constable Johnson, climbed the stairs to where Doe's parents were confronting her.  (T 657).  Constable Longman could hear the "disturbance" upstairs and, upon entering the bedroom, he saw Doe "sobbing" and "distressed." (T 659-60).  Once alone, Doe told the police that Weingarten had abused her from the time she was ten until she turned sixteen and that this abuse had taken place in several different countries. (T 661).

### 8.  Subsequent Years

Doe was put in foster care and eventually obtained a non-molestation order against her father.  (T 305).  She stayed in England for a while longer but eventually returned to New York, where she was married for a short time to someone in the Satmar community.  (T 314-15).  After her divorce, Doe left the religious life (T 317), left New York (T 318), and legally changed her name (T 170).

### B.  The Defendant's Case at Trial

Weingarten called two of his daughters—Chaya and Chaneh—to testify on his behalf.  Chaya stated that Doe had told her to falsely claim that Weingarten had sexually abused her and threatened to use the "Mafia" to hurt her if she did not.  (T 898-99).  Both Chaya and Chaneh also testified that they had never observed Weingarten sexually abuse Doe (T 903, 939), and Chaya claimed that it was, instead, Feige who had sexually abused her.  (T 915).  Chaya described this sexual abuse as follows: "I heard them giggling," and "I saw my mother on my sister and she was playing around in her vagina area, and then I saw a

lot of times playing with her breasts, with her vagina, with her back." (T 916).  According to

Chaya, this happened "most of the night," "playing around with her and giggling all night."

(T 917).  On cross-examination, both Chaya and Chaneh testified that they had been alone

with their father since approximately 2002 (T 928-29, 943-44), and that they had never

spoken with Weingarten about Doe's allegations against him (T 929-30, 946).

II.    The Verdict, Sentencing and Post-Conviction Proceedings

        The jury found Weingarten guilty of all counts of the indictment.  (Dkt. Entry

No. 54).   At sentencing, the victim's brother spoke, stating that his father's actions

"victimized and brought pain to myself, to my dear sister, to my other six dear siblings, to

my mom, to the extended family wherever they reside." (Sent'g Tr. at 15-16).  He outlined

verbal and psychological abuse waged against his mother and his siblings, and the

reputational impact his father's actions had on their family.  (Id. at 18, 21).  He continued:

> I don't think I'll ever be able to forgive for what my father has done to
> my dear sister.  I'll not forgive him for not being a father, just naturally
> protecting his daughter from any type of harm.  Instead he chose to
> become a member of the lowest of society in humankind, sexually
> molesting his own daughter, my dear sister.  I will not forgive him taking
> away her precious well-deserved childhood, destroying her early years
> of life and taking away her innocence.

(Id. at 16).  Following these statements, Jane Doe spoke:  "The pain will never leave my

heart.  He ruined so much of me, taking away my essence, my trust, my innocence, my youth

and adolescence.  He took away from my mother, stole away from my father and robbed me

from my siblings and estranged me from family and he robbed me from my own self."  (Id.

at 33).  She too went on to describe the victimization suffered not only by herself, but by her

mother and siblings, as a result of the defendant's abuse.  (Id. at 34-36).  She additionally

described how the defendant had also molested his own younger brother.  (Id. at 39).  Jane
Doe stated:

> That day I knew that not only did he molest me, he molested his own
> brother, a boy; I knew this wasn't just me and not only are girls in danger
> in his presence but boys too.  He's a double threat, not only to my sisters
> but my brothers too, and any other young children in his presence, a
> school teacher or yeshiva teacher.  I couldn't let it continue. It was my
> responsibility to tell the truth to the FBI and to the court.

(Id. at 38).  She stated that her "final wishes," were that her brother and herself "be safe and

for us to be able to let go and live a peaceful life now that we are both close to almost 30 and

a large part of our life has been stolen by pain and torture."  (Id. at 48).  She also wished for

"safety and recovery" for her younger siblings, mother and uncle hoping "for their future to

be happy and peaceful without fear from him."  (Id. at 48-49).

At the time of sentencing, the defendant raised numerous mitigating factors

including the fact that he was, at the time, "a 59-year old man and in delicate physical

health."  (Dkt. Entry No. 75, at 25).  The defendant indicated that he was suffering from

"elevated uric acid levels in his body and from urinary retention, which requires self-

catherization every two and a half to three hours."  (Id.  (citing Presentence Investigation

Report ¶ 152) (internal quotations marks omitted)).  The defendant further contended that his

medical problems placed him at "an unnecessary and unacceptably high risk" in prison.  (Id.

(citations omitted)).  After considering these factors, among others, the court sentenced

Weingarten to thirty years' incarceration.  (Dkt. Entry No. 81).

The defendant subsequently appealed.  On January 18, 2011, the Second

Circuit reversed Weingarten's conviction on Count Three on the grounds that the travel

charged in that count between Israel and Belgium did not have a sufficient nexus to the

United States.  Because of this determination, the case was remanded for resentencing.

United States v. Weingarten, 632 F.3d 60 (2d Cir. 2011).

        At his resentencing, the defendant submitted a letter contending that he should receive a lower sentence in part because he "suffers from serious health issues," (Dkt. Entry No. 100, at 28), and "is frail, and small in stature," (id. at 38).  The defendant's medical records, which outlined various urinary conditions and additional "special health needs that pose[d] unique hardships," (id. at 29), were supplied to Probation and filed with the court for consideration in resentencing.  Defense counsel's medical addendum was incorporated into the PSR, which detailed how the defendant "suffers from a urethral stricture," had a "cystoscopy and surgery to look for stones," and "developed a condition where he feels no sensation when he needs to urinate and when he does it is painful."  (PSR, at Def. Letter dated Aug. 25, 2011).  The defendant went on to point out that he suffered from urinary tract infections, hematuria and edema as well as self-catherization; hyperlipidemia; skin lesions and other minor conditions.  (Id.).  At the defendant's resentencing, the court explained that, the dismissal of Count Three "passe[d] in the night with the criminal activity which [was] the basis of the sentence."  (Sent'g Tr. 309).  The court also recounted Weingarten's repeated rapes and abuse of Jane Doe, in addition to its efforts "to talk [] the defendant out of representing himself."  (Sent'g Tr. 311).  As the court explained, "I had seen fear in courtrooms before but I have never seen anything like what I saw in this case, and it was not only visible.  Anyone present could feel Jane Doe's fear of her father.  It filled the courtroom."  (Sent'g Tr. 311-12).  The court commented that Weingarten, as at his original sentencing proceeding, continued to show "not one spec[k], one shred, one hint of remorse,"

a factor relevant to his sentence.  (Sent'g Tr. 313).  The court ultimately resentenced the defendant to thirty years' incarceration.

The defendant again appealed, which was denied, see United States v. Weingarten, 713 F.3d 704, 11-3999-cr (2d. Cir. 2013).  Weingarten petitioned for rehearing *en banc*; the Second Circuit denied that petition on July 1, 2013.  In 2014, the defendant filed a 2255 petition which was denied in full.  The defendant appealed and, following briefing and oral argument before the Second Circuit, the defendant's conviction and sentence were affirmed.  See Weingarten v. United States, 865 F.3d 48 (2d Cir. 2017).  According to the defendant's facility, FCI Fort Dix, he is considered to have served only 38.6% of his sentence; accounting for good time, his projected release date is April 29, 2034.

## ARGUMENT

The defendant has not provided extraordinary or compelling reasons that warrant release to home confinement.  While the government does not contest or seek to minimize the defendant's stated health concerns, many are iterations of the same concerns that the defendant has raised to the court since 2009.  His current medical conditions do not make him any more susceptible to contracting COVID-19, and the steps taken by the Bureau of Prisons ("BOP") to treat and contain the virus are sufficient to allay the defendant's risks of contraction.  The memoranda of the Attorney General regarding treatment of inmates in the face of COVID-19 indicate, and legal counsel at the defendant's facility has opined, that the defendant is ineligible for home release because of the heinous nature of his crimes.  This Court should also determine that the extreme relief of releasing the defendant nearly 15 years prematurely is not justified in the circumstances.

I.      Applicable Law

        "A district court may not generally modify a term of imprisonment once it has

been imposed," except pursuant to a statutory grant of authority.  United States v. Savoy, 567

F.3d 71, 72 (2d Cir. 2009) (internal quotation marks omitted).  Section 3582(c) is one source

of such authority.  Specifically, 18 U.S.C. § 3582(c)(1)(A)(i), referred to as the

"compassionate release" statute, permits a court to modify an already imposed sentence upon

a showing of "extraordinary and compelling reasons."  If a court finds such "extraordinary

and compelling reasons," it may "modify a term of imprisonment" when, "after considering

the factors set forth in § 3553(a) to the extent that they are applicable," and to the extent a

reduction is consistent with the applicable policy statement in the Sentencing Guidelines, the

court "finds that extraordinary and compelling reasons warrant such a reduction."  Id.; see

also United States v. Gotti, 2020 WL 497987, at *2 (S.D.N.Y. Jan. 15, 2020) ("It is

important to note that a defendant who meets all the criteria for compassionate release

consideration listed above is not thereby automatically entitled to a sentence modification.

He is simply eligible for a sentence modification.  The court confronted with a

compassionate release motion is still required to consider all the Section 3553(a) factors to

the extent they are applicable, and may deny such a motion if, in its discretion,

compassionate release is not warranted because § 3553(a) factors override, in any particular

case, what would otherwise be extraordinary and compelling circumstances.").

        The Application Notes to § 1B1.13, in turn, describe multiple ways that a

defendant can show an "extraordinary and compelling reason":

(A)(i)      The defendant is suffering from a terminal illness (i.e., a serious and advanced
            illness with an end of life trajectory).  A specific prognosis of life expectancy
            (i.e., a probability of death within a specific time period) is not required.

Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(A)(ii)       The defendant is—

(I)       suffering from a serious physical or medical condition,

(II)      suffering from a serious functional or cognitive impairment, or

(III)     experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, app. n.1.

As the proponent of the motion, the defendant bears the burden of proving "extraordinary and compelling reasons" exist under the above criteria to justify early release. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); see also United States v. Greenhut, No. 18-CR-00048 (CAS), 2019 WL 6218952, at *1 (C.D. Cal. Nov. 21, 2019) (stating that a defendant seeking relief under § 3582(c)(1)(A) "bears the initial burden to put forward evidence that establishes an entitlement to a sentence reduction").

II.     Exhaustion Is Moot

Though the defendant had not exhausted his administrative remedies as required under 18 U.S.C. § 3582(c)(1)(A) at the time he filed the instant motion, and thus briefed the issue of exhaustion, thirty days have now elapsed since the defendant filed a petition for release with his facility without a response from the warden.  Therefore, the defendant's motion is properly before the Court.

18

III.     The Defendant is Ineligible for Home Release Under Department of Justice Policy

        Legal counsel from FCI Fort Dix, where the defendant is currently housed, has advised the government that, in line with the Attorney General's memorandum dated March 26, 2020, the defendant is ineligible for home release due to the nature of his crimes of conviction.  In contradiction to the portions of the Attorney General's memorandum the defendant cites, Def. Mot. 31-34, when considered in its entirety, the memorandum specifically states that certain "offenses, such as sex offenses, will render an inmate ineligible for home detention."  See Dkt. Entry No. 121-10 (Def. Ex. J).  Likewise, the Attorney General's memorandum dated April 3, 2020, emphasizes the need to protect the public from the risk of criminal activity including "heinous sex offenses."  See Dkt. Entry No. 121-11 (Def. Ex. K).  The defendant is precisely who these memoranda aim to carve out from early release opportunities—sex offenders who have committed unthinkable crimes against vulnerable people.

        Moreover, in conducting their assessment of release eligibility, the BOP considers such a request "only when there are particularly extraordinary and compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing."  See https://www.bop.gov/policy/progstat/5050_050_EN.pdf, at 3 (last visited May 16, 2020).  The defendant has failed to satisfy this prerequisite and would therefore be ineligible for release on this ground too.  The defendant's medical condition has remained fairly static and, while COVID-19 has presented an unforeseen circumstance, the BOP has not, as a blanket policy, determined that the virus alone constitutes a "particularly extraordinary and compelling circumstance."  Nor does the defendant qualify for release "based on medical circumstances," as contemplated by the BOP.  See id. at 4-5.  Specifically,

the defendant does not have a terminal illness or a "debilitated medical condition," defined as "an incurable, progressive illness" which renders the inmate "completed disabled" or "capable of only limited self-care and . . . confined to a bed or chair more than 50% of waking hours." Id. at 5. While the defendant does partially qualify as an "elderly inmate[] with medical conditions," he is not unable to function in the correctional facility and he has not served "at least 50%" of his sentence, as contemplated by BOP policy. Additionally, as discussed in greater detail herein, the defendant was enduring many of his current medical conditions at the time of sentencing and the PSR addressed them. Thus, the defendant is ineligible for release under both the Attorney General's memorandum and BOP policy based on the nature of his crimes of conviction and the fact that the medical conditions upon which his argument rests were present and considered at the time of sentencing.

IV.    The Defendant Is Not Entitled to Release Under 18 U.S.C. § 3582

In any event, the defendant's request for relief fails on the merits as a matter of law. The defendant argues that the current COVID-19 crisis constitutes an "extraordinary and compelling reason[]" under § 3582(c)(1)(A)(i), which, coupled with his health problems, warrants his immediate release from custody, nearly fifteen years before his currently scheduled release date. As set forth below, the defendant's medical conditions do not constitute "extraordinary and compelling reasons" for release, nor is release appropriate after consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).

A.    The Defendant's Medical Conditions Do Not Warrant Early Release

The defendant has failed to establish that the current pandemic constitutes an "extraordinary and compelling reason" warranting his release under 18 U.S.C. § 3582 even in light of his compromised health. While the defendant lists at length each physical ailment

from which he suffers, many projected conditions lack medical basis and appear to be used as leverage towards the defendant's release.  There is no credible reason to believe that the facility cannot continue to maintain the defendant's medical care as it has for the last decade; thus the defendant cannot satisfy the requirements under Section 1B1.13.  The COVID-19 pandemic does not substantially alter this calculus, as the risk of the defendant contracting the virus remains low; thus the defendant cannot establish an "extraordinary" basis for his release.

At bottom, the defendant has various bladder, kidney and urinary related issues, a heart condition he has had since age 45 and nutrition-related deficiencies for which he takes supplements.  The defendant's facility has had him classified as "Care Level 1: Healthy or Simple Chronic Care" since 2011.  See Dkt. Entry No. 121-12 (Def. Ex. L).  The majority of the defendant's jail medical record consists of issues that have been resolved. See Dkt. Entry No. 121-7 (Def. Ex. G), at 4-7; Dkt Entry. No 121-8 (Def. Ex. H), at 3. However, the defendant intimates, without medical verification, that he is "vulnerable to severe lung problems, as many of his family members . . . have died from lung disease," Def. Mot. at 5, and that he has "undiagnosed and untreated cancer," Def. Mot. at 7.  The defendant cites to no medical finding of either condition, save the hypothesis of a doctor who has never examined the defendant that, based on jail medical records, the defendant could have "possible renal and/or bladder cancer."  Dkt. Entry No. 121-4 (Def. Ex. D).  Following these red herrings, which lack any medical verification, the defendant details the risks associated with each condition, as if he in fact has been diagnosed with them.  Def. Mot. at 7. These statistics remain inapplicable to the defendant unless and until he receives such diagnoses.  It is moreover difficult to accept the defendant's proclaimed concerns regarding

21

lung disease and cancer when he has not appeared to make any movement toward seeking

further medical care or resolution for presumably critical conditions.  Rather, he raises them

for what appears to be the first time in this motion, advancing them for legal gain rather than

medical treatment.

      In truth, the brunt of the defendant's medical afflictions have remained

consistent since the sentencing court twice imposed a 30-year sentence, after considering the

defendant's mitigating vulnerabilities.  The defendant's urological and bladder conditions, as

well as the related impact of those on his health, were raised at each of his sentencings and

his medical needs were taken into consideration at that time.  Indeed, jail medical records

from 2009 to 2011 indicate that the defendant was suffering from:

> - "neurogenic bladder"
>
> - self catherization
>
> - urinary retention "due to Hyperplasia prostatic"
>
> - "Elevated prostate specific antigen [PSA]"
>
> - bladder stones.

See Dkt. Entry No. 121-6 (Def. Ex. F); Gov't Ex. 1.  Likewise, the defendant's most recent

medical records, dated February 27, 2020, indicate that the defendant still has:

> - "chronic neurogenic bladder"
>
> - "self urinary bladder catherization"
>
> - urinary retention" and "prostatic enlargement,"
>
> - "high PSA" (prostate specific antigen) (noting also that the defendant "does
>
> not desire treatment")
>
> - bladder or kidney stones.

See Dkt. Entry No. 121-5 (Def. Ex. E); Dkt. Entry No. 121-8 (Def. Ex. H).  Notably, the defendant's recent medical provider wrote that the defendant has had "prostate enlargement for 11 years," and that defendant's "urinary symptomology persists; no new symptoms or worsening of it; he does urinary bladder self catherization with no difficult [sic]." Additionally, the provider noted that the defendant "decline[d] prostate biopsy," as well as the defendant's refusal to take various medications and to partake in various annual examination procedures.  Dkt. Entry No. 121-5, at 1.  Each of the defendant's hospitalizations relate to the same conditions: kidney or bladder stones; urinary retention; urinary tract infections.  See Dkt. Entry No. 121-8 (Def. Ex. H).  Consistent with the BOP doctor's notes, the hospital provider also wrote that the medical "impression was a noncompliant patient" who had "traumatically dislodge[ed] his own Foley catheter," resulting in the emergent medical condition.  Id. at 1.

Even if the defendant could prove that his medical conditions place him within the categories described in U.S.S.G. § 1B1.13(A)(ii)(I) or (II), i.e., that the defendant is "suffering from a serious physical or medical condition" or "is experience deteriorating physical . . . health because of the aging process," he still bears the burden of showing that those conditions "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility" and that he is "not expected to recover" from any such conditions.  U.S.S.G. § 1B1.13, app. n.1.  The defendant can make no such showing on his current medical record.  The correctional facility has cared for the defendant since his entry and has expressly noted that the care is manageable.  The defendant has, for the duration of his sentence to date, taken an active role in his own self-care, making frequent requests for the medical items he needs; reporting issues as they arise and having them

resolved; and declining care or medication when he does not wish to abide by the proscribed medical plan.  There is no reason in the records to believe this will not continue to be the case.

The risk of contracting COVID-19 also does not present an extraordinary or compelling circumstance warranting the defendant's release, standing alone or when coupled with the defendant's conditions.  The defendant does not list conditions which make him more susceptible to contracting the virus to begin with.  Although he claims to be immunocompromised, he is not suffering from "cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications," as the Centers for Disease Control and Prevention ("CDC") defines the term.  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 16, 2020).  While the government does not contest that the defendant could be more vulnerable to adverse outcomes due to his age should he contract the virus, his medical conditions are also not among those listed by the CDC as placing a person at higher risk of suffering from severe consequences.  Id. (listing chronic lung disease, moderate to severe asthma, serious heart conditions, people who are immunocompromised, severe obesity, diabetes, chronic kidney disease requiring dialysis, and liver disease).

Though the defendant also cites various sweeping statistics regarding the BOP virus outbreak, his exposure risk remains low.  As of May 18, 2020, FCI Fort Dix has reported 27 cases of coronavirus among its inmate population, and 22 inmates have recovered.  There have been no associated deaths.  See https://www.bop.gov/coronavirus/.  The facility has taken appropriate measures to treat and contain the virus.  FCI Fort Dix

24

advises that the COVID-19-positive inmates are isolated from the general inmate population on their own floors within the facility.  Each unit is kept in isolation from each other, and none of the facility floors or units co-mingle with each other.

Indeed, as the Court is aware, in light of the seriousness of the current crisis, the BOP has taken significant measures across the board in an effort to protect the health of the inmates in its charge.  The BOP began planning for potential coronavirus transmissions in January 2020.  At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control and Prevention, including by reviewing guidance from the World Health Organization.

On March 31, 2020, BOP announced that it was implementing the COVID-19 Phase Two Action Plan in order to minimize the risk of COVID-19 transmission into and inside its facilities.  The Phase Two Action Plan comprises many preventive and mitigation measures, including the following: all incoming inmates are screened, and staff are regularly screened; contractor visits are limited to essential services, while nearly all attorney, social, and volunteer visits have been suspended; inmate movements between facilities have been extremely limited; and institutions are taking additional steps to modify operations to maximize social distancing.  As of April 1, 2020, the BOP began implementing its Phase Five Action Plan to decrease the spread of COVID-19, which provided for securing each inmate in every BOP institution to his or her assigned cells/quarters for a period of fourteen days, while still providing inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.  And, as of April 13, 2020, the BOP commenced its Phase Six Action Plan, which continued the practices outlined above, and additionally suspended inmate movement and extended the

time that inmates must remain in their cells in order to prevent the spread of the virus. Further detail about the steps being taken by the BOP are available at the BOP website, www.bop.gov.  The defendant thus cannot sustain his burden of demonstrating that the COVID-19 pandemic constitutes an "extraordinary and compelling reason[]" warranting his immediate release in these circumstances.

> B.     The Defendant's Continued Incarceration Is Warranted Under § 3553(a)

Consideration of the § 3553(a) sentencing factors, as required under 18 U.S.C. § 3582(c)(1)(A)(i), also compels that the defendant's motion for early release be denied.  The seriousness of the defendant's crimes of conviction and history and characteristics warrant his continued incarceration even amidst the present pandemic.  The defendant was convicted of committing unthinkable sexual crimes against his young daughter, and the evidence at trial and statements contained in the PSR and sentencing transcript support the conclusion that he additionally terrorized other members of his family and community.  At sentencing, the victim explained that she came forward to prevent the defendant from inflicting more harm—against her and her family, as well as other young people in the community.  Even now, the defendant's advanced age can hardly be viewed as a mitigating factor, as he committed such crimes as a mature, grown adult and parent of eight children.  Likewise, he seeks to be released to home incarceration as if that would prevent further harm; however, the defendant committed his crimes in the security of his own home.  His release to the New York area almost guarantees that the defendant could again pose harm to his family and community.  The defendant's continued incarceration is therefore necessary to serve the goal of specific deterrence.  It additionally meets the important goal of general deterrence for other sexual offenders, and promotes justice and safety for the victims of their crimes.

The victim also stated at the time of sentencing that she seeks peace for herself and for her family, peace in knowing that the defendant cannot interact with them any longer, so that they may heal.  In a statement attached hereto, the victim additionally wrote:

> My mind shudders thinking about the impact of releasing sexual predators from serving their sentences.  This sends a message of extreme fear to current victims that they will no longer be safe if they come forward to seek justice and stop sexual crimes.
>
> For the sake of current sexual victims, and for the sake of my safety and life, and the other victims of Weingarten, please have compassion and order for Weingarten to continue serving his sentence where he can not continue with his crimes.

GX 2.  It is clear that the interests of the victim and her family can only be met with the defendant's continued incapacitation.  It is just and appropriate that the defendant continue to serve the well-considered, heavily litigated sentence imposed.

V.     Conclusion

The defendant's medical conditions, standing alone and when coupled with COVID-19, do not rise to the level of "extraordinary" or "compelling" reasons to allow him to cheat justice and evade more than half of his 30-year sentence, which was imposed after careful consideration of the 3553(a) factors.  The defendant has been and is receiving adequate medical care, and there is every reason to believe that the BOP will continue to implement measures intended to prevent the spread of COVID-19, and to address his medical needs as they arise.

For the reasons set forth above, the defendant's motion should be denied.

Dated: Brooklyn, New York
          May 19, 2020

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York


                              By:    /s/ Jennifer M. Sasso
                                        Jennifer M. Sasso
                                        Assistant United States Attorney

CC: Defense Counsel (by ECF)